1  ARTHUR L. SHINGLER III (181719)
   MARY K. BLASY (211262)
2  HAL CUNNINGHAM (243048)
   DAVID GOLDBERGER (225869)
3  SCOTT+SCOTT LLP
   600 B Street, Suite 1500
4  San Diego, CA 92101
   Tel:  619-233-4565
5  Fax:  619-233-0508
   ashingler@scott-scott.com
6  mblasy@scott-scott.com
   hcunninging@scott-scott.com
7  dgoldberger@scott-scott.com

8  and

9  DAVID R. SCOTT
   SCOTT+SCOTT LLP
10 108 Norwich Avenue
   Colchester, CT 06415
11 Tel:  860-537-3818
   Fax: 860-537-4432
12 drscott@scott-scott.com

13 Attorneys for Lead Plaintiffs

14             UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16 SHARON HODGES, On Behalf of Herself and )   No. C-09-02147 JW-RS
   All Others Similarly Situated,           )
17                                          )   CLASS ACTION
                          Plaintiff,        )
18                                          )   AMENDED COMPLAINT FOR
        vs.                                 )   VIOLATIONS OF THE FEDERAL
19                                          )   SECURITIES LAWS
   AKEENA SOLAR, INC., BARRY                )
20 CINNAMON and GARY EFFREN,                )
                                            )
21                        Defendants.       )
                                            )
22 _____     DEMAND FOR JURY TRIAL

23

24

25

26

27

28

Lead Plaintiffs, Sharon Hodges, David Gordon and Joel Gentleman (collectively, "plaintiffs" or "Lead Plaintiffs") allege the following based upon the investigation by plaintiffs' counsel, which included,   among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, and press releases, wire and press releases published by and regarding Akeena Solar, Inc. ("Akeena" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet. Lead Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This is a securities fraud class action on behalf of persons who purchased the common stock of Akeena Solar, Inc., the self-proclaimed "Nation's Leading Solar Power Installer," between December 26, 2007 and March 13, 2008 (the "Class Period").  The action is brought against Akeena, its founder, Chief Executive Officer and President, Barry Cinnamon ("Cinnamon"), and Chief Financial Officer, Gary Effren ("Effren"), for violations of the federal securities laws for making false and misleading public statements concerning Akeena's sales backlog, access to financing, business fundamentals and financial metrics during the Class Period.

2.      Akeena markets, sells and installs solar power systems for residential and small commercial customers in the United States. The Company does not manufacture, but designs its grid-tied solar power systems to be electrically connected to the utility grid so that excess energy produced during the day can flow backwards through the utility's electric meter:



AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 1 -

3.     Defendant Cinnamon, Akeena's founder, is a long-time advocate of solar energy and widely recognized solar energy expert.  He started his career in solar energy in the late 1970s at the Massachusetts Institute of Technology ("MIT").  During the late 1970s and early 1980s, Cinnamon designed and installed active solar, passive solar and ground coupled heat pump systems.  Cinnamon, who earned his B.S. Degree in Mechanical Engineering from MIT and an MBA degree in Marketing from Wharton School of the University of Pennsylvania, is a Certified Solar Installer and a licensed California Solar Contractor.

4.     In December 2005, Cinnamon was elected President of the California Solar Energy Industries Association ("CSEIA"), the largest state solar organization in the country.  From the helm of the CSEIA, Cinnamon lobbied to get the California State Public Utilities Commission ("PUC") to approve a solar rebate program (the "California Solar Incentive"), a financial necessity for solar installers like Akeena that had eluded the industry for years.  Indeed, the California State Legislature had failed to pass solar initiatives in 2004 and 2005.  Those efforts foundered in large part due to Cinnamon's objection to a requirement that system installers receive union wages.  Others disputed whether the rebate program would lower the cost of providing solar energy and would instead add to California's exorbitant energy costs by requiring that a handout be paid to solar companies.

5.     The state-based rebate program and federal tax benefits were a financial necessity for solar installers like Akeena though, and due in large part to Cinnamon's herculean efforts, on December 14, 2005, the PUC approved the largest solar initiative in U.S. history, a $3.2 billion rebate program to subsidize the installation of 1 million rooftop systems over the following decade.  As retold by the *San Jose Mercury News* on December 14, 2005, Cinnamon told them solar systems "cost about $25,000 to install," but for "installing a 2.5 kilowatt solar system, the PUC proposal would provide a rebate of about $7,000 in 2006" and "a federal tax credit would lower the cost by another $2,000."  ***According to Cinnamon, the rebate program "guarantees a smooth curve of 10 years of growth in the solar industry."***  (Emphasis added.)

6.     As fate would have it though, that same month Cinnamon's wife sued him for divorce.  The Company Cinnamon had built from scratch, in a lucrative industry he had helped father, was rapidly becoming a very valuable asset up for grabs.  The divorce proceedings grew

1  contentious over the ensuing two years, with Cinnamon's wife accusing both him and Akeena of

2  concealing documents and figures she and her experts needed to value the ownership interest in

3  Akeena that California community property laws provided her.

4          7.      Both to capitalize on final PUC adoption of the California rebate program in January

5  2006, and to fund any property interest his former spouse claimed in Akeena, Cinnamon devised a

6  complicated plan to obtain a public stock listing for Akeena that would not entail the disclosures a

7  traditional initial public stock offering does.  First, Cinnamon acquired the SEC-registered stock of

8  an insolvent Canadian hydropower company in 2006 through a reverse merger.  He then listed that

9  stock on the "pink sheets" in late 2006 and finally, on September 24, 2007, moved the listing to the

10 NASDAQ National Market.

11         8.      The Company's registration statement filed with the SEC in December 2006 made

12 clear that Cinnamon, who at that time still maintained a 52% ownership interest in Akeena (after

13 issuing shares to venture capital financiers), would continue to run Akeena as his own private

14 fiefdom despite any public ownership.  The registration statement disclosed that even though

15 Cinnamon's "***interests…may differ from the interests of other stockholders,***" due to his substantial

16 ownership interest, "Cinnamon will have the right and ability ***to control virtually all corporate***

17 ***actions….***"  (Emphasis added.)

18         9.      By the fall of 2007, Cinnamon still owned all eight million shares of his Akeena

19 stock, but those shares only comprised 28.7% of the Company's equity structure.  To fund Akeena's

20 operations (the Company has never made a profit), Cinnamon had been forced to obtain several

21 rounds of venture capital financing, issuing millions of shares and warrants in the process,

22 significantly diluting his ownership.  As 2007 drew to a close, Cinnamon's wife was demanding her

23 share of Cinnamon's shrinking equity interest in Akeena, threatening to further reduce Cinnamon's

24 influence at the lucrative franchise he'd built.

25         10.     Cinnamon knew the only way he could fund his wife's financial demands with stock

26 sales proceeds – without dramatically further reducing his control of Akeena – was to fatten the

27 Company's stock price so he could buy her out with stock sales proceeds enriched by the public

28 capital markets.  But the primary stock analysts that covered Akeena were demanding that Cinnamon

1   demonstrate a clear "path to profitability" before they would increase its stock ratings, including

2   demonstrating a strong demand for Akeena's sleek new "Andalay" system released in the fall of

3   2007, increasing profit margins and signing a significant licensing partner who could pay Akeena

4   higher margin loyalty licensing fees, which go straight to the bottom line and increase earnings,

5   despite the fact that Akeena neither manufactured nor had yet been able to patent the Andalay

6   system.   Committed to raising the Company's public stock price to satisfy his own financial

7   predicament, Cinnamon determined to heed their demands.

8        11.   First, defendants began touting Akeena's new state-of-the-art "Andalay" solar system,

9   billing it as a significant cost leader and profit enhancer.   According to defendants, Andalay had

10   "built in features that cut installation time from half a day to half an hour," promising that "***sales of***

11   ***Andalay [would] contribute towards gross margin improvement in the range of 10% to 15% as we***

12   ***benefit from our cost savings and charge a premium price that is commensurate with Andalay's***

13   ***customer benefits***."  (Emphasis added.)  But unbeknownst to investors because Akeena concealed it,

14   the Andalay product, which was manufactured for Akeena by its suppliers, was riddled with design

15   defects that significantly diminished it aesthetics.   Cinnamon and Effren were aware of these defects,

16   as they were forced to approve discounts on units installed in the field and refunds on returns.

17        12.   Next, in connection with releasing the Company's 2Q 2007 financial results on

18   August 9, 2007, in addition to disclosing 2Q 2007 sales revenues of $7.5 million and promising the

19   Company was on track to grow FY 2007 revenues by 135% (over FY 2006), ***for the very first time***

20   Akeena released a so-called sales "backlog," much to the elation of the investment community.

21   Asked to define how Akeena was calculating the astounding ***$13.6 million*** backlog during the

22   Company's earnings conference later that day, which as one analyst noted equated to ***"almost two***

23   ***quarters in terms of the run rate equivalent" of Akeena's 2Q 2007 sales***, Cinnamon stated Akeena

24   was then ***"targeting getting [the sales booked as backlog] done, soup to nuts, in the range of one to***

25   ***two months,"*** adding that ***"[i]t's not until we book it as GAAP revenue that it comes out of the***

26   ***backlog and we disclose this as our revenue."*** Defendants later confirmed on November 13, 2008

27   that the Company had booked ***more than*** $13.6 million in "backlog" by September 30, 2007, all of

28

1   which would presumably result in actual sales during the 4Q 2007, then well underway.  (Emphasis

2   added.)

3        13.     Though these statements were made prior to the start of the Class Period, they

4   remained "alive" in the market and the investment community's reliance on the transparency the

5   backlog reports purportedly provided into then-present sales demand and booked sales was justified.

6   As Judge Alex Kozinski of the Ninth Circuit Court of Appeals recently explained in analyzing

7   securities fraud claims based on overstatements of backlog: "Backlog is much like accounts

8   receivable: It represents [a company's] contractual entitlement to perform certain work, just like

9   accounts receivable represents the company's contractual entitlement to be paid for work already

10  performed."  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 990 (9th Cir. 2008).   Yet as

11  defendants would be forced to finally admit at the end of the Class Period, in reality, the backlog

12  reported included sales customers had no firm commitment to complete for more than six months (if

13  ever), with CFO Effren conceding that prior to October 1, 2007, the "***definition was looser in that if***

14  ***we had a signed contract, it would count as backlog.  Clearly, the issue is that some of those jobs***

15  ***fell through if financing fell through.  Some of them were – some of those jobs still aren't***

16  ***installed."***  (Emphasis added.)  While defendants stopped providing precise backlog calculations

17  ***during*** the Class Period, they never retracted those false and misleading numbers provided prior to

18  the start of the Class Period, knowing the market had fixated on them.

19       14.     The falsity of the reported backlog was particularly misleading because, in reality, the

20  electric utilities the California Solar Initiative made administrators for the rebate program had not yet

21  certified the Andalay system, such that customer rebates were not being paid, forcing Akeena to fund

22  the installations itself, or forgo sales where it was unable to do so.  And Akeena was very cash-

23  strapped at this time, having only narrowly averted a default on its limited access to a line of credit

24  that required a significant ratio of assets to lending.  The paperwork required to even apply for the

25  solar rebate was reportedly two inches thick and with the rebates not being paid, Cinnamon and his

26  sales reps were having an increasingly difficult time selling the Andalay system.  Meanwhile, the

27  investment community knew that successfully gaining market share by maximizing Andalay sales

28  during its initial roll-out in the fall of 2007 was imperative because without patent protection, and

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 5 -

1   because Akeena was an installer not a manufacturer, the Company had to achieve significant first-

2   mover status to make up for its lack of product control.

3           15.    In addition to announcing Akeena's NASDAQ National Market listing on September

4   24, 2007, the Company also announced that it had entered into a purportedly valuable supply

5   contract with China's Suntech Power Holdings Co. Ltd. ("Suntech"), the world's third-largest maker

6   of solar power modules by market value, whereby Suntech would "[d]eliver 10 to 14 [megawatts

7   ("MW")] of Akeena's [n]ew Andalay Solar Panels" in 2008 alone.  Based on defendants' statements

8   that the supply contract would lock in a supply of often difficult-to-obtain solar panels, the supply

9   contract was perceived as adding value.  However, defendants concealed that rather than obtaining a

10   volume discount, they had actually agreed to pay Suntech a premium far above market price for the

11   panels.  Akeena agreed to the economically infeasible premium, in large part, to induce Suntech to

12   later enter into a licensing agreement, which would allow Akeena to persuade the market that the

13   Company was avoiding the capital intensive installation business on some sales, allowing it to

14   simply take royalty licensing fees for using its technology, purportedly diminishing some of

15   Akeena's cash flow problems.  Assuming – **without any basis -** that the Company could charge

16   above-market prices for the sleek, aesthetically pleasing Andalay system, offsetting the premium

17   prices they were paying Suntech for the solar panels, defendants withheld from the market the

18   economic lunacy of the Suntech supply agreement.

19           16.    On October 31, 2008 Cinnamon and his wife attended a Judicially Supervised

20   Settlement conference and reached an agreement.  Unbeknownst to the investment community, their

21   settlement agreement required Cinnamon to pay his former spouse $1.875 million **by January 31,**

22   **2008.**  If Cinnamon could not fully fund the settlement by January 31, 2008, their settlement

23   agreement required that he transfer Akeena stock with a market value on January 31, 2008 of $2.3+

24   million to an account from which his wife's bankers could sell the stock into the market over a six-

25   month period.  To the extent the sales proceeds did not cover the $1.875 Cinnamon owed his wife

26   under their settlement agreement, Cinnamon had to make up the difference.  Desiring to retain as

27   much control over Akeena as he could, Cinnamon did not want to be forced to turn over a significant

28   number of shares to his wife at the end of January 2008.  Instead, he committed to doing whatever it

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      - 6 -

1  took to increase the Company's stock price, even in the short term, so that he could directly sell

2  enough Akeena stock to make the January 31, 2008 $1.875 million payment, without substantially

3  diminishing his ownership interest in Akeena.

4         17.     Making matters worse for Cinnamon, when the Company announced on November 1,

5  2007 it had raised $26.1 million through a private stock placement of 3,728,572 shares and warrants

6  to purchase 745,716 additional shares, Akeena's stock price fell from the $8.40 per share it closed at

7  on October 31, 2007 (when Cinnamon entered into the settlement agreement), to $7.25 per share at

8  the close of trading on November 1, 2007.  The stock then plummeted another13% in a single

9  trading session, closing at $5.50 per share on November 13, 2007, when the Company announced its

10  dismal 3Q 2007 financial results, including that margins had dropped from 25% in the 3Q 2006 to

11  21%.  The Company's stock price had declined a full $3 per share, ***more than one third***, in the two

12  weeks following Cinnamon's entry into the settlement agreement.  As a result, Cinnamon would

13  have to sell a third more of his Akeena shares to obtain the same proceeds he would have received

14  just two weeks earlier.  Knowing he had to fund the divorce settlement by January 31, 2008, ***or give***

15  ***up an ever increasing number of shares to his wife to sell***, Cinnamon would undertake more

16  aggressive measures designed to respond directly to the demands being placed on him to raise

17  Akeena's stock ratings.

18         18.     First, at the start of the Class Period on December 26, 2007, Cinnamon announced

19  that Akeena's credit line with Comerica Bank, the Company's longtime lender that was also

20  providing limited financing to customers for Andalay purchases, had been increased by 70% in

21  "***recognition of the growing strength of the company's balance sheet and financial condition.***"

22  The line of credit increase was important as Akeena then had less than eight months cash available

23  and Comerica had already waived a violation of a financial covenant, averting a default.  But

24  defendants concealed from the market that in reality this was not a credit line "increase" at all but a

25  mere cash collateralization agreement whereby Akeena would be required to deposit ***every*** additional

26  dollar "borrowed" back into the bank.  Yet with the actual terms concealed, news of the "increase"

27  sparked a significant surge in Akeena's stock price on unusually high trading volume.

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS    - 7 -

19.      Then, as his coup d'état, on January 2, 2008, Cinnamon announced the Company had entered into a substantial *licensing agreement* with Suntech that promised additional sales of over 10 MW of Andalay system panels in 2008, *causing an incredible 43+% spike in Akeena's stock price in a single trading session*.  As retold by *Forbes* in its January 2, 2008 story entitled "*Akeena Solar Lights Up*":

> ***Akeena Solar shares went nova Wednesday after the solar company signed a licensing deal with Suntech Power Holdings***.
>
> Akeena Solar soared 43.8%, or $3.49, to close at $11.45 after the solar power systems designer announced it penned a licensing agreement with Suntech Power to distribute its Andalay home solar panel system in Europe, Japan and Australia.
>
> According to Jessup & Lamont Securities analyst Brian Yerger, the deal was driven by Andalay's lower installation cost.
>
> ***Yerger, whose parent company Empire Financial Holding has done business with Akeena, added that Suntech is a logical partner to license outside of the U.S. market because it had previously signed an agreement with Suntech to manufacture 10 megawatts of its Andalay products in 2008***.
>
> Shares of China-based Suntech rose 4.4%, or $3.64, to $85.96.
>
> The Andalay technology's lower installation cost is partly the result of its built-in wiring, grounding and racking.
>
> Barry Cinnamon, Akeena's chief executive, also touted the "outstanding aesthetics" of the Andalay system, which is black and streamlined.
>
> ***The Los Gatos, Calif.-based company did not disclose the financial terms of the deal.***
>
> "The logical implication that the market is telling me is it's expecting other deals like this coming through later in the year," Yerger said.
>
> ***Wednesday's announcement came a week after the company announced Comerica would increase its existing credit line to $25 million from $7.5 million***.
>
> ***The company said it plans to use the additional borrowing capacity, combined with a recent $26.1 million equity increase, for growth opportunities and working capital needs***.

(Emphasis added.)

20.      The Company's stock price spiraled on very high trading volume between December 26, 2007 and January 7, 2008, buoyed by defendants' false and misleading statements, rising from its opening of $6.84 per share on December 26, 2007 to $16.80 per share in intraday trading on January 7, 2008 as the market assimilated the news.  And Cinnamon cashed in.  Indeed, knowing the market

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 8 -

1    would respond positively to the announcement of the credit line "increase" and purportedly lucrative

2    Suntech licensing agreement, defendant Cinnamon knowingly timed those disclosures in order to

3    limit the number of Akeena shares he would be required to sell to fund his divorce settlement. ***By***

4    ***virtue of this timing deception, rather than being required to sell 700,000 shares of Akeena stock***

5    ***at the approximately $7 per share the stock closed at on December 24, 2007, this ruse permitted***

6    ***Cinnamon to sell just 400,000 shares for proceeds of over $5.6 million.***

7        21.    Cinnamon's stock sales were unusual both in scope and volume as he had not

8    previously sold a single share during the entirety of Akeena's history as a publicly traded company:



22.    Public investors, including the Lead Plaintiffs, did not fare so well.  Defendants'

Class Period statements (including pre-Class Period statements that remained alive in the market)

were false and misleading, including that they:

- touted the perceived profitability of the Suntech supply contract and licensing agreements, despite defendants' knowledge they would actually ***diminish*** profit margins going forward;

- concealed that contrary to the purported sales "backlog" of $13.6 million defendants reported Akeena had accumulated by the end of the 3Q 2007 (September 30, 2007) that investors were led to reasonably believe would pay during the 4Q 2007, by the start of the Class

Period, defendants knew they had only completed only $10.3 million in sales during the quarter ending December 31, 2007, *or 20% less than the purported backlog*;

- misstated the marketability of the Andalay system – both concealing the latent design defects requiring significant refunds and price discounts – and not disclosing that rebates were not paying and the level of customer financing required to complete planned sales was either limited or non-existent; and

- concealed that Akeena's 4Q 2007 quarterly loss (for the period that had *already* ended December 31, 2007) *had increased more than 300%,* expanding from $1.19 million in 4Q 2006 *to $4.47 million,* or $0.18 a share, and that the Company's profit margin had decreased again.

(Emphasis added.)

23.     As the truth leaked into the market, including the illusory nature of the credit line "increase," problems with the Company's financial reporting, the Company's actual 4Q 2007 sales volume, and the fact that Cinnamon had sold $5.6 million of shares at the highest prices the stock traded at on January 2nd and 7th 2008, the Company's stock price plummeted, closing at $6.20 per share by February 22, 2008, erasing tens of millions of dollars in market capitalization.  The stock price fell even lower on unusually high volume on March 13, 2008 when Akeena's dismal 4Q 2007 and FY 2007 audited financial results were finally released, along with Effren's revelation that the Company's past "backlog" reports were totally unreliable and the reduction of Akeena's 2008 sales guidance, finally conceding the Suntech supply and licensing agreements would have no meaningful financial impact during 2008.

24.     The Class Period stock price inflation was due to Company-specific misstatements as the S&P 500 Index, and solar giants Suntech (STP), LDK Solar (LDK) and Energy Conversion Devices, Inc. (ENER), were all relatively flat on a comparative basis during this same period:



**JURISDICTION AND VENUE**

1
2    25.    The claims asserted herein arise under §§10(b), 20(a) and 20A of the Securities

3    Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and Rule 10b-5, 17

4    C.F.R. §240.10b-5.  Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

5    26.    Venue is proper in this district pursuant to §27 of the 1934 Act.  Acts and transactions

6    giving rise to the violations of law complained of occurred in this District.

7    **THE PARTIES**

8    27.    (a)    Lead Plaintiff Sharon Hodges purchased the common stock of Akeena at

9    artificially inflated prices during the Class Period and was damaged thereby.

10    (b)    Lead Plaintiff David Gordon purchased the common stock of Akeena at

11    artificially inflated prices during the Class Period and was damaged thereby.

12    (c)    Lead Plaintiff Joel Gentleman purchased the common stock of Akeena at

13    artificially inflated prices during the Class Period and was damaged thereby.

14    28.    Defendant Akeena Solar is a public corporation with its executive offices in this

15    District. During the Class Period, Akeena stock traded on the NASDAQ in a highly efficient market,

16    trading hundreds of thousands, if not millions, of shares every day.  Akeena was followed by stock

17    analysts and was constantly in communication with the markets and investors in quarterly

18    conference calls and frequent presentations to investor and analyst conferences. Akeena also filed

19    periodic public reports with the SEC, and regularly issued press releases to the financial press.

20    Financial information about Akeena was widely distributed.

21    29.    Defendant Barry Cinnamon ("Cinnamon") is Akeena's founder, Chief Executive

22    Officer and President.  Cinnamon was intimately knowledgeable about all aspects of Akeena's

23    business operations as he received daily reports regarding sales, demand, product quality, customer

24    service, customer financing, and customer rebate payment timing issues.  Cinnamon  was also

25    intimately involved in the preparation of Akeena's financial statements and guidance, including the

26    amounts of backlog, inventory, warranty accruals and what disclosures would be made, and the

27    functioning of Akeena's internal financial, accounting and disclosure controls. Cinnamon was also

28    intimately involved in and fully knowledgeable concerning Akeena's  "line of credit" from

Comerica, even making public statements regarding the issue. He reviewed and approved Akeena's SEC filings and its Sarbanes-Oxley certificates.  During the Class Period, Cinnamon sold 400,000 shares of his Akeena stock for $5.6+ million in insider trading proceeds.  These sales were unusual in timing and amount and inconsistent with Cinnamon's historical Akeena stock sales, as the following chart shows:



30.     Defendant Gary Effren ("Effren") was Chief Financial Officer of Akeena during the Class Period.  Akeena's September 24, 2007 release announcing Effren's appointment quoted Cinnamon as stating "***Gary will play a leadership role with the management team and investment community.  His expertise in long-range budgeting and planning*** will assist the team in achieving our strategic and financial objectives."  (Emphasis added.)  The release also stated that "Effren brings extensive public company finance experience to Akeena Solar," that "[f]rom 1980 to 2006, Effren held various executive financial positions at Knight Ridder, Inc., a Fortune 500 media company, including vice president of finance and chief financial officer," and that "[d]uring his tenure at Knight Ridder, his overall responsibilities included corporate accounting and financial reporting, strategic business development, tax, treasury, risk management, and investor relations."

1    Prior to joining Knight Ridder, Effren worked as an auditor at Peat Marwick Mitchell. Effren is a

2    CPA with 30 years of experience in accounting and finance. Effren was thoroughly knowledgeable

3    about all aspects of Akeena's business operations as he received daily reports regarding sales,

4    demand, product quality, and customer service and financing issues. Effren was also intimately

5    involved in the preparation of Akeena's financial statements and projections, including the amounts

6    of backlog, inventory, warranty accruals and what disclosures would be made, and the functioning of

7    Akeena's internal financial, accounting and disclosure controls. Effren also knew of the terms of the

8    purported line of credit "increase" announced on December 26, 2007. He reviewed and approved

9    Akeena's SEC filings with the SEC as well as its Sarbanes-Oxley certificates.

10           31.     Indeed, Defendants Cinnamon and Effren (collectively the "Individual Defendants")

11   ran Akeena as "hands-on" managers, dealing with important issues at the Company, including

12   marketing and sales of Akeena products, customer financing, customer rebate availability and

13   payment timing, and all aspects of Akeena's corporate finance transactions. Defendants were also

14   personally familiar with Akeena's diminished revenue prospects as 4Q 2007 progressed, as they

15   continually monitored Akeena's sales, revenues, refunds and rebate payment timing.

16                                **BACKGROUND TO THE CLASS PERIOD**

17           32.     Akeena designs, markets and sells solar power systems for residential and small

18   commercial customers in the United States. The Company focuses on the design and integration of

19   grid-tied solar power systems, which are electrically connected to the utility grid so that excess

20   energy produced during the day flows backwards through the utility's electric meter. The Company

21   was founded by Cinnamon in 2001 and is headquartered in Los Gatos, California. It has additional

22   offices in Fresno, Lake Forest, Bakersfield, Manteca, Santa Rosa, Palm Springs, San Diego and

23   Thousand Oaks, California; and Fairfield, New Jersey.

24           33.     Officially started on January 1, 2007, California implemented a law entitled the

25   California Solar Initiative, that provided $3.2 billion in funding for commercial and residential solar

26   installations. The stated goal of this program is to build a million solar roofs over the next 10 years,

27   equal to ~3,000 megawatts. Akeena estimated during the Class Period that if California's citizens

28   used 100% of the subsidy, this would equate to $18 billion worth of installations.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS              - 13 -

34.     Defendants concede that by virtue of his substantial share holdings in Akeena, defendant Cinnamon exercises virtual control over the Company.  According to the 2008 Annual Report to Shareholders, "Cinnamon beneficially owns a significant number of shares of our common stock, . . . giv[ing] him significant influence over decisions."

35.     In order to raise additional operating capital on the open market and to create a public market into which to sell some of his Akeena holdings (to cash out his former wife in their divorce proceedings, as described in the paragraphs *above* and that follow), in August 2006, Cinnamon caused Akeena to acquire the trading stock of Fairview Energy Corp., Inc. ("Fairview"), an insolvent – but SEC-registered – Canadian small business entity focused "on developing renewable energy sources that create 'green' hydro-electric  energy, by identifying  run-of-river projects in the province of British Columbia, Canada."  Utilizing Fairview's SEC-registered status, on August 30, 2006, defendants announced Akeena had obtained a listing on the NASDAQ's Over-the-Counter Bulletin Board under the symbol AKNS.OB.  In September 2007 that listing was moved to the NASDAQ National Market under the symbol AKNS.

36.     Prior to obtaining the public stock listing, on or about December 23, 2005, Cinnamon's wife filed for divorce in the California Superior Court for Santa Clara County, California.  Cinnamon's wife claimed a community property interest in Akeena and the value of the Company became a hotly contested issue in their divorce, with Cinnamon's wife accusing him and Akeena of concealing documents relevant to valuation and breaching his fiduciary duties to her in the discovery of Akeena's true value.  The parties attended a Judicially Supervised Settlement conference on October 31, 2009 and agreed to a final resolution of Cinnamon's wife's community property interests in Akeena.

37.     Unbeknownst to investors, the Judicially Supervised Settlement Agreement (the "Settlement Agreement") executed on October 31, 2007 required that Cinnamon immediately sell millions of dollars worth of Akeena stock to pay his wife a $1.875 million financial settlement ***on or before January 31, 2008***.  The Settlement Agreement also provided that in the event Cinnamon was unable to pay his wife the $1.875 million by January 31, 2008, he would be required to transfer Akeena stock with a market value of $2,533,783 on January 31, 2008 to a UBS account in his wife's

1   name for sale over a six-month period.  In the event that stock could not be sold on the open market

2   for at least 74% of the $2,533,783 (or $1.875 million), Cinnamon would be required to pay his wife

3   the difference.

4           38.     Making matters worse, the Company announced on November 1, 2007 it had raised

5   $26.1 million through a private stock placement of 3,728,572 shares and warrants to purchase

6   745,716 additional shares, causing Akeena's stock price to fall from the $8.40 per share it closed at

7   on October 31, 2007 (when Cinnamon entered into the Settlement Agreement), down to $7.25 per

8   share on November 1, 2007.  The stock then plummeted another13% in a single trading session,

9   closing at $5.50 per share on November 13, 2007 when the Company announced its 3Q 2007

10  financial results, specifically disclosing that margins had dropped from over 26% in the 2Q 2007 to

11  21%.  All said and told, the Company's stock price had declined a full $3 per share, ***more than one***

12  ***third***, in the two weeks following Cinnamon's entry into the Settlement Agreement.  As a result,

13  Cinnamon would have to sell a third more of his Akeena shares to obtain the same proceeds he

14  would have received just two weeks earlier.

15          39.     Knowing he had to fund the divorce settlement by January 31, 2008, or give up an

16  ever-increasing number of shares to his wife to sell, at the start of Class Period, Cinnamon began

17  undertaking more aggressive measures to respond directly to the demands being placed on him to

18  raise the Company's stock ratings (and thus, its price).  In order to limit the number of shares he

19  would be required to sell to fund the divorce settlement by January 31, 2008, among other things

20  Cinnamon would misstate the true nature of the Comerica "line of credit," conceal that the backlog

21  figure alive in the market was grossly overstated, and time the announcement of Akeena's illusory

22  licensing agreement with Suntech to permit him to take advantage of the artificially inflated stock

23  price he knew would result.  ***As a result, rather than having to sell an anticipated 700,000 shares,***

24  ***or 8% of his Akeena holdings, to fund the divorce settlement, Cinnamon was able to sell only***

25  ***400,000 shares of his Akeena holdings.***

26

27

28

**DEFENDANTS' PRE-CLASS PERIOD MISSTATEMENTS THAT REMAINED "ALIVE" IN THE MARKET DURING THE CLASS PERIOD**

40.     On August 9, 2007, Akeena announced its 2Q 2007 financial results, with Cinnamon falsely assuring investors of the Company's purportedly then-present "backlog"[1] and business growth and financial profitability:

> Barry Cinnamon, CEO of Akeena, stated, "***The escalating demand for solar installations continues to fuel our business***."
>
> *       *       *
>
> Cinnamon continued, "Our continued expansion demonstrates our commitment to operate in areas where the" 'climate' is favorable for solar and customer awareness is high. In addition, ***our increased sales and marketing efforts helped us end the second quarter with a backlog of $13.6 million***."
>
> *       *       *
>
> Outlook
>
> ***For 2007 management is reiterating its guidance for revenue growth of approximately 135 percent over 2006 revenue of $13.4 million***.

(Emphasis added.)

41.     During the Company's August 9, 2007 earnings conference call, Cinnamon broke with the Company's express policy in the past of ***not*** providing a "backlog" number and stated that the Company "ended the quarter with a ***backlog of $13.6 million*** and ***$14 million of cash***," explaining the "backlog of $13.6 million [was] a direct result of . . . sales and marketing efforts." Then-CFO Lad Wallace repeated Cinnamon's provision of the $13.6 million "backlog." Analysts expressed exuberance at finally being provided a quantification of Akeena's "backlog," as it purportedly provided transparency into the Company's operating metrics and financial guidance:

> GEORGE SANTANA: A couple of questions, that backlog figure, is that the first time you've presented that?
>
> BARRY CINNAMON: Yes, it is.

---

[1]     Investors are entitled to rely on defendants' discussion of "backlog." As Judge Alex Kozinski of the Ninth Circuit Court of Appeals recently reminded, "Backlog is much like accounts receivable: It represents [a company's] contractual entitlement to perform certain work, just like accounts receivable represents the company's contractual entitlement to be paid for work already performed." *Berson,* 527 F.3d at 990.

GEORGE SANTANA: *Thanks. Thanks so much. That gives us a little bit more clarity to your operation*.

LAD WALLACE: You're welcome.

\*       \*       \*

RON WOLSDORF, ANALYST, COHEN & CO.: Hi, this is [Ron Wolsdorf] with Cohen. Congrats on the quarter, and *indeed the backlog figure is very impressive*. Can you speak to those figures? It sounds like you haven't given backlog in the past, but *it's almost two quarters in terms of the run rate equivalent*. And then related to that, I was wondering what you've been seeing in terms of California applications for residential?

BARRY CINNAMON: Okay, sure. Well, let me answer the question about California applications for residential. *It's continuing to go up. And that's reflected in our backlog*. And the backlog is created by the continued investments we've made over the past six months in sales and marketing and new offices. And we will continue to make those investments, and *we therefore expect that backlog to continue to grow as our business grows*.

RON WOLSDORF: Okay. Do you have any stats for speaking to the California residential applications in terms of month to month change or over whatever period you track them?

BARRY CINNAMON: On general trends, our applications are continuing to go up. *And that's reflected in the increased sales and increased backlog*. . . .

\*       \*       \*

UNIDENTIFIED PARTICIPANT: Thanks. Barry, first off, congratulations on your success. *Just not to be obsessed with backlog, but one more time, the definition* -- let me back up a second. *When I come into your store and sign for a purchase order, about how long am I waiting for delivery?*

BARRY CINNAMON: We are constantly striving to shorten the time frame from when you sign up to when we get the installation done. So, depending on your ability as a customer to take delivery, *we're really targeting getting that done, soup to nuts, in the range of one to two months*. Some commercial jobs take longer. Some residential jobs take shorter. It also has some variability on the location that we're in. But, overall, we're very, very happy with the backlog that we've generated.

UNIDENTIFIED PARTICIPANT: Right. *So, this backlog implies what it implies, which is I'm looking at a good chunk of this in the third quarter?*

BARRY CINNAMON: *Well, yes, very specifically, if you come in and sign up today in our store in Los Gatos, you're immediately in the backlog*.

UNIDENTIFIED PARTICIPANT: Yes.

BARRY CINNAMON: *It's not until we book it as GAAP revenue that it comes out of the backlog and we disclose this as our revenue*.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS            - 17 -

UNIDENTIFIED PARTICIPANT: Wow, that's great. And you -- can you provide any color on what backlog was approximately last quarter, even though it hasn't been disclosed yet?

BARRY CINNAMON: No. We've just disclosed this first quarter's backlog -- this quarter's backlog.

UNIDENTIFIED PARTICIPANT: *Okay. Well, congratulations on that number. It's phenomenal*. . . .

\*     \*     \*

BARRY CINNAMON: Thank you for joining us today. *In closing, I'd like to emphasize that our investments are paying off,* with five new offices opened this year so far, terrific revenue growth, *a large backlog* and a pending new product that we believe will completely change the rooftop solar installation business.

(Emphasis added.)

42.     Defendants' statements about the reliability of the purported "backlog" were critical as Akeena then only had $14 million cash but was spending more than $885,000 per month *net of what it was bringing in*, and had burnt through over $5.3 million during the first six months of 2007 alone. "Burn rate" refers to the rate at which a company uses up its supply of cash over time. It's the rate of negative cash flow, usually quoted as a monthly rate, but in some crisis situations, it might be measured in weeks or even days. If a company's cash burn continues over an extended period of time, then the company is operating on stockholder equity funds and borrowed capital. The investment community was fixating on Akeena's newly reported backlog because it knew Akeena's cash burn rate was spiraling, having increased 27x over the burn rate for the first six months of 2006, and defendants' provision of a backlog figure provided the only visibility into cash Akeena had coming in the door to fund operations and the expansion Akeena needed to become profitable. Because Akeena is an installer, rather than a manufacturer of solar panels and units, rapid expansion of its sales footprint was deemed critical by and demanded by the investment community. Akeena needed to be viewed as a first-mover in the industry in order to obtain market share and needed to rapidly expand its sales staff and offices in order to achieve that. The market knew Akeena needed cash to achieve these goals, which could come either in the form of bank lines of credit or as payment for products currently believed to have been sold and which were included in "backlog." Critically, as the Company's Form 10Q for the 2Q 2007 revealed, "[a]s of June 30, 2007,

1  approximately $3.5 million was outstanding under the [Company's] 2007 Credit Facility **and no**

2  **additional borrowing capacity was available at June 30, 2007**." Comerica did subsequently raise

3  the line of credit to $7.5 million before the start of the Class Period, but every dime of that was

4  needed.

5      43.    On August 13, 2007, the Company announced that Comerica Bank would provide

6  Akeena customers financing through home equity lines of credit and other financial instruments.

7      44.    On August 16, 2007, stock analyst David Sternman of Jessup & Lamont initiated

8  coverage on Akeena, assigning a "Neutral" recommendation.  Sternman was generally favorable

9  about Akeena's prospects, largely parroting what Cinnamon and Effren had stated on August 9,

10  2008, including that Akeena was "[r]amping up for growth," was "in the midst of 100+% Y/Y sales

11  growth on the heels of strong demand for solar power panel installations," that the Company

12  "intend[ed] to expand into other states that have favorable tax policies and high grid electricity

13  prices."  Significantly, Sternman reiterated that "[b]acklog stood at an impressive $13.6 million in

14  Q207" and that "current expansion of offices should fuel another year of at least 40% sales growth in

15  2008 as well."  Sternman also reiterated (based on defendants' statements in the August 9, 2007

16  earnings release and at the earnings conference), that:

17      Demand for solar power has been growing quickly, and **Akeena now has $13.6**
        **million in backlog orders**, which should help fuel consistent results in the quarters to
18      come. A customer typically must wait 2-4 months from the time a contract is signed
        to the time installation is complete.

19
                                    * * * *
20
        **Akeena appears positioned to maintain its strong growth trajectory, as sales are**
21      **likely to rise 130-140% in 2007, and another 40-50% in 2008. We are very**
        **comfortable with those growth projections** as they simply represent typical
22      traction/growth for stores that have been opened recently. These stores will likely
        build traffic in coming quarters, reaching maturity within about 12 months.
23
        **Backlog currently stands at $13.6 million, which represents roughly five months of**
24      **sales, indicating that the company should have little trouble meeting our Q307 and**
        **Q407 sales forecasts**, unless there is a shortage of solar panel material. Akeena
25      works with a variety of suppliers to ensure a steady supply of panels while seeking
        the lowest possible prices.
26
        **We expect sales to grow an additional 30-40% in 2009, as the recent capital raise is**
27      **likely to fuel an additional round of new store openings** that reach maturity by
        2009.
28

* * * *

> ***Thanks to the recent capital raise, Akeena has enough cash to last through 2009 at current burn rates,*** but continued investments in new retail locations could accelerate that burn rate.

(Emphasis added.)

45.     Sternman's report was not all positive though.  Sternman took great issue with the lack of transparency into Akeena's "path to profitability," and expressly stated the achievements Akeena would have to make to increase his stock rating, recommendation and ultimately the Company's stock price, concluding that:

> Thanks to a recent equity infusion ***and an expanded line of credit***, Akeena is well capitalized to invest in new growth initiatives. We think the company's effort to expand quickly while the market is in its infancy is the right move. Howeve*r*, ***we are concerned that Akeena's low gross margin profile will impede robust profitability when the business model is at maturity.*** We are initiating coverage of Akeena Solar with a Neutral rating. Shares trade at roughly 1.7X projected 2008 sales, on an EV basis, which is reasonable in the context of strong growth and ***low gross margins***. ***Our view of the stock would strengthen if the company can generate signs of a tangible ramp in gross margins, sign licensees or show strong demand for its new technology, or if management can evidence a clearer path to profitability***.

* * * *

STOCK VALUATION

As Akeena is unlikely to be profitable in the next few years, we believe that investors are more likely to value its stock on sales growth and new product traction. As noted earlier in the report, sales are growing at a very fast pace. We expect sales to reach $44-45 million in 2008, and approach $60 million in 2009.

***The company is currently valued at roughly 1.7X projected 2008 sales, which is a fair value, in light of projected strong sales growth, fairly low gross margins, and an unclear path to profitability. We believe shares will come to garner a higher valuation if:***

***• Gross margins can approach/exceed 30%***

***• Sales growth in 2H08 and 2009 can exceed the 30-40% that we currently anticipate***

***• The company inks licensees for its new solar panel module technology.***

• A range of new state or federal tax credits is put into place to support more robust demand for solar power.

***• Management can demonstrate a clearer path to profitability.***

1  We are initiating coverage of Akeena Solar with a Neutral rating, though we note a
2  number of potential catalysts that render our forecasts and share price targets too
   conservative.

3  (Emphasis added.)

4      46.     Sternman's August 16, 2009 report also signaled the growing relationship between

5  Comerica and Akeena, which would be significant when Akeena announced on December 26, 2007,

6  the start of the Class Period, that Comerica had increased Akeena's line of credit to $25 million and

7  that the line of credit no longer contained the assets restrictions the prior line of credit had, leading

8  many to conclude that because Comerica was also providing customer financing, Akeena's finances

9  were transparent to Comerica and Comerica was validating Akeena's financial strength:

10     ***Solid backing from Comerica***

11     Akeena recently raised $12.6 million in fresh equity to fund a continuing geographic
       expansion while investing in development of the new solar panel program. To
12     augment the new equity capital, Akeena has also expanded its line of credit with
       Comerica Bank (NYSE/CMA/NR), from $2.0 million to $7.5 million. Taken
13     together, these two sources of capital should provide ample resources for Akeena's
       growth through at least 2008, in our view.

14     Comerica is also providing loans to Akeena's customers that want to upgrade to solar
15     but lack the cash to do so.

16     47.     Suddenly, on September 21, 2007, the Company disclosed that David "Lad" Wallace,

17 the Company's CFO had "resigned" effective immediately with no replacement.  The Company's

18 September 21, 2007 release stated Cinnamon would also assume the role of CFO while Akeena's

19 Board looked for a replacement.  On September 24, 2007, defendants would announce that Effren

20 accepted an offer to become the Company's CFO effective September 21, 2007.

21     48.     On September 24, 2007, the Company also announced and touted its new NASDAQ

22 listing, stating in relevant part:

23     NASDAQ's rigorous review and high corporate governance standards have resulted
       in it becoming the largest electronic stock market in the United States, and home to
24     category-defining companies that are leaders across all areas of business.

25     "***Achieving a listing on the NASDAQ stock exchange is a key milestone in our
       company's evolution,*** *" said Barry Cinnamon, CEO of Akeena. "**The NASDAQ**
26     ***listing provides visibility for our successful growth story and should result in
       improved liquidity for our shares by providing additional access to institutional
27     investors. We are proud to have built the financial infrastructure and underlying
       business to achieve this goal***."

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 21 -

(Emphasis added.)

49.     On September 24, 2007, the Company also began touting its new state-of-the-art "Andalay" solar system, which it would bill as a significant cost leader and profit enhancer.  The Company's release, entitled "Now There's a Whole New Look To Solar Power – Akeena Solar's New Panels Look Great and Install in Minutes," stated in relevant part:

> Akeena Solar, Inc., a leading designer and installer of solar power systems, today unveiled unique new solar panels that look like handsome designer-produced skylights and have built in features that cut installation time from half a day to half an hour.
>
> Best Looking Rooftop System
>
> "We've been selling solar power systems since 2001," said Barry Cinnamon, CEO of Akeena Solar, Inc.  "***We know what consumers want: great aesthetics and superior reliability, and we've designed a system that meets these requirements***.  We're calling this new system Andalay – and it's the best looking system available on the market.  Gone are the days when solar panels had to have a somewhat industrial look on a home."
>
> Andalay is the latest, state-of-the-art solar panel technology, combining built-in reliability with outstanding aesthetics.  Unlike ordinary solar panels, Andalay panels are all-black and when installed actually look like a skylight on a home.  Andalay features built-in wiring, built-in grounding and built-in racking so the panels attach directly to the roof offering a smooth, flush appearance.  And the installation has been so streamlined – using 70 percent fewer parts and 25 percent fewer attachment points – a system for a small house can now be installed in under an hour on the roof.
>
> ***Unparalleled Reliability***
>
> "Andalay is truly revolutionary.  ***The panels look better, are more reliable, offer superior performance and bring solar to its rightful place at the forefront of alternative energy technologies,***" said Cinnamon.  "We are excited to bring a product that answers the concerns of consumers with an efficient – and sexy – solution.  It is simple, consumers feel good, homes look great and the environment gets better."
>
> ***Additionally, the economics make sense***.  With states offering rebates and tax credits, ***payback on a system is getting shorter and shorter***.  In California, a system would ordinarily cost $25,000, but with the state's rebates and tax credit the cost would be reduced to about $17,000.  A solar power system can save about $100 of electricity every month, payback is in about eight years, and customers get a locked-in electric rate of 12 cents per kwh for the 30+ year life of the system.
>
> Andalay solar panels were launched and showcased at a reception prior to Solar Power 2007, the premier solar event in the United States on September 24, 2007 in Long Beach, CA.  The panels will be available to consumers in major U.S. solar markets (including California, New York, Connecticut, New Jersey, Pennsylvania and Hawaii).

(Emphasis added.)

1          50.     In a separate release also disseminated on September 24, 2007, entitled "Akeena

2    Solar Partners with Suntech to Manufacture New Solar Panel; Suntech to Deliver 10 to 14 MW of

3    Akeena Solar's New Andalay Solar Panels," the Company also announced that it had entered into a

4    lucrative strategic supply relationship with China's Suntech for the Andalay solar panels:

5          Akeena Solar, Inc., a leading designer and installer of solar power systems, and
           Suntech Power Holdings Co., Ltd., one of the world's leading manufacturers of
6          photovoltaic (PV) cells and modules, today announced that Suntech has signed a
           letter of intent to manufacture Akeena Solar's Andalay solar panels.  ***Under the***
7          ***terms of the agreement, Suntech will manufacture and deliver 10 to 14 Megawatts***
           ***of Andalay solar panels to Akeena Solar during 2008***.

8          Andalay is the brand name for Akeena Solar's patent-pending high performance
9          solar panel systems.  Unlike ordinary solar panels, Andalay panels feature built-in
           wiring, built-in grounding and built-in racking so the panels attach directly to the
10         roof offering a smooth, flushed appearance.  Andalay is the logical next step in the
           evolution of solar power technology, combining superior aesthetics with unparalleled
11         reliability.

12         "***Our engineers re-thought the concept of a solar panel so that the panels can be***
           ***manufactured from the start to simplify installation, improve reliability and look***
13         ***like a glass skylight on the roof," said Barry Cinnamon, CEO of Akeena Solar,***
           ***Inc***.  "We are proud to have Suntech as our manufacturing partner.  And the
14         improvements are not just in appearance and reliability; with Andalay we expect to
           reduce rooftop installation time by over 50 percent, requiring 70 percent fewer parts
15         and 25 percent fewer rooftop attachment points."

16   (Emphasis added.)

17         51.     What defendants concealed was that Akeena had agreed to pay Suntech a much

18   higher premium than the market price for the solar panels Suntech was providing warranted.  Akeena

19   agreed to this higher price, in large part, to induce Suntech to enter into a licensing agreement with

20   Akeena, which would allow Akeena to persuade the market that it was getting out of the capital-

21   intensive installation business, allowing it to simply take royalty licensing fees from others using its

22   technology, and diminishing some of Akeena's cash flow problems.  Assuming they could charge

23   more for the sleek, aesthetically-pleasing Andalay system, making up for the higher prices being

24   paid for the solar panels, defendants withheld from the market the economic lunacy of the Suntech

25   supply agreement.

26

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 23 -

1    52.    Instead, during the Company's investor conference that day, defendants assured the

2   market of the Company's "Strengthening Financial Foundation" and that "New Technology Reduces

3   Cost by 9% and Increases Price by 5%," heralding in a "10-15% Gross Margin Improvement":

## Strengthening Financial Foundation

- Steady sales growth since 2001
- Targeting 2007 revenue growth 135%+[1] versus 2006
- Lines of credit with Kyocera, Sharp, SunPower and Suntech
- In Aug. 2006, received $2.7 million in net proceeds from private placement as part of our public offering
- In Jan. 2007, secured $2.0 million short-term financing facility
- In Mar. 2007, raised approximately $4.0 million of gross proceeds in a private investment in public equity (PIPE) offering
- In May 2007, raised $12.6 million of gross proceeds in a private investment in public equity (PIPE) offering
- In June 2007, increased its short-term financing facility from $2.0 million to $7.5 million
- $13.5 million backlog, at June 30
- Pending NASDAQ application

[1] 2007 revenue guidance provided on August 9, 2007 earnings press release.

14





53.    On November 7, 2007, Cinnamon presented at the Pacific Growth Equities Clean Technology & Industrial Growth Conference at the W Hotel in San Francisco and continued touting the Company's margin improvement and strong financial metrics.  The presentation was webcast live on www.akeena.com during and following the presentation.

54.    On November 13, 2007, defendants issued a release entitled "Akeena Solar Report Third Quarter Revenue of $8.1 Million, Up 125% Over Prior Year; On Track to Achieve Year-Over-Year Revenue Growth of 135% in 2007; Successfully Introduced Andalay, Company's Proprietary Solar Installation Technology."  However, the release stated "Gross profit for the third quarter 2007 was $1.7 million, *or 21.0% of sales*, compared to $0.9 million, *or 24.7% of sales*, in the third quarter of 2006," causing a one day 13% decline in Akeena's stock price.  (Emphasis added.)

55.    The reliability of the previously reported "backlog" was even more critical this quarter as the Company's cash had fallen below $11.5 million as Akeena burned through another $4.5 million during the 3Q 2007 alone, almost *twice* as much as the first two quarters combined, resulting in a cash burn rate of $1.5 million per month for the 3Q 2007.  The Company's 10-Q disclosed that "[a]s of September 30, 2007, approximately $4.7 million was outstanding under the [Company's] 2007 Credit Facility and approximately $212,000 in additional borrowing capacity was available."  ***However, at this rate of cash burn, without further financing or an easing of the terms***

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 25 -

1  **on the Company's line of credit, Akeena would be out of cash in less than eight months.**

2  Critically, the Company's 3Q 2007 10Q also disclosed that Akeena was "required to achieve certain

3  performance objectives under its 2007 Credit Facility, based upon its forecasted results of

4  operations," that as of "September 30, 2007, **the Company was in violation of a financial**

5  **covenant**," and that it had been forced to obtain a waiver from Comerica, to avoid a default.

6        56.    While the critical state of Akeena's cash position and burn rate significantly increased

7  the importance of maintaining visibility into Akeena's ability to bring cash in the door, during the

8  3Q 2007 earnings conference call, Effren stated Akeena no longer wanted to provide a backlog

9  number, citing the "growing commercial size of [Akeena's] business" and noting that a "commercial

10  contract can take three months to a year between signing and revenue recognition."  However,

11  without disclosing the specific backlog, Effren did expressly confirm that "**on a comparable basis to**

12  **the $13.6 million of backlog disclosed at the end of Q2, the Q3 backlog was bigger**."  Because

13  Akeena reported a "mix of about 30% commercial and 70% residential" for the 3Q 2007 – **the exact**

14  **same as the Company had reported for the 2Q 2007,** and because the mix for the 4Q 2007 **then**

15  **underway** would only moderately change to a 35% commercial/65% residential split, and the only

16  problem with visibility defendants were then conceding was as to the commercial portion of the

17  backlog (with the residential portion still largely being expected to pay in two months or less of

18  booking), it was reasonable to infer that as of November 13, 2007: (i) Akeena had at least $13.6

19  million worth of largely quick-paying residential orders contracted for, expected to produce 4Q 2007

20  sales of **at least** $13.6 million; and (ii) that Akeena was **then** experiencing an **increase** in demand

21  which should result in sales far **exceeding** $13.6 million in the 4Q 2007.

22        57.    Concerning the Company's purportedly growing profit margins, Cinnamon added:

23      **We expect the sales of Andalay will contribute towards gross margin improvement**
24      **in the range of 10% to 15% as we benefit from our cost savings and charge a**
    **premium price that is commensurate with Andalay's customer benefits**.

25            *     *     *

26      The margins on commercial typically in the industry range from 10% to 15%, and
    the margins for residential range from 20% to 25%.  **Most of the product that we're**
27      **going to be getting from Suntech is intended for residential sales, where we'll be**
    **seeing those higher margins and where we'll also be seeing better margins**
28      **fundamentally because the product has lower cost for us to install**.  At this time, we

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS    - 26 -

haven't completely finalized what the plan is for next year in terms of that mix, so it's premature for us to say that the margins on a blended basis will go up or down.

The other thing that we're working on is we are also in discussions for some licensing of the Andalay technology, ***and licensing typically has a very, very high margin contribution***. We do this licensing into areas and distribution opportunities where we currently don't have a footprint, so it turns out to just be a positive contribution to our bottom line.

*       *       *

***The margins would be at the high end of the 25% and then perhaps higher***, and then it really depends on what the competitive situation is for us, whether or not we want to use some of that margin to buy extra business or whether we just want to keep those profits for ourselves. Our approach going out of the box with Andalay is to focus on the better reliability of the product, the higher, the better aesthetics and the better performance, and use those customer benefits to charge a slight premium on the price. ***We're not going in there in a discounting environment, whatsoever***.

(Emphasis added.)

58.     As to the Company's existing line of credit with Comerica, the Form 10-Q Akeena filed with the Securities and Exchange Commission ("SEC") on November 13, 2007 stated:

Under the 2007 Credit Facility, the Company can borrow against 80% of Eligible Accounts Receivable plus 50% of Inventory Availability (as such terms are defined in the monthly borrowing base report provided to Comerica Bank as per the terms of the 2007 Credit Facility), up to a maximum loan amount of $7.5 million. As of September 30, 2007, 80% of the Company's Eligible Accounts Receivable was approximately $1.7 million, and 50% of Inventory Availability was approximately $3.3 million. ***All of the existing property and assets of the Company are pledged as collateral for the 2007 Credit Facility.***

(Emphasis added.)

59.     On November 27, 2009, Jessup & Lamont research analyst Brian C. Yerger issued a report on Akeena's status entitled "Andalay System Revealed." Like Sternman had been, Yerger was critical of Akeena's failure to demonstrate a clear "path to profitability," again demanding that until Akeena could announce a licensing agreement and could demonstrate that through the licensing agreement its margins would improve, the Company's stock ratings, and ultimately its price, would be hindered. This was particularly crucial to Cinnamon, whose recent divorce settlement expressly required that he be able to sell enough Akeena stock before January 31, 2008 to fund the $1.875 million payment due his wife, or risk forfeiting a significant percentage of his Akeena holdings. Specifically, as to visibility and stock price valuation, Yerger stated in his conclusions that:

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 27 -

Akeena Solar is in the midst of a large growth phase with estimated revenue growth of 86% Y/Y for 2008. The financial implications of the Andalay rollout are still developing and the ultimate impact of this new technology on future margins and profitability remains elusive. ***As such, we will initiate Akeena shares at a neutral rating until the strategic and profitability picture becomes clearer***.

Balancing the strong revenue growth prospects with the uncertainty surrounding the outcome of its new technology, we believe Akeena is fairly valued at $4.60 a share or 1.7x our 2008 revenue estimate on an EV basis.

* * * *

STOCK VALUATION

Akeena Solar is displaying large increases in top-line growth as the solar power industry continues to grow at a rapid pace. Installation revenue jumped 86% Y/Y in 2006 and is predicted to rise another 135% for 2007. We are estimating an 86% increase in revenues for 2008. As the only public domestic solar installation pure-play, Akeena's position in the public marketplace is unique, ***yet hundreds of private companies and many larger publicly traded, vertically integrated solar corporations are also competing for market share in the U.S. installation market***.

***We believe Akeena does have a possible first mover advantage in rolling out its new Andalay branded product into a predominantly generic industry. With the Suntech Power agreement in place for 2008, we feel conditions are ripe for Akeena to strike favorable deals for licensing, franchising, and/or 3rd party distribution. Unfortunately, the company remains hesitant to provide much information regarding the exact strategic direction for the Andalay rollout for competitive reasons (appropriate in our view at this time). As Akeena releases further information regarding the rollout; visibility and confidence in sales traction, margin improvement, and ultimately profitability can be increased. Until that time, our confidence in long-term revenues, margins, and profitability remains somewhat lower than usual.***

* * * *

In evaluating and estimating the correct valuation for Akeena shares, we believe balancing four main factors can provide investors with insight into the opportunities and risks for AKNS.

1. Revenue growth, which is somewhat dependent on political incentive factors

2. ***Margin expansion, which is closely correlated to management's ability and Andalay product traction***

3. Political risk as Congress debates merits of solar incentives

4. ***Increasing visibility of profit picture tied closely to the long-term strategy for Andalay***

We believe top-line revenue will continue to display strong growth, with possible upside/downside adjustments relating to the outcome of the political risks mentioned. ***Margin expansion and profit visibility remain relatively low as the company has just begun to embark on the Andalay rollout.***

*Balancing these disparate factors, we are initiating Akeena shares with a neutral rating until the many unanswerable factors above can be fully evaluated. As the company is displaying rapid revenue growth, constrained gross margins, and exposure to unresolved external macro and internal strategic risks, we feel the shares are fairly valued at 1.7x our 2008 revenue estimate of $58.3 million on an EV basis. Investors should be aware that our neutral stance on AKNS shares could be quickly and dramatically altered as news flow regarding the Andalay rollout and pending U.S. solar legislation impacts the company's outlook.*

(Emphasis added.)

60.     Specifically concerning the impact a new licensing agreement could have on margins, Yerger stated:

Akeena has aligned itself with a quality manufacturer to produce the Andalay product.  Suntech Power is recognized as a leading producer of solar panels (4th in 2006 global market share according to Solarbuzz) and is the largest of the new Chinese entrants into the market. The letter of agreement calls for Suntech to deliver 10 -14 MW of panels in calendar 2008 and the lower end of that range, if installed exclusively by Akeena, would represent an $80 million revenue opportunity.

*Conversely, Akeena could choose to license or franchise a portion of the Andalay supply to other installers and/or distributors. This would sacrifice additional top-line growth, yet markedly increase margins.* The company is contemplating many scenarios and has not stated its intentions in regard to the strategy or combination of strategies it will pursue at this time.

* * * *

*As of Q307, the company's installs are 70% residential with 20-25% gross margins and 30% commercial with 10-15% margins. The Andalay product should provide AKNS with a 10-15% margin improvement for residential* and we estimate ASPs per installed watt for 2008 of $8.25 for residential and $8.00 for commercial vs. an $8.05 ASP for the current installs in Q307.

* * * *

We estimate Akeena will be involved in approximately 9 Megawatts(MW) of installations in 2008, up from an estimated 4MW in 2007. 7MW are estimated to be installed by AKNS and 2MW sold by strategic distribution channels. We are estimating the remaining 1-2 MW of STP manufactured Andalay panels will be delivered in Q408 but not yet sold or booked as revenue in 2008 due to various lead times for installations. *A large, unannounced licensing or other distribution agreement would allow the company to distribute substantially more Andalay panels than we have forecast in 2008 and would most likely result in higher revenues and better margins for the year vs. our estimates.*

(Emphasis added.)

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS
### AND SCHEME TO DEFRAUD DURING THE CLASS PERIOD

61. At the start of the Class Period, on December 26, 2007, Akeena announced that Comerica Bank had **increased** its existing "credit line" from $7.5 million to $25 million. The Company's release stated:

> Akeena Solar, Inc., a leading designer and installer of solar power systems, has received a commitment from Comerica Bank to **increase its existing credit line from $7.5 million to $25 million**. Availability of the increased funding capacity is subject to execution of final definitive loan documentation. Under the increased $25 million facility, **$17.5 million would be available for borrowing on a non-formula basis**, with up to a further $7.5 million available for borrowing against accounts receivable and inventory levels.
>
> "**With this additional borrowing capacity**, coupled with our recent $26.1 million equity raise, **Akeena will have the financial flexibility and resources to fund our working capital needs and ambitious growth plans for the intermediate future**," said Gary Effren, Akeena Solar chief financial officer. "**We . . . are pleased by their recognition of the growing strength of the company's balance sheet and financial condition**."

(Emphasis added.)

62. The purportedly restriction-free $17.5 million increase in Akeena's credit line was significant, as the Company's existing credit line with Comerica for $7.5 million required that the line of credit be backed by assets, with only 80% of the Company's eligible accounts receivable and 50% of its inventory constituting qualifying assets. If the level of Akeena's eligible accounts receivable or inventory fell, the Company's access to its line of credit would also be diminished and the bank could declare a default – rendering the outstanding balance then due and payable. Yet, the implicit message in defendants' December 26, 2007 release was that Comerica was no longer requiring that the additional $17.5 million line of credit be collateralized by qualifying assets – **or anything** – as heralded by the financial press:

*Associated Press:*

> Akeena Solar Inc., which designs and installs solar power systems, said Wednesday **a lender will increase its existing credit line to $25 million from $7.5 million.**
>
> The company plans to use the additional borrowing capacity, combined with a recent $26.1 million equity increase, for growth opportunities and working capital needs.
>
> **The commitment from Comerica Bank  gives Akeena $17.5 million on a non-formula basis** and up to an additional $7.5 million for borrowing against accounts receivable and inventory levels.

1                                   \*       \*       \*

2           ***Akeena Solar Inc. . . . received a boost after reporting that Comerica Bank had***

3           ***increased its credit line to $25 million from $7.5 million. Its stock rose $1.23 cents,***
          ***or 18.6 percent, to $7.85.***

4 *Silicon Valley/San Jose Business Journal:*

5           ***Akeena Solar Inc.  said Wednesday it increased its credit line from $7.5 million to***

6           ***$25 million.***

                                    \*       \*       \*

7

8           ***"With this additional borrowing capacity, coupled with our recent $26.1 million***
          ***equity raise, Akeena will have the financial flexibility and resources to fund our***

9           ***working capital needs and ambitious growth plans for the intermediate future,"***
          ***said company CFO Gary Effren.***

10 *The Wall Street Journal:*

11           ***Akeena Solar climbed 1.48, or 22%, to 8.10. The solar-power-systems installer said***
          ***it received a commitment from Comerica Bank to increase the company's existing***

12           ***credit line to $25 million from $7.5 million.***

13 *Kobias.com:*

14           ***Akeena Solar, Inc. has received a commitment from Comerica Bank  to increase***
          ***its existing credit line from $7.5 million to $25 million.*** Availability of the increased

15           funding capacity is subject to execution of final definitive loan documentation.
          ***Under the increased $25 million facility, $17.5 million would be available for***

16           ***borrowing on a non-formula basis,*** with up to a further $7.5 million available for
          borrowing against accounts receivable and inventory levels.

17 *Midnight Trader:*

18

19           ***Akeena Solar Hikes Credit Line to $25 Mln - Pre-Market Volume Interest Building***
          ***in Shares.***

20 *The Street.com:*

21           ***Also rising was Akeena Solar. The Los Gatos, Calif., maker of solar power systems***

22           ***announced that Comerica Bank has agreed to increase Akeena's credit line from***
          ***$7.5 million to $25 million. Shares leapt 22.4% to $8.10.***

23 (Emphasis added.)

24         63.      The Company's stock price rose precipitously on this news, increasing from an

25 opening price of $6.84 per share to close at $8.10 per share on December 26, 2007, on unusually

26 high volume of more than six times the average daily trading volume for the previous 30 days.

27         64.      As December 2007 drew to an end however, unbeknownst to the market, Cinnamon

28 knew he had to fund his divorce settlement through sales of Akeena stock by January 31, 2008.  If he

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      - 31 -

1   could not fund the settlement through stock sales himself, Cinnamon faced the unenviable

2   proposition of transferring a significant portion of his Akeena holdings to his wife's UBS account

3   where they would be sold into the market.  News of the new "borrowing" facility had certainly

4   increased the Company's stock price, but Cinnamon was looking at selling hundreds of thousands of

5   shares and the Company's stock price was still below $7 per share.  To make matters worse, on

6   December 27, 2007, popular and widely-followed CNBC television stock-picker Jim Cramer

7   lowered his guidance on Akeena from "hold" to "sell."

8          65.    Before the opening of trading on January 2, 2008, **the same day Cinnamon's divorce**

9   **became final**, the Company issued – with much fanfare – a release entitled "Akeena Solar Licenses

10  New Solar Panel Technology to Suntech; Suntech to Distribute Andalay Panels in Europe, Japan and

11  Australia," which stated in relevant part:

12         Akeena Solar, Inc., a leading designer and installer of solar power systems,
           announced that its state-of-the-art solar panel technology, Andalay, will be
13         distributed in Europe, Japan and Australia under a license agreement with Suntech
           Power Holdings Co., Ltd. one of the world's leading manufacturers of photovoltaic
14         (PV) cells and modules.

15         The terms of the Licensing Agreement authorize Suntech to distribute Andalay in
           Europe, Japan and Australia commencing in January 2008. This Licensing
16         Agreement is in addition to Suntech's previous agreement to manufacture Andalay
           solar panels.
17
           Andalay solar-panel technology was envisioned by Akeena's CEO, Barry Cinnamon,
18         after years of rooftop solar installation experience and customer feedback. "Andalay
           improves on conventional solar panels by including built-in wiring, grounding and
19         racking designed to provide maximum rooftop performance for consumers while
           minimizing installation costs for solar system installers.  The result is a rooftop solar
20         power system with superior built-in reliability with outstanding aesthetics in an all-
           black, streamlined appearance," said Barry Cinnamon.   "Moreover, an installed
21         Andalay system uses 70 percent fewer parts and requires 25 percent fewer
           attachment points than traditional solar systems, meaning better long-term
22         performance."

23         Len May, Suntech's Managing Director of BIPV Products, said: "Akeena's new
           Andalay technology will be a valuable addition to our growing portfolio of solar
24         products and will help keep Suntech on the leading edge of solar technology
           innovation.  Andalay is a significant innovation that directly addresses the need to
25         reduce the cost of solar systems, and we are confident that there will be significant
           demand for this attractive and high performance solar solution in markets outside of
26         the U.S."  **Suntech targets sales of over 10MW of the Andalay solar panels to the
           licensed regions in 2008**.
27
           "**We welcome this expanded collaboration with Akeena Solar to introduce this
28         lower installed cost solution to international markets**," said Dr. Zhengrong Shi,

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS              - 32 -

Suntech's Chairman and CEO.  "The innovative Andalay panel is the perfect complement to our product offering and a clear example of Suntech's efforts to support and promote products that bring the industry closer to grid parity.  This agreement will leverage Suntech's product development expertise, flexible and low cost manufacturing base, and robust global sales and distribution channels to expand the availability of this important new solar innovation."

"We are delighted Andalay will be available in select countries outside the United States through one of the world's leading manufacturers of solar cells and panels," said Barry Cinnamon.  "Suntech is the natural partner to license this technology given their role in co-developing and manufacturing the product, and their extensive international distribution channels that are among the strongest in the industry. Akeena Solar and Suntech also share a focus on quality and value.  *We are experiencing very strong demand for Andalay, and this licensing agreement with Suntech will allow us to meet our customer's needs for Andalay outside of our direct channels in the U.S*."

(Emphasis added.)

66.    Announcement of the new Suntech licensing agreement was received very favorably by the investment community (buttressed by defendants' earlier statements about the increased profit margins such an arrangement would entail), causing Akeena's stock price to increase over 40% on more than 15 million shares trading on January 2, 2008.  That day, *Forbes* published an article entitled "Akeena Solar Lights Up," which stated in relevant part:

Akeena Solar shares went nova Wednesday after the solar company signed a licensing deal with Suntech Power Holdings.

Akeena Solar soared 43.8%, or $3.49, to close at $11.45 after the solar power systems designer announced it penned a licensing agreement with Suntech Power to distribute its Andalay home solar panel system in Europe, Japan and Australia.

***According to Jesup & Lamont Securities analyst Brian Yerger, the deal was driven by Andalay's lower installation cost***.

***Yerger, whose parent company Empire Financial Holding has done business with Akeena, added that Suntech is a logical partner to license outside of the U.S. market because it had previously signed an agreement with Suntech to manufacture 10 megawatts of its Andalay products in 2008***.

Shares of China-based Suntech rose 4.4%, or $3.64, to $85.96.

***The Andalay technology's lower installation cost is partly the result of its built-in wiring, grounding and racking***.

Barry Cinnamon, Akeena's chief executive, also touted the "outstanding aesthetics" of the Andalay system, which is black and streamlined.

The Los Gatos, Calif.-based company did not disclose the financial terms of the deal.

"The logical implication that the market is telling me is it's expecting other deals like this coming through later in the year," Yerger said.

***Wednesday's announcement came a week after the company announced Comerica would increase its existing credit line to $25 million from $7.5 million.***

The company said it plans to use the additional borrowing capacity, combined with a recent $26.1 million equity increase, for growth opportunities and working capital needs.

(Emphasis added.)

67. *Business Week* weighed in on the announcement, stating*:*

The 42% jump in Akeena's shares to $11.31 on Jan. 2 made much more sense, given that the new licensing agreement expands the Los Gatos (Calif.) company's relationship with Suntech Power Holdings (STP), a leading producer of solar panels. ***Suntech expects to sell more than 10 megawatts of the Andalay solar panels to the licensed regions this year.***

"Suntech could be number one on a volume basis by next year, so it's a great partnership for Akeena," said Brian Yerger, an equity analyst at Jesup & Lamont, which has a neutral rating on the stock. He said it's not yet clear, however, how much additional revenue the licensing deal will bring Akeena. (Empire Financial, with which Jessup & Lamont recently merged, has done investment banking with Akeena within the past 12 months.)

The licensing agreement authorizes Suntech to distribute Akeena's innovative, lower-cost solar panel technology, Andalay, in Europe, Japan and Australia. In September, Suntech agreed to manufacture and deliver 10 to 14 megawatts of Andalay solar panels to Akeena for distribution in the U.S. during 2008.

* * * *

What's significant about the partnership between Suntech and Akeena is that it should help solar panels compete with low-cost coal-fired electricity that comes off the power grid. The Andalay panels are equipped with built-in wiring, grounding and racking that allow them to be installed on roofs at a much lower cost of labor and also gives the panels a more aesthetic appearance.

***The main benefit of Akeena's the new deal will be fatter margins, compared with the thin margins the company earns on its pure installation business, Yerger added.***

***When a leading solar panel producer like Suntech can lower the cost to the end-user not only by improving the manufacturing process but also "through something as mundane as installations," it's sure to expand its market share, Yerger said.***

* * * *

Akeena's path to higher profits seems much more straightforward. ***Including the Andalay products, the company's revenue will nearly double this year to over $58 million from $31 million in 2007, said Yerger at Jesup.*** The licensing arrangement

with Suntech will provide only a small boost in revenue, where ***the main benefit will be in the wider gross margins, he said.***

Yerger estimates that Akeena will install roughly seven megawatts of Andalay panels in 2008, with another two megawatts worth to be sold through strategic distribution channels such as the Suntech deal. ***But the additional sales could be as much as 10 megawatts according to Suntech's estimate, he said.***

(Emphasis added.)

68.     As one poster on the Akeena stock board on Yahoo! Finance speculated,

STP estimates 10 MW of sales in 2008...AKNS sold 1MW last quarter for $8.5 Million ***so this would translate into an additional $85Million in sales for 08.*** Given that estimates are for $55Million, this is a huge amount of growth.

(Emphasis added.)

69.     *Bloomberg* reported on January 2, 2008 that Akeena's stock rose 46% "in early trading after licensing technology to Suntech Power," increasing from $3.64 to $11.60 before trading even started.

70.     On January 3, 2008, *Bloomberg* reported that Jessup & Lamont issued a report stating Akeena's ability to ***"expand its credit line and sign major licensing deal has reduced mgmt's execution risk,"*** providing in relevant part:

Jessup & Lamont notes that AKNS announced the first licensing deal for its new patent pending solar panel technology dubbed Andalay. The firm also notes that the co recently received a commitment from Comerica Bank to increase its existing credit line from $7.5 mln to $25 mln. The firm says the co's ability to . . . expand its credit line and sign a major licensing deal with a large global solar manufacturer has reduced management's execution risk. ***The market is rewarding this reduction in risk with a premium multiple of roughly 4x the firm's 2009 rev estimate of $82 mln.***

(Emphasis added.)

71.     Jessup & Lamont's own "Andalay Distribution and Licensing Report" issued that day stated in relevant part that:

***Catalysts/Keys:***

***1) Suntech Power licensing announced***

Akeena Solar announced the first licensing deal for its new patent pending solar panel technology dubbed Andalay. Under the terms of the licensing agreement, Suntech Power (NYSE/STP) has authorization to distribute the Andalay product in Europe, Japan, and Australia commencing in January 2008. ***STP anticipates demand for over 10 Megawatts (MW) of Andalay panels in 2008.***

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 35 -

Despite a small window of exclusivity for STP, Akeena is pursuing additional licensing and distribution deals for the Andalay product.

*2) Comerica Bank credit line increased*

*Akeena recently received a commitment from Comerica Bank to increase its existing credit line from $7.5 million to $25 million. When combined with the recent equity offering proceeds of over $26 million, the new credit line should provide the company with greatly improved financial resources.*

\* \* \* \*

*Conclusion*

*Akeena Solar's ability to raise capital, expand its credit line and sign a major licensing deal with a large global solar manufacturer has reduced management's execution risk. The market is rewarding this reduction in risk with a premium multiple of roughly 4x our 2009 revenue estimate of $82 million. We believe Akeena is fully valued at this time and remain neutral on the shares.*

\* \* \* \*

STOCK VALUATION

*Akeena's ability to successfully raise equity capital, expand its credit facility, and sign a licensing agreement with one of the largest solar manufacturers in the world has increased our confidence in management's ability to execute its growth plan and reduce investment risk. The dual Suntech Power agreements provide the company with a possible first mover advantage in rolling out its new Andalay branded product into a predominantly generic industry. As Akeena continues to execute its plan, visibility and confidence in sales traction, margin improvement, and ultimately profitability can be increased.*

The market has rewarded this reduction in perceived risk by increasing AKNS shares some 150% in a little more than a month. Volatility has dominated AKNS shares over the past year with an initial 150% rise, followed by a 60% drop, then the aforementioned recent recovery to a new high. We believe volatility will continue to dominate the shares as projected revenue growth, margin improvement and profitability remain a battleground for investors.

We believe top-line revenue will continue to display strong growth, yet visibility on margin expansion and profits still remains relatively low as the company has just begun to embark on the Andalay rollout. *The continued progress in executing financing and licensing deals has reduced our risk premium and expanded the multiple we would be willing to pay for AKNS shares, yet the company is currently valued at roughly 4 times our 2009 revenue estimate of $82 million….*

(Emphasis added.)

72.   Missing from the financial community's analysis – because defendants concealed them – were the actual terms of the Suntech licensing agreement. Curiously, Suntech, the very manufacturer of a product that Akeena did not have patented in the U.S., much less Asia or Europe,

1    was going to pay Akeena huge licensing royalty fees for selling a product it was itself

2    manufacturing.  While the Akeena Andalay system was unique, it was not spectacularly so.  Indeed,

3    others in the industry stated the old-fashioned straight installs were probably cheaper.  As such, the

4    only value to Suntech of the licensing arrangement was the value of its relationship with Akeena and

5    the ability to use the brand-new Akeena/Andalay brand-name.  Critically, the licensing agreement

6    provided no enforcement mechanism and provided Akeena with no legally enforceable rights to the

7    royalty licensing payments.

8        73.    Nonetheless, as defendants continued heralding the perceived profitability of the

9    Suntech supply contract and licensing agreement and the increased line of credit, the Company's

10   stock traded as high as $16.80 in intraday trading by January 7, 2008, with over 14 million shares

11   trading that day alone.  Taking advantage of the inflated stock price and his timing of the Suntech

12   announcement, on January 2, 2008, defendant Cinnamon sold 100,000 shares of Akeena stock for

13   $11.12 per share, for $1,112,000 in proceeds, and on January 7, 2008, defendant Cinnamon sold

14   another 300,000 shares of Akeena stock at $15 per share, for $4,500,000 in proceeds.

15       74.    On February 19, 2008, Akeena announced its preliminary 4Q 2007 financial results,

16   issuing a release which stated in relevant part:

17       Akeena Solar, Inc., a leading designer and installer of solar power systems, expects
         to report record revenue for fiscal 2007 of $32.2 million, representing a 141%
18       increase over fiscal 2006 revenue of $13.4 million. As part of its third quarter
         release, management had indicated it expected 2007 revenue growth of 135% over
19       2006.

20       "*Our goal is to double revenue in 2008, building on 2007's stellar revenue growth
         and propelled by the transition to Andalay, our proprietary solar panel installation
21       technology. By building the racking, wiring and grounding into the solar panel
         itself, Andalay provides customers with a better looking and more reliable solar
22       power system. And from Akeena's standpoint, the lower installation costs and
         faster installation times with Andalay yield greater operational efficiencies," said
23       Barry Cinnamon, president and chief executive officer of Akeena Solar*.

24       "Since 2001 we have been investing in establishing our brand and reputation,
         expanding our footprint and building the infrastructure to scale our business. The
25       leverage that these infrastructure and technology investments provide *allow us to
         place a greater emphasis on profitable growth*."
26
         "*Our 2008 business plan calls for us to achieve EBITDA breakeven by year-end,
27       adjusted for non-cash stock based compensation expense. We expect to make
         substantial progress toward reaching GAAP profitability by the end of 2009,"*
28       added Cinnamon. "*As our industry benefits from declines in solar panel prices in*

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 37 -

*the coming years, the infrastructure we have built will allow us to continue to strengthen our market position.*"

Management plans to report final results for the fourth quarter and year ended December 31, 2007 on March 13th and conduct a conference call at 11:00 a.m. PT/2:00 p.m. ET on that day.

(Emphasis added.)

75.     The false and misleading statements defendants made in the pre-Class Period that remained alive in the market during the Class Period (¶¶22, 40-60) and the false and misleading statements defendants made during the Class Period which began December 26, 2007 (¶¶61-74) were false, misleading and/or incomplete because:

(a)     Defendants knew the "backlog" they reported with the Company's 2Q 2007 results, and confirmed as *exceeding $13.6 million* at the end of 3Q 2007, was not only unreliable, but grossly overstated as Akeena's actual sales in 4Q 2007 (which had already ended on December 31, 2007) underperformed the backlog *by more than 20%*;

(b)     Defendants knew the Suntech supply contract and licensing agreement would add very little to the Company's bottom line and would diminish rather than augment the Company's gross margins going forward;

(c)     The Suntech licensing agreement was legally unenforceable;

(d)     Akeena was buying more product from Suntech under the supply contract than it could marketably sell under the diminishing demand, leading to rapidly increased inventories;

(e)     The Suntech supply contract was priced well above market rate, making the Andalay system more expensive than comparable products available in the market, significantly diminishing demand for them in the market;

(f)     The Andalay system had significant design defects that required Akeena to make partial refunds to leave the systems in the field, or to replace many units undercutting the purported "great aesthetics and superior reliability" defendants promised Andalay provided;

(g)     Akeena was under accruing warranty reserves, which would negatively impact future earnings, particularly the 25% margins promised on November 13, 2007;

1    (h)    Defendants knew the Company's 4Q 2007 gross profit margins – for the

2 quarter that had *already ended* December 31, 2007 – had dramatically decreased;

3    (i)    Defendants knew the Company's net loss in the 4Q 2007 that had *already*

4 *ended* had increased nearly four times over its 4Q 2006 loss;

5    (j)    Defendants knew the electric utilities the California Solar Initiative made

6 administrators for the program had not yet certified the Andalay system, such that customer rebates

7 were not being made, forcing Akeena to fund the installations itself and forgo sales where it was

8 unable to do so;

9    (k)    Defendants knew the purported $17.5 million "increase" in Akeena's line of

10 credit announced on December 26, 2007 was merely a cash collateralization agreement requiring

11 that the Company leave the funds in the bank, where they would neither provide "financial

12 flexibility" nor "fund . . . working capital needs and ambitious growth plans for the immediate

13 future," but would instead simply increase Akeena's restricted cash; and

14    (l)    Defendants knew Akeena was still operating with significantly defective

15 internal controls, rendering its publicly-disclosed financial results and projections meaningless.

16                    **THE TRUTH BEGINS TO EMERGE**

17    76.    On January 9, 2008, the *Associated Press* divulged that Cinnamon had sold the

18 300,000 shares of Akeena stock at $15 per share on January 7, 2008.

19    77.    Also on January 9, 2008, RiskMetrics Group, which owns Institutional Shareholder

20 Services and is highly respected by the investment community because it provides independent,

21 user-funded research (rather than being paid by the companies it covers), issued a damning report

22 challenging Akeena's financial reporting.  This was particularly critical to Akeena because Akeena

23 had been forced to concede in its 2007 Annual Report to Shareholders, in connection with its

24 Sarbanes-Oxley reporting requirements, that the Company lacked meaningful internal controls, and

25 thus the ability to accurately project or report its financial results.  With defendants having ceased

26 providing further backlog information, yet claiming the backlog was "larger" at the end of 3Q 2007

27 than it was at the end of 2Q 2007, the investment community would grow apprehensive about the

28 veracity of defendants' prior guidance.

78.     Specifically, as to Akeena's rapidly expanding inventory levels, the RiskMetrics report disclosed:

**Analysis of Inventory Levels**

RiskMetrics considers inventory trends to be a reliable indicator of a company's margin sustainability prospects as well as an indicator of demand for a company's products. We monitor inventory trends by analyzing inventories in days sales ("DSI"). **Increases in DSI often indicate that demand was weaker than anticipated causing an increase in inventory** or that a company has produced an excess amount of inventory to take advantage of higher fixed cost absorption. In either case, **if the company is unable to reduce the excess inventories, margins in future periods will be pressured as production is slowed to pare inventory levels.** DSI data for each company is shown in Table 2a.

**Similarly, discrepancies between inventory growth trends and expected forward sales growth can also be indicative of weaker than anticipated growth or excess production.** A comparison of inventory growth and sales growth is shown in Table 2b.

Our typical inventory analysis is somewhat tempered by the fact that there is a significant amount of volatility in inventory levels across the solar industry as companies ramp up capacity for the future at the same time they are struggling with a worldwide shortage of polysilicon. Thus, inventory levels vary significantly based on the timing of when/if individual companies are able to obtain much needed raw materials. Nevertheless, **we have identified cases where inventory growth appears aggressive. We caution that inventory growth at the following companies appears excessive and may result in future quarter margin pressure. AKNS….**

AKNS – AKNS's inventory expressed in days sales (DSI) grew 45 days year-over-year and 42 days sequentially to 95 days - a historical high. Additionally, increasing our concerns, inventory growth exceeds revenue growth expectations. While NTM sales are expected to grow 116%, inventory grew 345%. The Company attributes the ramp-up in inventory to "large purchases of solar panel inventory in preparation for installation on various residential and commercial jobs".

Table 2a: Inventories in Days Sales (DSI)

| (In Days) | 30-SEP-07 | 30-JUN-07 | 31-MAR-07 | 31-DEC-06 | 30-SEP-06 | 30-JUN-06 | 31-MAR-06 | 31-DEC-05 | 30-SEP-05 | 30-JUN-05 |
|---|---|---|---|---|---|---|---|---|---|---|
| AKNS | 95 | 53 | 75 | 45 | 50 | - | - | - | - | - |

Table 2b: Inventory Growth (YOY) - NTM Sales Growth

| | AKNS |
|---|---|
| Inventory Growth, YOY | 345% |
| NTM Sales Growth[7] | 116% |
| Inventory Growth - NTM Sales Growth | 230% |

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- 40 -

(Emphasis added.)

79.     As to Akeena's under accrual for warranty expenses, the RiskMetrics report further disclosed:

> ***Warranty Policies and Warranty Liability Accrual***
>
> Solar Energy Equipment manufacturers provide warranties for any malfunction and defect in their product but also guarantee the long term power generation capability of their solar modules. On average the companies surveyed a little over 1% of annual sales for future warranty costs. ***This section highlights companies which may have temporarily benefited from a decline/reversal of their warranty liability and also compares each company's warranty liability level to average industry peer levels.*** Relevant data showing warranty accruals relative to sales is shown in Table 3. We also provide a critical assessment of the accrual practices across companies with regard to the type and length of warranties provided. We detail warranty policy disclosures for each company surveyed in Appendix 2.
>
> Industry wide warranty liability balances expressed, as a percentage of TTM sales, were relatively stable in the September 2007 quarter. However, the accruals and/or policies of certain companies are worth noting. Specifically:
>
> ***Declines in warranty liability balances at AKNS…may have benefited earnings in recent quarter….***
>
> * * * *
>
> ***Overall, we caution that given the current level of warranty accrued for products that are covered for periods of up to 25 years, any material power generation issue associated with the solar modules sold by these manufacturers is likely to have a significant adverse impact on margins.***

Table 3:  Summary of Warranty Policies and Warranty Liabilities Relative to Sales

| COMPANY | Warranty Policy Summary | Warranty Liability / TTM SALES |
|---|---|---|
| AKNS | Product defect / workmanship warranty: 5 year<br>Power generation warranty: 5 to 25 years on solar panel and inverters<br>Accrual policy: Based on historical experience and future expectations | 2.2% |

(Emphasis added.)

80.     On this news, the Company's stock, which had traded as high as $16.80 per share in intraday trading on January 7, 2008, fell precipitously to close below $10 per share on unusually high volume of over eight million shares trading – more than 13 times the average daily trading volume during December 2007.

81.     Thereafter, on January 16, 2008 defendants filed a Form 8-K with the SEC disclosing for the first time that the previously-announced $17.5 million "increase" in the line of credit with

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                - 41 -

1   Comerica (increasing the Company's line of credit from $7.5 million to $25 million) was not really

2   an increase at all, but a mere cash collateralization agreement whereby Comerica merely agreed to

3   increase Akeena's "line of credit" to the extent Akeena agreed to maintain a cash deposit with

4   Comerica for the same amount.  Defendants now disclosed "the first $17.5 million borrowed under

5   the Credit Facility will not be governed by any formula restrictions *but is subject to satisfaction by*

6   *the Company of a cash collateral balance requirement*."   The investment community began

7   questioning the timing of Cinnamon's stock sales and the viability of its business model, again

8   flanked by Akeena's rapidly decreasing cash position and increasing burn rate, and Akeena's stock

9   continued plummeting, closing at $8.50 per share that day – almost half of what it had traded at on

10   January 7, 2008.

11         82.    On February 20, 2008, Akeena preliminarily disclosed full fiscal 2007 sales of $32.2

12   million, *disclosing the 4Q 2007 sales were only $10.3 million – far less than the "backlog"*

13   *exceeding $13.6 million that defendants had promised on November 17, 2007 -- existed as of the*

14   *end of the 3Q 2007 on September 30, 2007*.  In fact, while defendants had stated during the 3Q 2007

15   earnings conference call that they did not want to disclose a backlog value due to the increase in

16   commercial sales – which took longer than the one to two months defendants had stated in August

17   2007 it took, on average, for residential contracts to pay – even if the backlog value they reported

18   that was purportedly "bigger" than $13.6 million was discounted by 30% (the percentage of orders

19   defendants attributed to commercial at the end of the 3Q 2007), if defendants' backlog report at the

20   end of 3Q 2007 was to be believed, Akeena *then* had over $9.5 million in quick-paying residential

21   orders booked for payment early in the 4Q 2007 and *according to defendants, demand was then*

22   *growing*, meaning it was reasonable for investors to conclude that actual 4Q 2007 sales would

23   dramatically exceed $13.6 million.  But defendants knew as of December 31, 2007, *at the very*

24   *latest,* that the Company's *actual* 4Q 2007 sales of $10.3 million had dramatically underperformed

25   the purported "backlog" by more than 20%.  Still, when they went to the market on January 2, 2008

26   to disclose the licensing agreement with Suntech, promising additional sales of over 10MW of the

27   Andalay solar panels in 2008 under the new licensing agreement, defendants had continued

28   concealing that as of December 31, 2007 they already knew they had significantly missed the 4Q

2007 sales targets purportedly justified by the backlog.  Following Akeena's February 20, 2008 disclosure that it had significantly missed the previously reported backlog sales and was lowering its fiscal 2008 annual sales growth guidance ***by more than 25%***, from 135% to 100% for FY 2008, the Company's stock price plummeted to close at $6.20 per share on February 22, 2008, again erasing hundreds of million of dollars in market capitalization.

83.     On March 3, 2008, Global Hunter Securities initiated coverage recommending a price per share of $7.20.  Global Hunter Securities also disclosed:

> Working capital strain from slow rebate payouts. The California Solar Initiative made the electric utilities the administrators of the program. ***So far, the utilities have been delaying the systems' certification and activation and consequently, the payout on rebates. This has created some working capital strain on the installers.***

(Emphasis added.)

84.     Specifically, where customers did not receive timely rebates, Akeena would have to either fund the installation itself, and carry a loan on the installation, help the customer obtain financing through Comerica, or forego the sale.  Because Akeena's cash was running out, the first scenario was growing less and less possible, the second (Comerica) scenario was limited, and so Akeena's customers had been reneging on previous purchase agreements during the Class Period.

85.     When Akeena finally announced its 4Q 2007 financial results on March 13, 2008, the Company was forced to publicly disclose that the ***loss for the Company's 4Q 2007 quarter that ended December 31, 2007*** – well in advance of Cinnamon's January 2nd and 7th stock sales – had actually ***increased to $4.47 million, or $0.18 a share,*** from $1.19 million, or $0.07, a year earlier. During the conference call following the earnings release, Effren also disclosed that rather than achieving the ***increases*** in gross profits promised, ***"Gross margin for the fourth quarter was 18.2%, compared to 17.2% in the same quarter of last year and 21% in the third quarter."***  Specifically addressing the Suntech licensing agreement and Suntech's "margins in Europe," Effren finally conceded that "***it's something that is going to be relatively small in 2008, I'd say, less than $1 million.***" Effren also made the following admissions concerning Akeena's prior backlog reports – seriously undermining their reliability:

> ***I believe the number was $13.8 million that we disclosed at the end of Q2.***  That was before I was here.  But I do want to tell you, just reiterate some of my prepared

remarks, that the definition that we're using now is a much tighter definition. It's jobs that we have a high expectation – very high expectation – will be installed in no more than six months. ***In the past, our definition was looser in that if we had a signed contract, it would count as backlog. Clearly, the issue is that some of those jobs fell through if financing fell through. Some of them were – some of those jobs still aren't installed.***

(Emphasis added.)

86.     According to *Bloomberg*, on this news Akeena's stock "fell 56 cents, or 8.4 percent, to $6.15 a share in NASDAQ stock market composite trading of 2.18 million" shares.

### POST CLASS PERIOD REVELATIONS

87.     Following the end of the Class Period, Akeena's margins continued dropping, its losses mounted, and its stock price plummeted further, demonstrating that Suntech had no intention to pay meaningful loyalty licensing fees pursuant to the licensing agreement announced on January 2, 2008. Moreover, an April 3, 2008, a report by research analysts at Needham & Company disclosed that Suntech was "charging AKNS a premium price" for the solar panels being purchased pursuant to the Suntech supply contract announced in September 2007.

88.     When Akeena later announced its 1Q 2008 financial results on May 8, 2008, the Company was forced to further disclose that it "now expect[ed] demand for the rest of the year to be weaker than we had originally envisioned and full year revenue to grow by 40% to 50% over last year," down from 100% on March 13, 2008. The quarterly net loss increased to $4.6 million.

89.     On August 5, 2008, Pacific Crest Securities issued a "Morning Note," disclosing latent design defects in the Andalay product:

*Installer, supply chain reveal defects in Andalay.* Our checks with CA-based installers revealed quality issues with deliveries of Andalay modules. Our contacts revealed that *some panels are being returned to Akeena*, depending on the severity of the defect. Specifically, we believe the anodization process is of sub-par quality and is affecting the aesthetics of the product. We believe the issue is with the frame extruder, which does not affect the performance of the modules.

*Impact to the model is unknown.* Akeena touts the aesthetically pleasing nature as a key contributor to charging a premium price for Andalay. Poor manufacturing quality affecting the looks, coupled with reports from our contacts that the module has been returned, *suggest to us that either price breaks were negotiated on the modules kept in the field, or Akeena will suffer increased costs to rectify the situation. In either case, margins should be affected* in Q2. Checks within the supply chain suggest that the module manufacturer is not at fault; instead, the subcontractor delivering the frames is to blame. We believe the problem has been addressed by modifying the anodization process.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 44 -

(Emphasis added.)

90.     During the August 6, 2008 earnings conference call, analysts questioned the purported "increase" in Akeena's "line of credit" announced on December 26, 2007:

> BRAD HENDRICKSON, ANALYST, NOKOMIS: Hi, good afternoon. Hey Gary, I missed what you said on the restricted cash. *What's the restricted cash from?*
>
> GARY EFFREN: It's an amount equivalent to the drawdown on the line of credit as of the end of the quarter.
>
> BRAD HENDRICKSON: *And how come that has to be restricted?*
>
> GARY EFFREN: *Under the terms of our loan agreement with Comerica, we have a requirement to have that amount of cash on deposit. It's basically a collateral requirement.*
>
> BRAD HENDRICKSON: Okay. So, okay. How come you guys -- okay. Maybe I'll talk to you about that off line, because *I don't really understand why you'd even have a line of credit where for every dollar -- for every dollar you take, you need to keep a dollar restricted?*
>
> GARY EFFREN: Let's take it off line. *It's the accounting that's required under the terms of the line of credit and we can talk about that later* . . . .

(Emphasis added.)

91.     Akeena's stock closed at $5.35 on May 8, 2008.

92.     On July 22, 2008, RiskMetrics issued a second report challenging the financial reporting practices of several high-flying solar companies.  Akeena was once again the poster child, with RiskMetrics this time ferreting out and challenging the Company's "more aggressive revenue recognition practice" during the Class Period.  Specifically, RiskMetrics' report disclosed in relevant part that:

> *Revenue Quality and Recognition—Trade Receivables, Unbilled Receivables, and Deferred Revenue*
>
> We assessed risk related to revenue quality and recognition by reviewing levels of trade receivables, unbilled receivables (where disclosed and applicable), and deferred revenue (also known as customer advances) at each company. *We identify concerning trends at certain companies that do not coincide with industry peers*….
>
> *RiskMetrics generally considers significant increases in trade receivables and/or in unbilled receivables, as measured in days sales ["DSO"], to be indicative of either more generous credit terms or sales incentives or, in certain instances, a more aggressive revenue recognition practice. Similarly, we generally view a decline in deferred revenue, as expressed in days sales ["DSDR"], to be indicative of either a decline in demand for a company's products/services or of an accelerated revenue recognition pace.* However, given the rapid revenue growth being experienced by

the companies analyzed, we did our best to separate changes in these balance sheet accounts due to growth in the business with those that appear atypical regardless of growth (and are therefore concerning)....

\*       \*       \*       \*

• *Trends at AKNS appear concerning. In Q1'08, DSO increased by 12 days year-over-year and 4 days sequentially to an all-time high of 88 days. Adding to this concern, DSDR decreased by 12 days year-over-year and 4 days sequentially to an all-time low.*

\*       \*       \*       \*

## Chart 1: DSO Trends at Global Solar Energy Equipment Manufacturer



\*       \*       \*       \*

Table 1: DSO Trends at Global Solar Energy Equipment Manufacturer

| Company | 03/08 | 12/07 | 09/07 | 06/07 | 03/07 | 12/06 | 09/06 | 06/06 | 03/06 | 12/05 | 09/05 | 06/05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AKNS | 88 | 84 | 75 | 60 | 76 | 70 | 65 | 0 | 0 | | | |

\*       \*       \*

## Chart/Table 2: Deferred Revenue Trends at Global Solar Energy Equipment Manufacturer[1]



| Company | 03/08 | 12/07 | 09/07 | 06/07 | 03/07 | 12/06 | 09/06 | 06/06 | 03/06 | 12/05 | 09/05 | 06/05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AKNS | 12 | 16 | 14 | 17 | 24 | 26 | 14 | | | | | |

(Emphasis added.)

93.    For the Company's 2Q 2008, announced August 6, 2008, Akeena now "expect[ed] to grow revenue in 2008 between 30% and 40% over 2007" and announced a $5.1 million net loss. Gross profits had declined to 14.8%.  The Company's stock dropped to $4.22 per share.

94.    By October 9, 2008, the once high-flying Company would report having received a "Notice of Non-Compliance with NASDAQ Marketplace Rule 4350" and delisting threat:

> Akeena Solar, Inc., a leading designer and installer of solar power systems, received notice from The Nasdaq Stock Market on October 7, 2008 that due to the resignation of Mr. George Lauro from its Board of Directors on October 1, the Company no longer complies with Nasdaq's audit committee composition requirements as set forth in Marketplace Rule 4350.
>
> Consistent with Marketplace Rule 4350(d)(4), the notice from NASDAQ confirmed that Akeena will have a cure period in order to regain compliance as follows:
>
> - Until the earlier of Akeena's next annual shareholders' meeting or October 1, 2009; or,
>
> - By March 30, 2009 if the next annual shareholders' meeting is held before March 30, 2009.
>
> Akeena must submit to NASDAQ documentation, including biographies of any new directors, evidencing compliance with these rules no later than these grace period dates.  The Company does not anticipate difficulty in regaining compliance within the grace period, and has begun the process of identifying a replacement independent director to join its Board and Audit Committee.  In the event Akeena does not regain compliance by the required date, NASDAQ will provide written notification that Company's securities will be delisted.  At that time, the Akeena could appeal the decision to a Listing Qualifications Panel.

95.    On November 6, 2008, the Company announced 3Q 2008 sales growth of only 31% and a "[n]et loss for the third quarter of 2008 [of] $5.5 million, or $0.19 per share, compared to a net loss of $3.7 million, or $0.16 per share, in the third quarter of 2007 and a net loss of $5.1 million, or $0.18 per share in the second quarter of 2008."

96.    During the Company's November 6, 2008 earnings conference call, Effren was again asked to explain the economic benefit of the purported "increase" of the Comerica "credit line" in December 2007:

> THEODORE O'NEILL, ANALYST, KAUFMAN BROTHERS: Thank you. Gary, I wonder if you could talk about the restricted cash and how you can use that going forward. As I read it, it is a function of your accounts receivable, the rebates in your

1   accounts receivable and inventory levels that allow you to access that. Is that -- could
    you explain that?

2   GARY EFFREN: Sure, Theo. *The current line of credit that we have with*
3   *Comerica requires us to have a cash balance restricted as to the amount of*
    *borrowings up to the first $17.5 million,* and we can borrow the next $7.5 million
4   based on a percentage of receivables and inventory. *So the restricted cash is really*
    *collateral for the first $17.5 million of borrowing.*

5   THEODORE O'NEILL: So the $15 million that you've taken down now, you can
6   still use that to fund the operation going forward? *Any restrictions?*

7   GARY EFFREN: *There is a restriction on that; it actually serves as collateral for*
    *the first -- like I said, the $14.9 million is really collateral for the $14.9 million that*
8   *is drawn on the line*. . . .

9   (Emphasis added.)

10       97.      Akeena's stock price now dropped to $2.94 per share.

11       98.      On December 16, 2008, Akeena finally disclosed its previously reported commercial

12   sales were not materializing, forcing it to further reduce its "2008 Revenue Growth Rate Guidance":

13       Akeena Solar, Inc., a leading designer and installer of solar power systems, today
         issued revised guidance for the fiscal year ending December 31, 2008.  Due to
14       delayed installations at a few large commercial projects, the company now
         anticipates 2008 annual revenue growth to be in the range of 25% - 30% over 2007.
15       Previously, management had estimated year-over-year revenue growth in 2008 to be
         between 30% - 40%.
16
         99.      On December 16, 2008, the Company's stock that traded at $16.80 per share on
17
     January 7, 2008 plummeted to close at just $1.80 per share.
18
         100.     On March 16, 2009, Akeena Solar filed its 2008 annual financial report.  In relevant
19
     part, the 2008 annual report disclosed:
20
         *Revaluation of inventory*
21
         *During the fourth quarter of 2008, we recorded a $2.6 million inventory write-*
22       *down*, which represented 6.5% of net sales. *This non-cash charge was an*
         *adjustment to the carrying value of our solar panel inventory to reflect the sharp*
23       *decline in world-wide panel prices since the end of the third quarter of 2008*.
         Inventory at year end was $10.5 million, 86% of which were solar panels. Andalay
24       solar panels accounted for approximately 73% of our total inventory. The valuation
         adjustment reflects both the decline in the year end market price of solar panels
25       *compared to our original cost* as well as the lower year end cost for Andalay's
         integrated wiring, grounding and mounting technology.
26
                              *        *        *        *
27

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 48 -

***Our Cash Flows***

Cash used in operating activities was approximately $24.8 million, approximately $18.8 million and approximately $2.3 million for the years ended December 31, 2008, 2007 and 2006, respectively. ***Cash used in operating activities during the year ended December 31, 2008, was primarily due to an increase in inventory,*** an increase in prepaid expenses and other current assets and ***a decrease in accounts payable***, partially offset by non-cash stock-based compensation expense, the write-down of inventory and the increase in bad debt expense. ***The increase in inventory was primarily the purchase of solar panels, while the increase in prepaid expenses and other current assets and the decrease in accounts payable were due to the timing of payments. Cash used in operating activities during the year ended December 31, 2007, was primarily an increase in inventory, an increase in accounts receivables, an increase in prepaid expenses and other current assets and a decrease in customer rebate payable….The increase in inventory was primarily the purchase of solar panels, while the increase in accounts receivables and the increase in prepaid expenses and other current assets was primarily the timing of payments. The decrease in customer rebate payable was due to the timing of receipts from state government agencies.*** <u>***The increase in accounts payable was primarily the timing of payments related to the purchase of solar panels at the end of 2007.***</u> ***Cash used in operating activities during the year ended December 31, 2006, was primarily an increase in accounts receivable and an increase in inventory, partially offset by increases in accounts payable, customer rebates payable, accrued liabilities and accrued warranty and deferred revenue.***

(Emphasis added.)

## CLASS ACTION ALLEGATIONS

101.     This is a class action on behalf of purchasers of Akeena common stock between December 26, 2007 and March 13, 2008, excluding defendants (the "Class").  Excluded from the Class are officers and directors of the Company as well as their families and the families of the defendants.  Class members are so numerous that joinder of them is impracticable.

102.     Common questions of law and fact predominate and include whether defendants: (a) violated the Securities Exchange Act of 1934 (the "1934 Act"); (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; and (d) artificially inflated the price of Akeena common stock and the extent of and appropriate measure of damages.

103.     Lead Plaintiffs' claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Lead Plaintiffs will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

1    104.    At all relevant times, the market for Akeena's common stock was an efficient market

2    for the following reasons, among others:

3    (a)    Akeena's stock met the requirements for listing, and was listed and actively

4    traded on the NASDAQ National Market, a highly efficient and automated market;

5    (b)    According to the Company's 2008 Form 10-KSB, as of  March 10, 2008,

6    there were over 28 million shares of Akeena common stock outstanding.  During the Class Period,

7    on average, more than 3.6 million shares of Akeena stock were traded on a daily basis,

8    demonstrating a very active and broad market for Akeena stock and permitting a very strong

9    presumption of an efficient market;

10    (c)    As a regulated issuer, Akeena filed periodic public reports with the SEC;

11    (d)    Akeena regularly communicated with public investors via established market

12    communication mechanisms, including regular disseminations of press releases on the national

13    circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as

14    communications with the financial press and other similar reporting services;

15    (e)    Akeena was followed by several securities analysts who wrote reports that

16    were distributed to the sales force and certain customers of their respective firms during the Class

17    Period.  Each of these reports was publicly available and entered the public marketplace;

18    (f)    Numerous National Association of Securities Dealers ("NASD") member

19    firms were active market-makers in Akeena stock at all times during the Class Period; and

20    (g)    Unexpected material news about Akeena was rapidly reflected in and

21    incorporated into the Company's stock price during the Class Period.

22    105.    As a result of the foregoing, the market for Akeena common stock promptly digested

23    current information regarding Akeena from publicly available sources and reflected such information

24    in Akeena's stock price.  Under these circumstances, all purchasers of Akeena common stock during

25    the Class Period suffered similar injury through their purchase of Akeena common stock at

26    artificially inflated prices, and a presumption of reliance applies.

27    106.    Plaintiffs are also entitled to the *Affiliated Ute* presumption of reliance to the extent

28    that defendants' statements were materially misleading in failing to disclose material facts about

1   Akeena that would have caused plaintiffs and the Class not to have purchased Akeena stock at the

2   artificially inflated prices at which such securities traded during the Class Period.

3   **NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS**

4        107.   The statutory safe harbor provided for forward-looking statements under certain

5   circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The

6   specific statements pleaded herein either were not identified as "forward-looking statements" when

7   made or were not accompanied by meaningful cautionary statements identifying important factors

8   that could cause actual results to differ materially from those in the purportedly forward-looking

9   statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-

10  looking statements pleaded herein, defendants are liable for those false forward-looking statements

11  because at the time each of those forward-looking statements was made, the particular speaker knew

12  that the particular forward-looking statement was false, and/or the forward-looking statement was

13  authorized and/or approved by an executive officer of Akeena who knew that those statements were

14  false when made.

15  **LOSS CAUSATION**

16       108.   During the Class Period, as detailed herein, defendants made false and misleading

17  statements by means of concealment and obfuscation of critical information concerning Akeena's

18  business fundamentals and key financial metrics and engaged in a scheme to deceive the market.

19  This artificially inflated Akeena's stock price and operated as a fraud or deceit on the Class.  Later,

20  when defendants' prior misrepresentations and fraudulent conduct became apparent to the market,

21  Akeena's stock price fell precipitously, as the prior artificial inflation came out of the stock price

22  over time.  As a result of their purchases of Akeena securities during the Class Period, plaintiffs and

23  other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

24  **FIRST CLAIM FOR RELIEF**

25  **For Violation of Section 10(b) of the 1934 Act**
    **and Rule 10b-5 Against All Defendants**
26

27       109.   Lead Plaintiffs repeat and reallege the above paragraphs as though fully set forth

    herein.

28

110.     Throughout the Class Period, defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Akeena common stock, knowingly or recklessly made materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

111.     During the Class Period, defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Akeena common stock; (b) deceive the investing public, including plaintiffs and other Class members, as alleged herein; and (c) cause plaintiffs and other members of the Class to purchase Akeena common stock at inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein, in violation of §10(b) of the 1934 Act and Rule 10b-5, 17 C.F.R. §240.10b-5.   All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

112.     In addition to the duties of full disclosure imposed on defendants as a result of their affirmative false and misleading statements to the investing public, defendants had a duty to promptly disseminate truthful information with respect to Akeena's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, so that the market price of the Company's securities would be based on truthful, complete and accurate information.  SEC regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

113.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts even though such facts were available to them.

114.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Akeena common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Akeena common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by defendants, or upon the

integrity of the market in which the shares traded, Lead Plaintiffs and other members of the Class purchased Akeena stock during the Class Period at artificially high prices and were damaged thereby.

115.     Had Lead Plaintiffs and the other members of the Class and the marketplace known of the true facts, which were not disclosed by defendants, Lead Plaintiffs and the other members of the Class would not have purchased or otherwise acquired their Akeena shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

116.     By virtue of the foregoing, defendants have violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.  17 C.F.R. §240.10-5.

**SECOND CLAIM FOR RELIEF**

**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

117.     Lead Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

118.     The Individual Defendants acted as control persons of Akeena within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their executive positions, board membership, and stock ownership, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which plaintiffs contend were false and misleading.   The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

119.     In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

120.    Akeena controlled each of the Individual Defendants.

121.    By reason of such wrongful conduct, the Individual Defendants and Akeena are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

### THIRD CLAIM FOR RELIEF

**For Violation of Section 20A of the 1934 Act**
**Against Defendant Cinnamon**

122.    Lead Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

123.    While Akeena securities traded at artificially inflated and distorted prices, defendant Cinnamon personally profited by selling 400,000 shares of his holdings in Akeena securities on January 2, 2008 and January 7, 2008 while in possession of adverse, material non-public information about Akeena, pocketing over $5.5 million in illegal insider trading proceeds for use in his divorce settlement, as detailed herein.  Lead Plaintiffs and members of the Class traded contemporaneously with defendant Cinnamon by purchasing Akeena shares at artificially inflated prices on or within days of January 2, 2008 and January 7, 2008, and were damaged thereby, including 2,000 shares purchased by Sharon Hodges between January 3rd and 4th, 2008, 1,000 shares purchased by Joel Gentleman on January 7th , 2008 and 1,000 share purchased by David Gordon on January 3rd, 2008.

124.    Lead Plaintiffs and all the other members of the Class who purchased Akeena stock contemporaneously with the sales of Akeena stock by Cinnamon:

(a)    have suffered substantial damages in that they paid artificially inflated prices for Akeena stock as a result of violations of §10(b) of the 1934 Act and Rule 10b-5 herein described; and

(b)    would not have purchased Akeena stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated and/or distorted by Cinnamon's false and misleading statements.

1  125.  As a result of the wrongful conduct alleged herein, Lead Plaintiffs and other members

2 of the Class have suffered damages.

3  126.  By reason of the foregoing, defendant Cinnamon violated §20A of the 1934 Act and

4 is liable to Lead Plaintiffs and the other members of the Class for the substantial damages they

5 suffered in connection with their purchase of Akeena stock during the Class Period.

6          **PRAYER FOR RELIEF**

7  WHEREFORE, Lead Plaintiffs, on behalf of themselves and the Class pray for judgment as

8 follows:

9  A.  Determining that this action is a proper class action, certifying Lead Plaintiffs as class

10 representatives under Rule 23 of the Federal Rules of Civil Procedure and designating this

11 Complaint as the operable complaint for class purposes;

12  B.  Awarding compensatory damages in favor of Lead Plaintiffs and the other Class

13 members against all defendants, jointly and severally, for all damages sustained as a result of

14 defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

15  C.  Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity

16 and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 to assure that the

17 Class has an effective remedy;

18  D.  Ordering the Individual Defendants to disgorge their insider trading proceeds,

19 including a constructive trust over those proceeds;

20  E.  Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred

21 in this action, including counsel fees and expert fees; and

22  F.  Awarding such other and further relief as the Court may deem just and proper.

23          **JURY DEMAND**

24 Plaintiffs demand a trial by jury.

25

26

27

28

1   DATED:  December 11, 2009                SCOTT+SCOTT LLP
                                             ARTHUR L. SHINGLER III (181719)
2                                            MARY K. BLASY (211262)
                                             HAL CUNNINGHAM (243048)
3                                            DAVID GOLDBERGER (225869

4
                                             /s/ Mary K. Blasy
5                                            MARY K. BLASY
                                             600 B Street, Suite 1500
6                                            San Diego, CA 92101
                                             Tel: 619-233-4565
7                                            Fax: 619-233-0508

8                                            and

9                                            DAVID R. SCOTT
                                             108 Norwich Avenue
10                                           Colchester , CT 06415
                                             Tel:  860-537-3818
11                                           Fax: 860-537-4432

12                                           Attorneys for Lead Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2       I hereby certify that on December 11, 2009, I caused the foregoing to be electronically filed

3 with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

4 the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused

5 the foregoing document or paper to be mailed via the United States Postal Service to the non-

6 CM/ECF participants indicated on the Manual Notice List.

7       I certify under penalty of perjury under the laws of the United States of America that the

8 foregoing is true and correct.  Executed on December 11, 2009.

9

10                       _/s/   Mary K. Blasy_____

11                       MARY K. BLASY
                       SCOTT+SCOTT LLP

12                       600 B Street, Suite 1500
                      San Diego, CA 92101

13                       Telephone: 619-233-4565
                      Fax: 619-233-0508

14                       E-mail: mblasy@scott-scott.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28