1   STEVEN M. SCHATZ, State Bar No. 118356
    sschatz@wsgr.com
2   DOUGLAS J. CLARK, State Bar No. 171499
    dclark@wsgr.com
3   KELLEY M. KINNEY, State Bar No. 216823
    kkinney@wsgr.com
4   DOMINIQUE-CHANTALE ALEPIN, State Bar No. 241648
    dalepin@wsgr.com
5   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
6   650 Page Mill Road
    Palo Alto, CA 94304-1050
7   Telephone:  (650) 493-9300
    Facsimile:   (650) 565-5100
8
    Attorneys for Defendants
9   Akeena Solar, Inc., Barry Cinnamon and
    Gary Effren
10

11                 UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                     SAN JOSE DIVISION

14

15  SHARON HODGES, On Behalf of Herself and      )   CASE NO.:  CV-09-02147-JW
    All Others Similarly Situated,               )
16                                               )   **MOTION TO DISMISS AMENDED**
                  Plaintiff,                     )   **COMPLAINT FOR VIOLATIONS**
17                                               )   **OF THE FEDERAL SECURITIES**
            v.                                   )   **LAWS**
18                                               )
    AKEENA SOLAR, INC., *et. al*,                )
19                                               )   Date:   May 24, 2010
                  Defendants.                    )   Time:   9:00 a.m.
20                                               )   Dept:   Courtroom 8
                                                 )
21                                               )   Before:  Hon. James Ware
                                                 )
22  _____ )

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ........................................................................ 1

ISSUES TO BE DECIDED (LOCAL RULE 7-4(A)(3)) ........................................... 1

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 4

ARGUMENT.............................................................................................................. 7

I.      PRE-CLASS PERIOD STATEMENTS ARE NOT ACTIONABLE ................................. 8

II.     THE COMPLAINT FAILS TO PLEAD THE FALSITY OF ANY STATEMENT ........... 8

III.    PLAINTIFFS HAVE NOT PLEADED LOSS CAUSATION............................................ 19

IV.     THE COMPLAINT FAILS TO RAISE A STRONG INFERENCE OF SCIENTER ........ 21

CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................... 8

*Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982 (9th Cir. 2008) ................................. 10

*Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104 (N.D. Cal. 2009) ........................................... 9

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) ....................................................... *passim*

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367 (9th Cir. 2003) ............................. 15

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352 (2d Cir. 2002) ...................................... 19

*Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204 (4th Cir. 1994) ............................ 19

*In re Apple Computer, Inc. Sec. Litig.*, 886 F.2d 1109 (9th Cir. 1989) ................................. 18

*In re Business Objects S.A. Sec. Litig.*, No. C 04-2401, 2005 WL 1787860
      (N.D. Cal. July 27, 2005) ............................................................................. 23

*In re Clearly Canadian Sec. Litig.*, 875 F. Supp. 1410 (N.D. Cal. 1995) ............................. 8

*In re Downy Sec. Litig.*, No. CV 08-3261, 2009 WL 2767670
      (C.D. Cal. Aug. 21, 2009) ............................................................................. 9

*In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102 (2d Cir. 1998) ............................... 8

*In re Leapfrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033 (N.D. Cal. 2007) ...................... 15

*In re Northpoint Commc'ns Group, Inc. Sec. Litig.*,
      184 F. Supp. 2d 991 (N.D. Cal. 2001) ............................................................. 10

*In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999) ........................ 9, 21, 24

*In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399 (9th Cir. 1996) ............................................. 11

*In re Sun Healthcare Group, Inc. Sec. Litig.*, 181 F. Supp. 2d 1283 (D.N.M. 2002) .................... 8

*In re Vantive Corp. Sec. Litig.*, 110 F. Supp. 2d 1209 (N.D. Cal. 2000) ............................... 9

*In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002) ............................... 9, 22, 25

*In re Verifone Sec. Litig.*, 11 F.3d 865 (9th Cir. 1993) ................................................. 25

*In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173 (N.D. Cal. 2007) ...................... 20

*Karacand v. Edwards*, 53 F. Supp. 2d 1236 (D. Utah 1999) ............................................. 21

*Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129 (W.D. Wash. 2006) ..................................... 15

*Lipton v. Pathogenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002) ...................................... 23, 25

*McCasland v. FormFactor Inc.*, No. C 07-5545, 2008 WL 2951275
    (N.D. Cal. July 25, 2008) .......................................................................... 25

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049 (9th Cir. 2008) .................... *passim*

*Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001) ............................................. 12, 14, 15

*Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009) .................................... 7

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977) .............................................. 15

*Schultz v. Tomotherapy Inc.*, No. 08-cv-314, 2009 WL 2032372
    (W.D. Wis. July 9, 2009) .......................................................................... 10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ................................ 7, 18, 21

*Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231 (N.D. Cal. 1998) .................................... 9, 14, 18

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) ............................ 22

**STATUTES**

15 U.S.C. § 78u-4(b) .................................................................... 1, 7, 8

15 U.S.C. § 78u-5(c)(1) .................................................................. 1, 15, 22

**MISCELLANEOUS**

Donald E. Kieso, *et al.*, Intermediate Accounting (10th ed. 2001) ................................ 4

1

**NOTICE OF MOTION AND MOTION**

2    PURSUANT TO the Order dated December 14, 2009, on May 24, 2010 at 9:00 a.m.,

3    before the Honorable James Ware, United States District Court, defendants Akeena Solar, Inc.

4    ("Akeena" or the "Company"), Barry Cinnamon, and Gary Effren (collectively "Defendants") will

5    move the Court pursuant to Federal Rules of Civil Procedure 8, 9(b) and 12(b)(6), 15 U.S.C. § 78u-

6    4(b)(1) and (2) and 15 U.S.C. § 78u-5(c)(1)(A),(B) and (c)(2) for an order dismissing the Amended

7    Complaint for Violations of the Federal Securities Laws ("Complaint" or "AC").  This Motion is

8    based on this Motion and Memorandum, the Declaration of Dominique-Chantale Alepin ("Alepin

9    Decl.") and accompanying exhibits ("Ex."), the Request for Judicial Notice, the [Proposed] Order,

10   all pleadings and papers filed herein, oral argument of counsel, and any other matter submitted at

11   the hearing.

12

**ISSUES TO BE DECIDED (Local Rule 7-4(A)(3))**

13    1.    Does the Complaint meet the pleading requirements of 15 U.S.C. § 78u-4(b)(1).

14   (b)(2) and (b)(4) where it does not plead a false statement, the reasons why, all facts on which the

15   allegations are based, fails to plead loss causation, or plead sufficient facts to raise a strong

16   inference of scienter?

17    2.    Are Defendants' forward-looking statements actionable under 15 U.S.C. § 78u-

18   5(c)(1)(A),(B) or (c)(2) and were they accompanied by meaningful cautionary statements?

19

**INTRODUCTION**

20    Akeena is a designer and installer of solar energy systems and, during the class period

21   (December 26, 2007 through March 13, 2008, the "Class Period"), successfully managed many of

22   the challenges presented to a new public company in the rapidly growing solar industry.  From late

23   2007 until 2008, the Company experienced a remarkable period of growth and positive news after

24   just having gone public in August 2006.  During this time, Akeena was accepted on the NASDAQ,

25   hired a new Chief Financial Officer, raised $26.1 million in a private placement, unveiled its

26   proprietary solar system called Andalay, entered into a supply and a licensing agreement with a

27   major solar panel manufacturer, Suntech, increased its line of credit with Comerica Bank from $7.5

28   million to $25 million, and grew its revenue year over year by more than 140%.  During the Class

1   Period, Akeena, as the only publicly traded company that solely designed and installed solar

2   systems, attracted investors that purchased and sold its stock knowing it was a hopeful and risky

3   venture, especially given its lack of profitability since becoming publicly-traded in 2006.

4          Plaintiffs attempt to rewrite the history of this period, however, in an unsuccessful effort to

5   portray a fraudulent scheme.  Plaintiffs' claim is based on a theory that beginning in late 2007,

6   Akeena, Mr. Cinnamon and Mr. Effren embarked on a path to inflate the price of Akeena's stock

7   in the short term solely so Mr. Cinnamon could sell stock to fund a divorce agreement with his ex-

8   wife.  After devoting much of the Complaint to Mr. Cinnamon's purported motive for wanting to

9   inflate Akeena's stock price (omitting entirely why Mr. Effren or Akeena would engage in such a

10  scheme), plaintiffs neglect to put forth a coherent premise of the "fraud" Defendants allegedly

11  committed.  Instead, the Complaint just misleadingly picks and chooses portions of the Company's

12  disclosures in an effort to cast doubt on perfectly appropriate stock sales and accurately stated

13  public announcements while leaving the reader in a quandary to decipher the logic in the

14  Complaint's allegations.

15         Information from the publicly available documents on which plaintiffs rely actually

16  contradicts their claims.  Plaintiffs' drafting exercise does not even purport to be aided by

17  "confidential witnesses" or internal Company documents shedding light on the supposed fraud.

18  These facts further evidence that the Complaint was a drafting exercise and not a revelation of a

19  fraud.  Thus, multiple bases exist for granting this Motion.

20         First, plaintiffs have included a number of purportedly "false" statements that are not

21  actionable as a matter of law because they predate the Class Period.  The pre-Class Period

22  allegations are also separately refuted by public disclosures cited by plaintiffs in the Complaint.

23  Consequently, the pre-Class Period statements cannot be used as the basis for plaintiffs' claim.

24         Second, plaintiffs have not pleaded a false statement, let alone facts that would show that

25  such statements were false when made.  For example, the Complaint takes exception with the

26  backlog Akeena reported in August and November 2007, but pleads no facts raising an inference

27  that backlog was false or inaccurate.  Indeed, if the market expected that backlog would

28  automatically convert to revenue for 4Q 07, revenue expectations would have been adjusted

accordingly.  Instead revenue forecasts remained constant and Akeena met and indeed exceeded revenue expectations for the fourth quarter and fiscal year 2007, which the Complaint does not dispute.  Additionally, the Complaint omits the fact that backlog is a non-required reporting metric with company-specific definitions that represent the accumulation of uncompleted jobs with no certain completion dates before revenue can be recognized.  It also neglects that the Company explicitly and unequivocally publicly disavowed backlog as a meaningful metric.  With respect to backlog, the Company stated that "we don't believe that backlog is a meaningful metric . . . " and warned "that backlog would not provide meaningful visibility into future quarterly results."  *See* page 11 *infra*.  The Complaint pleads no facts that contradict the simple fact that Akeena disclosed its backlog, the investment community incorporated that data – along with the Company's growth estimates and other information – into its revenue expectations for Akeena and Akeena exceeded those expectations.  That is sound disclosure and performance, not securities fraud.

Similarly, although the investment community and analysts responded positively to Andalay, a product that offered fewer parts, faster installation and a sleeker look for solar panels, the Complaint alleges Defendants were secretly aware of certain unspecified "design defects" – defects of which, to this date, Akeena is not aware.  The Complaint also alleges that Akeena entered into an "economically infeasible" manufacturing agreement with Suntech agreeing to pay a "premium" for solar panels Suntech supplied.  Nowhere, however, does the Complaint point out that Akeena was operating in the face of a worldwide shortage of silicon – a necessary component for solar panels – and that the Suntech agreement addressed that critical supply issue, a fact which was fully disclosed.  Additionally, although the Complaint alleges Defendants withheld the limited revenue impact of the Suntech licensing agreement for 2008, the market was aware of this information *contemporaneously* with that announcement.  And finally, the Complaint alleges Defendants withheld key terms of its Comerica loan agreement at a time when the terms were not final or ultimately divergent from the Company's other loan covenants.  Consequently, this Complaint should be dismissed because it does not plead falsity, an essential element of a securities claim.

Third, plaintiffs have failed to plead loss causation. Importantly, throughout the Class Period, Defendants made full and accurate disclosures on all topics about which plaintiffs complain. In fact, on March 13, 2008, the end of the Class Period, Defendants made no "revelation" related to *any* of the topics about which plaintiffs complain, but instead announced the Company had *exceeded* revenue projections for 2007. Although the stock traded at a relatively low price during the spring of 2008, this was a reflection of the volatility of the stock due to the uncertain outlook of the Company, uncertainty around whether the federal solar tax credit would be extended beyond 2008 (a widely known and critical concern), and the economic crisis that was restricting consumers' access to credit. A drop in a company's stock price caused by such factors cannot be the basis for securities fraud. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (securities laws are designed "*not* to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.") (emphasis added).

Finally, the Complaint's scienter allegations are woefully inadequate. Mr. Cinnamon is not only alleged to have sold only 5% of his holdings during the Class Period, but he also did so pursuant to a validly executed 10b5-1 plan in which he ceded control over his stock sales to a broker. No other Section 16 officer, including Mr. Effren, is alleged to have sold stock. In conclusion, the Complaint should be dismissed with prejudice because it does not allege a single fact to support a fraud claim.

## STATEMENT OF FACTS

Akeena is a small Los Gatos based company that designs and installs solar power systems for residential and small commercial customers in the United States. AC ¶¶ 2, 32. Akeena is not a manufacturer of solar panels. *Id.* ¶ 2. The Company specializes in the design and integration of grid-tied power systems, which are electrically connected to the utility grid so that excess energy produced during the day flows backwards through the utility's electric meter. *Id.* ¶ 32. Akeena first became public in August 2006 and began trading on the NASDAQ National Market in September 2007. *Id.* ¶ 35. Barry Cinnamon, the Company's founder, Chief Executive Officer and President, is a longtime advocate of solar energy and founded Akeena in 2001. *Id.* ¶¶ 3, 29, 32. On September 24, 2007, the Company announced that Gary Effren, formerly the Chief Financial

1    Officer of Knight Ridder, joined the Company as Chief Financial Officer. *Id.* ¶¶ 30, 47.  The

2    Complaint addresses four aspects of the Company's business.

3        **Backlog.**[1]  Prior to the Class Period, during the August 9, 2007 conference call discussing

4    the Company's results for 2Q 2007 (ending June 30, 2007), Mr. Cinnamon disclosed that Akeena

5    had backlog of $13.6 million.  AC ¶¶ 40-41.  During the same call, Mr. Cinnamon explained that

6    residential contracts *can* take as short as one to two months to install, but that commercial contracts

7    *could* take longer.  *Id.* ¶ 41.  In the same call, the Company reiterated its fiscal year 2007 revenue

8    guidance of 135% growth over the prior fiscal year.  Ex. 1 at 4; AC ¶ 41.  At the end of the next

9    quarter, which also predates the Class Period, the Company announced revenue of $8.1 million for

10   3Q 2007 (ending September 30, 2007), and affirmed its guidance of increasing revenue by 135%

11   over the prior year.  AC ¶ 54.  During this November 13, 2007 conference call discussing the 3Q

12   results, Mr. Effren told analysts the Company would not prospectively provide a definite backlog

13   number (except to say that Akeena had grown its backlog in comparison to the previous quarter)

14   because of the growing commercial side of the business and the Company's belief that backlog

15   was not a meaningful metric.  *Id.* ¶ 56; Ex. 2 at 4.  He further stated:

16       [a] commercial contract can take three months to a year between signing and revenue
         recognition due to financing, permitting and other issues that are typical for our
17       industry.  Since commercial work can be lumpy and impact quarterly results
         significantly, we've concluded that backlog would not provide meaningful visibility
18       into future quarterly results.  Nonetheless, on a comparable basis to the $13.6 million
         of backlog disclosed at the end of Q2, the Q3 backlog was larger.
19

20   AC ¶ 56; Ex. 2 at 4.

21       The Company reported revenue of $13.4 million for fiscal year 2006; thus, a 135% increase

22   would have required $31.5 million of revenue in fiscal year 2007, or based on the Q3 2007 results,

23   4Q 2007 revenue of $9.6 million.  Analysts also projected $9.5 million in revenue for 4Q 2007.

24   AC ¶ 59; Ex. 3 at 9.  Ultimately, Akeena *exceeded* its own guidance and analysts' expectations,

25

26

27       [1] A company is not required to report backlog in its financial statements, and a company's
28   disclosure of backlog is not governed by the Generally Accepted Accounting Principles
     ("GAAP").  *See* Donald E. Kieso, *et al.*, Intermediate Accounting at 4 (10th ed. 2001).

1 announcing 4Q 2007 revenue of $10.3 million and 2007 fiscal year revenue of $32.2 million,

2 reflecting 140.6% in revenue growth for fiscal year 2007.  AC ¶¶ 82, 85; Ex. 4.

3      **Andalay Release.**  On September 24, 2007, Akeena announced that it had unveiled a

4 unique new solar panel system called Andalay, which not only had state-of-the-art solar panel

5 technology, but also had outstanding aesthetics.  AC ¶ 49.  Andalay offers built-in wiring,

6 grounding and racking, and installation requires 70% fewer parts and 25% fewer attachments,

7 allowing for faster installation.  *Id.*  An analyst report by Jesup & Lamont highlighted Andalay's

8 benefits and noted that Akeena was attempting to create value through Andalay by standardizing

9 installation of solar panels, thereby reducing costs.  *Id.* ¶¶ 59-60; Ex. 3 at 4.

10      **Suntech Manufacturing and Licensing Agreements.**  On September 24, 2007, Akeena

11 announced that Suntech, one of the leading manufacturers of photovoltaic cells and modules, had

12 signed a letter of intent to manufacture Akeena's Andalay solar panels.  Under the agreement,

13 Suntech would manufacture 10 to 14 megawatts ("MW") of Andalay solar panels during 2008.

14 AC ¶ 50.  In August 2007, Jesup & Lamont reported that the solar industry had been negatively

15 impacted in recent years by the shortage of silicon and that shortages were going to persist,

16 resulting in "firm" pricing likely for the second half of 2007.  *Id.* ¶¶ 44-46; Ex.5 at 3.  By

17 November, Jesup & Lamont noted that this shortage was at risk of lasting perhaps into 2010.  Ex. 3

18 at 8; AC ¶¶ 59-60.  Because Akeena relies on solar panel products primarily produced from

19 polysilicon, the September 24, 2007 announcement that Akeena had secured a panel supply of 10-

20 14 MW for 2008 was viewed positively by the investment community and contributed to Akeena's

21 stock closing 16% higher from the prior trading day close, and 27% higher by the end of the

22 trading week.  Exs. 3, 6.[2]

23

---

24    [2] On March 13, 2008, Akeena announced it had entered another supply agreement with Kyocera Solar Inc., whereby Kyocera would also manufacture Andalay solar panels.  Ex. 4 at 5;

25 AC ¶ 85.  Analysts reported that having two panel suppliers allowed the Company to receive competitive pricing going into 2009 and 2010 and would help manage supply risks.  Ex. 7 at 12;

26 AC ¶ 87.  Although both companies were charging a "premium" price compared to its straight solar module sales, this premium represented the additional parts being sold for the framing,

27 wiring and grounding components of the product.  Additionally, Akeena chose Kyocera and Suntech over second and third tier suppliers because they were more established and more likely

28 to honor their warranties in 20-30 years.  Ex. 7 at 12; AC ¶ 87.

On January 2, 2008, Akeena announced that it had also entered a license agreement with Suntech whereby Suntech would distribute Andalay in Europe, Japan and Australia starting in January 2008.  AC ¶ 65.  Jesup & Lamont issued a report the next day stating that the licensing agreement with Suntech, according to the Company, would likely provide "relatively small revenue improvements," around $1 million in 2008, but would enhance gross margins.  *Id.* ¶ 71; Ex. 8 at 2.

**Comerica Bank Credit Line.**  Between 2006 and 2007, Akeena developed a banking relationship with Comerica.  Prior to December 2007, Akeena maintained a $7.5 million line of credit with Comerica which was subject to collateral of all of Akeena's assets.  Ex. 16 at 5.  In addition, Comerica offered loans to Akeena's customers for purchase of solar panels.  AC ¶ 43.  On the first day of the Class Period on December 26, 2007, the Company announced that it had received a commitment from Comerica to increase its credit line from $7.5 million to $25 million.  *Id.* ¶ 61.  The release disclosed that availability of the funding was subject to execution of "final definitive loan documentation."  *Id.*  Under the increased facility, $17.5 million would be available for borrowing on a non-formula basis, with up to a further $7.5 million available for borrowing against accounts receivable and inventory levels.  *Id.*  On January 11, 2008, the Company reached final agreement on the terms of the credit line increase and executed the final loan documentation.  The complete agreement was filed with an 8-K on January 16, 2008, which summarized that under the terms of the agreement the first $17.5 million borrowed would be subject to a collateral cash balance requirement.  *Id.* ¶ 81; Ex. 9 at 4.

# ARGUMENT

To state a claim under Section 10(b) and Rule 10b-5, plaintiffs must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) loss or proximate causation; and (6) resulting damages.  *Dura*, 544 U.S. at 341-42; *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1164 (9th Cir. 2009).  The Reform Act applies to plaintiffs' claims and imposes "exacting" pleading requirements, described below where applicable.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).   A complaint "shall" be dismissed if it does not meet the Reform Act's pleading standards.  15 U.S.C. § 78u-4(b)(3)(A).

1    Plaintiffs' allegations must be sufficient to "nudge[] their claims across the line from conceivable to

2    plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (discussing pleading

3    requirements for 12(b)(6) motions to dismiss and stating that "a plaintiff's obligation to provide the

4    'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic

5    recitation of the elements of a cause of action will not do") (alteration in original) (citation omitted).

6    **I.    PRE-CLASS PERIOD STATEMENTS ARE NOT ACTIONABLE**

7          As a preliminary matter, the Complaint contains several purportedly "false" statements

8    made prior to the Class Period: (1) the August and November 2007 announcements regarding

9    backlog; (2) the September 2007 announcement regarding Andalay; and (3) the September 2007

10   announcement regarding the Suntech supply agreement.  *See* AC ¶¶ 40-60.  Plaintiffs claim that

11   Defendants face liability for these statements  as they remained "alive" in investors' minds because

12   Defendants "never *retracted*" them.  *See id.* ¶ 13 (emphasis added).  Plaintiffs' theory of liability

13   for these pre-Class Period statements is contrary to established law.  "A defendant . . . is liable only

14   for those statements made during the class period." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163

15   F.3d 102, 107 (2d Cir. 1998); *see also In re Clearly Canadian Sec. Litig.*, 875 F. Supp. 1410, 1420

16   (N.D. Cal. 1995) ("As the class period defines the time during which defendants' fraud was

17   allegedly alive in the market, statements made . . . before or after the purported class period are

18   irrelevant to plaintiffs' fraud claims.").  Thus, Defendants' failure to "retract" those pre-Class

19   Period statements also cannot subject them to liability.  *See In re Sun Healthcare Group, Inc. Sec.*

20   *Litig.*, 181 F. Supp. 2d 1283, 1293 (D.N.M. 2002).  For this reason, any claim for liability for these

21   three statements mentioned above must be dismissed.

22   **II.    THE COMPLAINT FAILS TO PLEAD THE FALSITY OF ANY STATEMENT**

23         As to the various selected statements, the Complaint fails to adequately allege falsity.  To

24   allege falsity, the Reform Act requires a plaintiff to "specify each statement alleged to have been

25   misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding

26   the statement is made on information and belief, the complaint shall state with particularity all facts

27   on which the belief is formed."  15 U.S.C. § 78u-4(b)(1).  The "all facts" requirement means that a

28   plaintiff must "provide, in great detail, all the relevant facts forming the basis of [his or] her

1   belief," including "adequate corroborating details." *In re Silicon Graphics, Inc. Sec. Litig.*, 183

2   F.3d 970, 985 (9th Cir. 1999) (rejecting plaintiff's allegations for failing to include "the sources of

3   her information").  The requirement has been called the Reform Act's "single most important

4   weapon against pleading fraud by hindsight." *In re Vantive Corp. Sec. Litig.*, 110 F. Supp. 2d

5   1209, 1216 (N.D. Cal. 2000), *aff'd*, 283 F.3d 1079 (9th Cir. 2002).

6          The Complaint points to the alleged "falsity" of statements made by Defendants before,

7   during and after the Class Period concerning backlog, Andalay, the Suntech agreements, and

8   Akeena's January 2008 loan from Comerica.  The Complaint is devoid of any facts that would

9   show that the noted statements were false at the time they were made.  *See In re Downy Sec. Litig.*,

10  No. CV 08-3261, 2009 WL 2767670, at *4 (C.D. Cal. Aug. 21, 2009) ("facts supporting falsity

11  must be pled with particularity, including the 'who, what, when, where, and how' of the alleged

12  fraud allegations.").  Instead of relying on any specific facts, internal documents or confidential

13  witnesses, the Complaint impermissibly uses 20/20 hindsight to demonstrate falsity by, in some

14  cases, juxtaposing later made statements against the earlier statements and, in other cases, simply

15  proclaiming their falsity.  *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th

16  Cir. 2008) (holding that "[a] litany of alleged false statements, unaccompanied by the pleading of

17  specific facts indicating why those statements were false" is insufficient under the PSLRA).

18         Moreover, the Complaint has pleaded falsity in a mix-and-match fashion – forcing

19  *Defendants* to ascertain what exactly is alleged to be false.  "In the context of securities class action

20  complaints, courts have repeatedly lamented plaintiffs' counsels' tendency to place 'the burden []

21  on the reader to sort out the statements and match them with the corresponding adverse facts to

22  solve the 'puzzle' of interpreting Plaintiff's claims.'"  *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d

23  1104, 1113 (N.D. Cal. 2009) (internal quotation marked omitted) (citing *Wenger v. Lumisys, Inc.*, 2

24  F. Supp. 2d 1231, 1244 (N.D. Cal. 1998)).  The instant Complaint requires no less effort on the

25  part of Defendants or the Court in sorting the various allegations (including completely irrelevant

26  quotations from before, during and after the Class Period), and in piecing together theories posited

27  by the Complaint.  *See, e.g.*, AC ¶ 78 (quoting from an analyst report during the Class Period on

28  inventory levels); *id.* ¶ 79 (quoting from an analyst report during the Class Period regarding

1   warranty liability balances); *id.* ¶ 92 (quoting from an analyst report after the Class Period

2   regarding revenue recognition at Akeena).  Plaintiffs' "puzzle pleading" should weigh heavily in

3   favor of the Complaint's dismissal.  *In re Northpoint Commc'ns Group, Inc. Sec. Litig.*, 184 F.

4   Supp. 2d 991, 1005 (N.D. Cal. 2001) (holding that "puzzle-style pleading" is "contrary to both the

5   PSLRA and the general standards for pleading fraud.").

6         **Backlog.**  The Complaint alleges that the backlog figures reported by Akeena on August 9,

7   2007 ($13.6 million) and November 13, 2007 (more than $13.6 million), months prior to the

8   beginning of the Class Period, were false and misleading.[3]  AC ¶¶ 12, 22.  As noted above,

9   Defendants cannot be held liable for these statements which were made prior to the start of the

10   Class Period.  *See supra* at 7-8.  The Complaint also fails to demonstrate that these backlog

11   statements were ever false.

12         The Complaint tries to demonstrate falsity of the pre-Class Period statements by arguing that

13   later statements regarding revenue revealed the "false nature" of the earlier backlog disclosures.[4]

14

---

15      [3] Plaintiffs' claim that the investment community was fixated on backlog is puzzling; the
16   same day Mr. Effren announced that the Company had backlog exceeding $13.6 million,
     Akeena's stock price dropped by 25% to $5.50.  *See* Ex. 6.

17      [4] The Complaint also claims that, despite specific warnings given to investors regarding the
18   lack of reliability of backlog as an indicator of future revenue, "[i]nvestors [in Akeena were]
     entitled to rely on defendants' discussion of 'backlog'" under *Berson v. Applied Signal
     Technology, Inc.*, 527 F.3d 982, 990 (9th Cir. 2008); AC ¶ 13.  The Complaint's hypothesis
19   regarding *Berson* is misguided; *Berson* simply held that statements the company in question,
     Applied Signal, had made regarding backlog could be relied on by investors.  The Ninth Circuit
20   made no generally applicable holding to statements made by other companies regarding backlog.
     *See Berson*, 527 F.3d at 990.  As the district court in *Schultz v. Tomotherapy Inc.*, held "[i]n
21   *Berson*, defendants had made statements suggesting that *all the orders in the backlog could be
     relied upon as future revenue* and only contractual cancellation or modifications could stand in
22   the way of those orders converting into revenue." No. 08-cv-314, 2009 WL 2032372, at *13
     (W.D. Wis. July 9, 2009) (emphasis added).  Here, not only did Defendants not make any
23   representations regarding how much of backlog would convert into revenue, they specifically
     dispelled any reliance on Akeena's backlog numbers as a predictor of future revenue and in
24   November 2007 gave no specific value of backlog except to state that it was "more than" what
     had been previously reported.  Thus, the holding in *Berson* on whether it was reasonable for
25   Applied Signal investors to rely on backlog figures is inapplicable to this case.  *See infra* at 10
     (quoting Ex. 2 at 4) ("we've concluded that backlog would not provide meaningful visibility into
26   future quarterly results.");  AC ¶ 56.  Though not necessary to resolve the issue, given the fullness
     of their forecast coupled with Mr. Effren's explicit disavowal of backlog as a predictor of future
27   quarterly results, plaintiffs misleadingly suggest that there is only one definition of backlog.
     Plaintiffs are wrong.  There are dozens of ways a company could define backlog, as it is not a
28   GAAP term.

Not so.  First, the Complaint cites to a statement made on February 20, 2008 reporting Akeena's sales and revenue figures for fiscal year 2007 and 4Q 2007.  AC ¶ 82.  According to plaintiffs' theory, because the Company "only" reported $10.3 million in sales for 4Q 2007, representations regarding backlog in August and November (as "at" or "exceeding" $13.6 million) were false.  *Id.* ¶¶ 22, 56, 82.  Plaintiffs themselves admit however that the reported backlog would only "*presumably* result in actual sales during the 4Q 2007." *Id.* ¶ 12 (emphasis added).  The Complaint's use of the word "presumably" is not without reason.  Absent from the Complaint is any statement made by *any defendant* that backlog would be converted into revenue by the end of fiscal year 2007.  *See Id.* ¶¶ 12-14, 22, 41, 44, 56, 75(a).  This is because such statements do not exist.  In fact, Mr. Effren expressly disavowed backlog as an accurate predictor of future revenue:

> Due to the growing commercial side of our business we *don't believe that backlog is a meaningful metric*.  A commercial contract can take three months to a year between signing and revenue recognition due to financing, permitting, and other issues typical to our industry.  Since commercial work can be lumpy and impact quarterly results significantly, *we've concluded that backlog would not provide meaningful visibility into future quarterly results*.

*See* Ex. 2 at 4 (emphasis added); AC ¶ 56; *see also* Ex. 1 at 12.  One wonders what else Mr. Effren could have said to dissuade investors from relying on Akeena's backlog numbers as a sole determinant of revenue.  Forward-looking statements when accompanied by cautionary language like that employed by Mr. Effren protect a defendant against claims of securities fraud.  *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1408 (9th Cir. 1996) (citations omitted); AC ¶¶ 12, 40-41.  Contrary to the Complaint's allegations, Defendants never indicated that backlog would be converted to revenue by the end of fiscal year 2007 and clearly warned the market that backlog should not be relied on in determining future quarterly results.

Moreover, the Complaint's theory that the false backlog figures were "revealed" when the Company disclosed its 4Q 2007 figures is further undermined by one important fact: at the same time Defendants disclosed the backlog figures (as at or exceeding $13.6 million) on November 13, 2007, the Company and analysts were contemporaneously predicting around *$9.5 million* in revenue for 4Q 2007.  *See* Ex. 3 at 6; AC ¶¶ 59-60; Ex. 10; AC ¶¶ 38, 54.  On November 13, 2007, the same day as Mr. Effren's cautionary discussion of backlog, the Company reiterated that it was

"squarely on track" to increase revenue 135% over fiscal year 2006, meaning that the Company was projected to hit revenue of $9.5 million in 4Q 2007. Ex. 10; AC ¶¶ 38, 54; *see also* Ex. 3 at 6; AC ¶¶ 59-60; Ex. 2 at 4. No investor could have possibly believed that Akeena would convert the $13.6 million in backlog into revenue by the end of 4Q 2007 as that belief was inherently inconsistent with the 4Q revenue projection *given the same day as the conference call.* Indeed, analyst revenue projections for 4Q remained at $9.5 million even after Mr. Effren's November 13 statement about backlog. *See* AC ¶ 59; Ex. 3 at 6 (projecting 4Q revenue of $9.5 million on November 27, 2007). Moreover, the Company exceeded its estimation, recording revenue of $10.3 million for Q4 2007 and revenue growth for the 2007 fiscal year in excess of 140% over fiscal year 2006.[5] *Lumisys*, 2 F. Supp. 2d at 1249 (holding "[t]hese projections are not actionable because Lumisys' results were pretty much what Lumisys had allegedly predicted.").

The Complaint also attempts to demonstrate falsity by pointing to a statement by Mr. Effren on March 13, 2008 in which he stated that the definition of backlog the Company used in 2007 was "looser in that if we had signed contract, it would count as backlog." AC ¶¶ 13, 85. The Complaint fails to demonstrate how a "looser" definition of backlog would have made backlog figures disclosed in August and November 2007 false. The fact that a contract sat in backlog, took time to be installed or ultimately fell through due to lack of financing does not render the earlier backlog figures false. *Ronconi v. Larkin*, 253 F.3d 423, 433 (9th Cir. 2001) (holding a later statement must be inconsistent with the prior statement to demonstrate falsity). The Complaint's reliance on easily refuted inferences or exaggerated "admissions" is understandable. The Complaint is bereft of real facts to support its backlog claims. Plaintiffs say backlog is false? How

---

[5] Plaintiffs are misguided in their claim that Defendants "concealed that Akeena's 4Q 2007 quarterly loss (for the period that had already ended December 31, 2007) had increased." AC ¶ 22 (emphasis omitted). Plaintiffs have not pointed to any statements that would have been rendered false and misleading by the disclosure of the 4Q 2007 losses on March 13, 2008. *Id.* Akeena never gave any guidance on an expected profit or loss for 4Q 2007. Akeena did warn investors that Akeena was incurring larger operating expenses (such as marketing and sales expenses) with the rollout of Andalay. *See* Ex. 2 at 4 ("As previously forecast, marketing campaigns, including the Andalay introduction, made-up a large percentage of our sales and marketing expense. *We expect more moderate increases in these expenses in the fourth quarter*.") (emphasis added); AC ¶¶ 56-57.

1   much was it?  Is there a Company document that reveals a lower figure?  Akeena obviously had

2   strong orders in 2007 – strong enough to exceed its own and analysts' expectations.

3          The Complaint's only purported "basis" for claiming that backlog was false is their

4   unsupported hypothesis that the California Solar Initiative "had not yet certified the Andalay

5   system, such that customer rebates were not being paid, forcing Akeena to fund the installation

6   itself, or forgo sales where it was unable to do so." AC ¶¶ 14, 75(j).  Plaintiffs provide no support

7   for the bald assertion that Andalay did not qualify for rebates, nor can they.  Moreover, the

8   Complaint never sheds light on how a delay in the payment of rebates would have any bearing on

9   backlog, much less when it would have impacted backlog and how much backlog would have been

10   overstated.  *See Metzler*, 540 F.3d at 1070-71.  Indeed, because Akeena – and not the customer –

11   was entitled to the rebate, an analyst noted this delay created "some working capital strain on the

12   installers" but did not indicate that it would impact signed contracts or backlog.  *See* AC ¶ 83; Ex.

13   11 at 3.  Even Akeena disclosed that because it fronted the rebates for the California Solar

14   Initiative, any impact of unfulfilled rebates affected Akeena's operating capital – not its backlog.

15   *See* Ex. 2 at 13; AC ¶¶ 56-57.[6]

16          **Andalay.**  On September 24, 2007, Akeena "unveiled unique new solar panels that look

17   like handsome designer-produced skylights" which not only looked sleeker than old solar panel

18   models but would cut installation time "from half a day to half an hour."  *See* AC ¶ 49.  The

19   Complaint alleges that beginning in September 2007, three months prior to the Class Period,

20   "defendants began touting Akeena's new state-of-the-art 'Andalay' solar system, billing it as a

21   significant cost leader and profit enhancer[,]" and argues that Defendants promised an

22   improvement in gross margins. *Id.* ¶¶ 11, 49.  The Complaint posits that this was false because

23   Andalay suffered from design defects (*id.* ¶ 11) which "required Akeena to make partial refunds to

24

25

26

27   ───────────────

       [6] Indeed the Company reported in November 13, 2007 that the California Solar Initiative
   program would not affect Akeena's bottom line as, "with the borrowing capacity that [Akeena
   has], it doesn't really even create a blip in terms of our ability to continue to sell and install

28   jobs." Ex. 2 at 13; AC ¶¶ 56-57.

1   leave the systems in the field, or to replace many units undercutting the purported 'great aesthetics

2   and superior reliability' defendants promised Andalay provided."  *Id.* ¶ 75(f).[7]

3        The allegations supporting the falsity of Andalay statements are woefully insufficient.

4   First, the Complaint fails to specify what types of "defects" Andalay suffered and how such defects

5   would have impacted Akeena's business.  Second, the Complaint alleges that the falsity of

6   statements is supported by disclosures about 4Q 2007 margins.  Statements regarding those

7   margins (which include both residential and commercial margins) have no bearing on statements

8   Defendants made in 2007 regarding Andalay.  Andalay is a *residential* solar power product which

9   Akeena began rolling out only toward the end of 4Q 2007.  *See* Ex. 12 at 8 ("We just started to

10  market and sell Andalay customers *at the end of the fourth quarter 2007 . . .*") (emphasis added);

11  AC ¶ 85.  The statements made regarding Andalay's impact on margins were made with reference

12  to *2008 residential* sales.  *See* Ex. 2 at 3 (quoting Mr. Cinnamon as saying with respect to

13  *residential* sales that he "expect[ed] the sales of Andalay will contribute towards gross margin

14  improvement in the range of 10% to 15%"); Ex. 2 at 4 (quoting Mr. Effren as saying: "We expect

15  to see margins on residential installation *[to] increase during 2008 with the rollout of Andalay.*").

16  Thus *any* realization (much less a full realization) of increased margins was expected to occur in

17  2008 – not in 4Q 2007.[8]

18        Third, the Complaint fails to demonstrate that Akeena suffered decreased margins.  Indeed,

19  Akeena's gross margins in 2007 *improved* relative to 2006, as did gross margins improve in 4Q

20  2007 as compared to 4Q 2006.  *See* Ex. 12 at 5 ("Margin improved year-to-year due to improved

21  _____

22    [7] The only support posited for the claim that Andalay suffered from design defects is a post-
    Class Period analyst report made on August 5, 2008 in which an analyst reported overhearing

23  from an installer that the panels had defects.  *See* AC ¶ 89.  Not only are third-hand reports
    considered insufficient "facts" to support a claim of falsity, but the report itself acknowledges

24  that the problem had been resolved.  *See id.*; *Lumisys*, 2 F. Supp. 2d at 1250 ("As the post-
    Reform Act cases have emphasized, without specific references to specific facts demonstrating

25  that the statements at issue were false or misleading when made, allegations regarding adverse
    information supposedly known to defendants are merely 'speculation and conclusions drawn

26  from hindsight.'") (citation omitted).  Moreover, Akeena, to this day, has never reported any
    design defects.

27    [8] In addition, plaintiffs fail to specify how a general statement about reduced margins (which
    included commercial and residential margins) would *necessarily* have meant that residential

28  margins had not increased.  *Ronconi*, 253 F.3d at 433.

efficiency" and margin "for the fourth quarter was 18.2% compared to 17.2% in the same quarter of last year.").  Although gross margins were down in 3Q 2007 as compared to 3Q 2006, Mr. Effren explained that this was due to the fact that commercial sales, which have lower margins, constituted a higher proportion of their sales.  *Id.*  Thus, the disclosure of mixed results regarding margins is not "inconsistent with the statements so as to show that the statements must have been false or misleading when made."  *Ronconi*, 253 F.3d at 434.

Finally, the statements regarding Andalay's aesthetics, reliability and ability to increase profits or margins are not actionable statements under the securities laws as they are nothing more than corporate puffery.  *See Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) (rejecting plaintiff's fraud and negligence claims based on the defendant's statements "generally describing the 'high priority' [defendant] placed on product development and alluding to marketing efforts" as "generalized, vague and unspecific assertions, constituting mere 'puffery' upon which a reasonable consumer could not rely."); *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1155 (W.D. Wash. 2006) (statements that a new product would "reach market in 2004 and more than double the market for [the company's] products by 2005" were puffery).[9]  The Andalay critique is not actionable and amounts to no more than a gratuitous attack on the product.

**Suntech Supply Agreement.**  On September 24, 2007, the Company announced that it had entered into a supply agreement with Suntech.  AC ¶ 15.  The Complaint alleges that statements regarding this supply agreement were false because "defendants concealed that rather than obtaining a volume discount, they had actually agreed to pay Suntech a premium far above market

---

[9] In addition, the statements regarding margins that would be achieved in the future (i.e. forward-looking statements) were made during a conference call at which Akeena gave a Safe Harbor warning and pointed investors to its risk disclosures in its 10Q filing and are thus protected from liability.  *See* Ex. 2 at 3; Ex. 13 at 23 ("Our recently announced Andalay Module technology is untested and may not be effective or patentable or may encounter other unexpected problems, which could adversely affect our business and results of operations.") (emphasis omitted); 15 U.S.C. § 78u-5(c)(1)-(2) (forward-looking statements cannot be the basis of a securities fraud claim if: (1) the statement is identified as forward-looking and is accompanied by sufficient cautionary statements; or (2) the person who made the forward-looking statements did so without actual knowledge that the statement was false or misleading); *In re Leapfrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1045-46 (N.D. Cal. 2007) (holding statements regarding improvements in gross margins in the second half of the new year "forward-looking" and protected under the Safe Harbor).

1   price for the panels" and because Defendants failed to disclose the "economic lunacy of the

2   Suntech supply agreement." *Id.* ¶¶ 15, 51.  Plaintiffs' allegations are tantamount to a challenge to

3   the decision to enter into the supply agreement with Suntech and as such must be dismissed.  The

4   soundness of a business decision is not a basis for securities fraud.  *Santa Fe Indus., Inc. v. Green*,

5   430 U.S. 462, 479 (1977).

6        The Complaint's allegations regarding the supply agreement are insufficient to support a

7   claim of falsity and the Complaint's theory is belied by judicially noticeable facts.  With regard to

8   the "economic lunacy" which Defendants purportedly failed to disclose, plaintiffs themselves

9   admit that one basis for entering the supply agreement with Suntech was to "lock in a supply of

10  often difficult-to-obtain panels." AC ¶ 15.[10]  The Company, as an installer of solar panels, had

11  been forthcoming with investors regarding its dependence on suppliers for components and how

12  fluctuations in price for those components could have a disastrous effect on revenue and demand

13  for Akeena's services.  *See* Ex. 13 at 22 ("We are subject to market prices for the components that

14  we purchase for our installations . . . . An increase in the price of components used in our

15  systems . . . could have a material adverse effect on our revenues and demand for our services.").

16  By entering into the Suntech supply agreement, Akeena was able to secure a fixed price for those

17  components, the availability and price of which could have severely impacted Akeena's

18  operations.  *See* Ex. 2 at 3 ("With the rapid industry growth we expect next year this decision to

19  lock-in a baseline panel source could give us a *competitive advantage if supplies tighten or prices*

20  *increase*.") (emphasis added).[11]  Quite to the contrary of the Complaint's characterization, the

21  Suntech supply agreement was a business move that provided Akeena with a competitive

22

23      [10] Plaintiffs' allegation that "defendants concealed . . that Akeena had agreed to pay Suntech
        a much higher premium than the market price for the solar panels" is belied by the fact that
24      Defendants explicitly disclosed in the November 13, 2007 conference call that Akeena had
        locked in a price that might turn out later to exceed the market price, in order to avoid being
25      without necessary components for its business.  *See* Ex. 2 at 3.  Additionally, any "premium"
        paid for the panels accounted for the fact Defendants were receiving a completely integrated
26      system that also contained their own proprietary frames with built-in wiring and grounding.

27      [11] Akeena also disclosed that it had entered the supply agreement with Suntech, of all solar
        panel suppliers, because it wanted to choose a partner that would honor supply guarantees for
28      twenty years.  *See* Ex. 7 at 12; AC ¶ 87.

1   advantage and the sustained ability to obtain a dependable supply of its proprietary solar modules.

2   *See* Ex. 8 at 4; AC ¶ 71 ("Extreme pricing and/or lack of acquisition of sufficient amounts of

3   polysilicon would inhibit Akeena's ability to procure  and sell its products . . . . The recent

4   agreement with [Suntech] alleviates this concern somewhat . . .").   Thus, plaintiffs' claim that

5   statements regarding the Suntech supply agreement were false and misleading should be dismissed.

6   The remainder of plaintiffs' claim regarding the falsity of the Suntech supply agreement is

7   conclusory and unsupported by any factual detail.  For example, plaintiffs allege "Akeena was

8   buying more product from Suntech under the supply contract than it could marketably sell under

9   the diminishing demand, leading to rapidly increased inventories."  AC ¶ 75(d).  This claim is

10  not even linked to any disclosure and fails to demonstrate how such an unsupported claim

11  supports falsity of any statement regarding the Suntech supply agreement.

12      **Suntech License Agreement.**  The Complaint next asserts that the Company's January 2,

13  2008 press release regarding the Suntech license agreement was false and misleading.  AC ¶ 19.

14  The Complaint alleges that the announcement of the Suntech license agreement was false because

15  the license agreement would actually "diminish profit margins going forward."  *Id.* ¶ 22.  The

16  Complaint cites to the disclosure of gross margins for 4Q 2007 (*id.* ¶ 85) and claims that those

17  margins demonstrate the falsity of the Suntech license agreement statement.  Yet how could a

18  license agreement entered in January 2008 have *any impact* on margins for a quarter that *had*

19  *already closed*?  *See* Ex. 14.  Plaintiffs do not explain this, nor can they.[12]

20      Moreover, the Complaint's supposition that the "falsity" of the Suntech statements were

21  "exposed" by Mr. Cinnamon's statement on March 13, 2008 that the Suntech royalties were

22  "something that is going to be relatively small in 2008, I'd say, less than $1 million" (AC ¶ 85) is

---

24  [12]   Another aspect of plaintiffs' decreased margins claim also defies logic: because there was
25  little to no cost associated with the license, the agreement could *only have* increased revenue and
    thus gross margins for Akeena.  *See* Ex. 12 at 7 ("With regards to licensing and margins in
    Europe, we're very happy that Suntech is taking the lead on selling Andalay in Europe, Japan,
26  and Australia.  And, as you know, the licensing revenues almost go completely to the bottom
    line.  I mean, we're getting a certain amount of money per – for every watt of panels they sell,
27  and we have to do very little other than just train them, support them, and give them a little bit of
    a marketing push.").  This Court is not required to accept inferences that are illogical.  *See*
28  *Metzler*, 540 F.3d at 1064-65 ("while the court assumes that the facts in a complaint are true, it is
    not required to indulge unwarranted inferences in order to save a complaint from dismissal.").

1  without merit.  The minimal licensing revenue projected for 2008 by the Suntech license

2  agreement had been previously disclosed on January 3, 2008 (the day after the press release) in an

3  analyst report.  *See id.* ¶ 71; Ex. 8 at 2 ("Akeena is estimating the STP agreement will result in

4  approximately $1 million in additional revenue for 2008 given the demand picture at this time.").

5  Thus, contrary to the Complaint's insinuation that investors expected a larger revenue stream from

6  the Suntech license agreement, investors were cognizant of the limited impact of the agreement the

7  day following Akeena's announcement (when the stock closed higher than the day of

8  announcement).  *See In re Apple Computer, Inc. Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989)

9  (holding that the defendants' failure to disclose material information was excused where that

10  information was credibly made known to the market).

11      The Complaint also alleges that Defendants failed to disclose "the actual terms of the

12  Suntech licensing agreement," including that Akeena had "no legally enforceable rights to the

13  royalty licensing payments" (AC ¶ 72), but fails to include any facts on what *actual terms* of the

14  agreement were omitted that rendered Defendants' statements misleading.  *Id.* ¶ 72.[13]  Plaintiffs'

15  claims regarding the omitted "actual terms" are pure conjecture and are totally unsupported by any

16  facts or corroboration and thus must be dismissed.  *See Lumisys*, 2 F. Supp. 2d at  1250 ("without

17  specific references to specific facts demonstrating that the statements at issue were false or

18  misleading when made, allegations regarding adverse information supposedly known to defendants

19  are merely 'speculation and conclusions drawn from hindsight.'").  Because the Complaint fails to

20  plead facts demonstrating what terms were omitted that rendered the statements regarding the

21  Suntech license agreement misleading, plaintiffs' claim must be dismissed.

22      **Comerica.**  On December 26, 2007, Akeena announced that it had received a commitment

23  from Comerica to increase Akeena's existing line of credit from $7.5 million to $25 million.  It

24  stated, "[a]vailability of the increased funding capacity [was] subject to execution of final

25

26      [13] A legal duty to disclose exists where a defendant must "state a material fact necessary in
    order to make the statement made . . . not misleading."  *Tellabs*, 551 U.S. at 318.  Other than
27  claiming the lack of enforceability of the Suntech license agreement, plaintiffs have failed to
    specify what terms of the Suntech license agreement were omitted such that their statements
28  regarding the agreement would be misleading.

definitive loan documentation." Ex. 15; *see also* AC ¶ 61.  Plaintiffs claim that this announcement was false and misleading because Defendants omitted that $17.5 million of the $25 million line of credit was subject to a cash collateralization requirement in the final loan agreement executed on January 11, 2008.  Defendants' disclosure in December, however, provided that the availability of the increased funding was subject to executing final definitive loan documents.  *See* AC ¶ 61.

The Complaint also ignores the Company's prior disclosures which explained that Comerica imposed collateral requirements on Akeena.  All of Akeena's prior loans with Comerica (which totaled only $7.5 million) were subject to collateralization requirements.  *See* Ex. 16 at 67.  It would not be reasonable for investors to believe that any bank would loan Akeena, a company that had not been profitable since it went public in 2006, nearly *two quarters worth* of its revenue without some type of collateralization requirement.  Thus, the fact that Akeena disclosed that it had obtained an additional loan financing *commitment* from Comerica *subject to final definitive loan documentation* and did not detail that collateralization requirements could be in the final agreement does not create an actionable securities claim.  *See Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 361 (2d Cir. 2002) ("As for [the omission of] the alleged difficulty of valuation, that should have been obvious to a prospective investor given [] the types of loans eBanker financed.");  *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 214 (4th Cir. 1994) (holding there is "no duty to disclose information of common knowledge[,] Murphy's Law or Peter Principle.").

### III.   PLAINTIFFS HAVE NOT PLEADED LOSS CAUSATION

The Complaint should also be dismissed for the separate and independent reason that the Complaint fails to plead that any of the alleged false statements caused plaintiffs any loss.  Plaintiffs appear to cobble together unrelated events that have one thing in common: they are close in time to when Mr. Cinnamon's brokers sold some of his stock pursuant to a 10b5-1 plan.  The Complaint can point to no material disclosure at the end of the Class Period about *any* of the alleged false statements.  A 10b-5 claim requires that (1) the value of plaintiffs' investment had declined and (2) "the drop in [defendant's] stock price was causally related to [the defendant's]" fraudulent conduct.  *Metzler*, 540 F.3d at 1062 (alteration in original).  Stock prices can drop for reasons unrelated to fraud: "changed economic circumstances, changed investor expectations, new

1    industry-specific or firm-specific facts, conditions, or other events, which taken separately or

2    together account for some or all of that lower price." *Dura*, 544 U.S. at 343 (finding the complaint

3    must provide "defendants with notice of what the relevant economic loss might be or of what the

4    causal connection might be between that loss and the [alleged] misrepresentation").

5           The securities laws operate, however, "not to provide investors with broad insurance

6    against market losses, but to protect them against those economic losses that misrepresentations

7    actually cause." *Id.* at 345.  Nowhere in the Complaint do plaintiffs point to a revelation of any

8    issues with respect to backlog, Andalay, the Suntech agreements, or the Comerica line of credit,

9    coupled with a loss by plaintiffs that was triggered by that revelation.  This defeats loss causation.

10   *Metzler*, 540 F.3d at 1062-63.

11          The Class Period ends on March 13, 2008, when Akeena announced its financial results for

12   the fourth quarter 2007.  AC ¶¶ 1, 85.  Akeena disclosed that 4Q 07 revenue had *exceeded* the

13   Company's revenue projections, which negates any claim that prior statements about backlog

14   caused any loss.  *Id.* ¶¶ 82, 85; Ex. 4.  Indeed, the Company announced that although it had

15   previously projected revenue growth of 135% for fiscal year 2007 over 2006, it actually grew

16   revenue by *140.6%*.   The Company said nothing about – let alone "admitted the truth of" – any of

17   the prior alleged false statements concerning backlog.  Moreover, preliminary 2007 revenue results

18   were released on February 19, 2008 disclosing fiscal year revenue of $32.2 million and the 141%

19   growth figure.  AC ¶ 82; Ex. 17.  The stock price closed at $7.38.  Ex. 6.  Under an efficient market

20   theory upon which plaintiffs' claims are premised (AC ¶¶ 104-06), this prior disclosure was

21   assimilated into the Company's stock price well before March 13 when the stock closed at $6.15.

22   Therefore, the stock price decline on that day could not have been caused by the disclosure of the

23   very same information that was known weeks before.  *See In re VeriSign, Inc., Derivative Litig.*,

24   531 F. Supp. 2d 1173, 1208 (N.D. Cal. 2007) (finding no loss causation where alleged "corrective

25   disclosure" simply repeated information that was disclosed five weeks earlier).

26          Contrary to plaintiffs' assertion that Mr. Cinnamon "finally conceded" on March 13 that

27   revenue on the Suntech licensing agreement would be relatively small, less than $1 million in

28   2008, an analyst report issued *January 3, 2008* and cited in the Complaint referenced *this same*

*figure* two months earlier.  AC ¶¶ 23, 71, 85; Ex. 8 at 2.  There can be no causal connection between the drop in Akeena's stock price on March 13, 2008 and the alleged misrepresentation about Suntech.  The Complaint also fails to plead loss causation with respect to allegations concerning Andalay's supposed design defects because *no such* "design defect" disclosures were made then, or ever.  AC ¶ 75(f).  Nor can plaintiffs point to any "revelation" about the Comerica line of credit in the March conference call and press release announcing results.  In sum, because plaintiffs have failed to satisfy the loss causation pleading requirements under *Dura* and *Metzler*, the Complaint must be dismissed.

## IV.     THE COMPLAINT FAILS TO RAISE A STRONG INFERENCE OF SCIENTER

Because the Complaint fails to plead any actionable statement, the Court need not address whether it adequately alleges Defendants' scienter.  *Karacand v. Edwards*, 53 F. Supp. 2d 1236, 1252 (D. Utah 1999) ("Where, as here, plaintiffs have not adequately pleaded falsity, it is unnecessary to determine whether they have adequately pleaded scienter.").  Assuming, for argument's sake, that plaintiffs have pleaded a false statement or loss causation, plaintiffs nevertheless have not pleaded scienter for either Mr. Effren or Mr. Cinnamon.

Under the Reform Act, not only must a complaint identify a false or misleading statement with particularity, a complaint must also "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u-4(b)(2)."  *Tellabs*, 551 U.S. at 321.  In the Ninth Circuit, "the required state of mind" involves intentional or conscious misconduct: either "actual knowledge" that a statement is false or misleading or "deliberate recklessness" as to the truth or falsity of a statement.  *Silicon Graphics*, 183 F.3d at 977.  Moreover, in determining whether there is a "strong" inference of scienter, "the court must take into account plausible opposing inferences."  *Tellabs*, 551 U.S. at 323.  A "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.  In other words, the Court "must consider plausible nonculpable explanations for the defendant's conduct" and must not "scrutinize each allegation in isolation, but . . . assess the allegations holistically."  *Id.* at 323, 326.  The Complaint fails to plead a strong inference of scienter as to any defendant.

1        **No Sufficient Direct Scienter Allegations are Alleged.**  The Complaint fails to plead any

2  facts that would sufficiently allege that either Mr. Effren or Mr. Cinnamon made any false

3  statements, much less that they knowingly or recklessly did so.  Instead, plaintiffs rely on

4  boilerplate allegations that defendants "knew" their statements were false because they ran Akeena

5  as "hands-on managers," were involved in "all aspects of Akeena's corporate finance transactions,"

6  and received "daily reports."  *See, e.g.*, AC ¶¶ 29-31, 75.  The Reform Act forbids this type of

7  pleading.  *See, e.g.*, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000-01 (9th Cir.

8  2009) (allegations that management closely reviewed purportedly manipulated accounting and

9  inventory numbers did not support strong inference that management was in position to know of

10  data manipulation); *Metzler*, 540 F.3d 1068 (finding no strong inference of scienter from allegation

11  that "hands on" defendant had in place a "management information system" because general

12  awareness of day-to-day business is not enough to establish scienter absent additional allegations

13  of specific information related to the fraud conveyed to management) (citation omitted).  To the

14  extent the Complaint asserts claims for Defendants' forward- looking statements about revenue

15  projections or gross margin improvement with the rollout of Andalay, the Complaint must plead

16  Defendants had *actual knowledge* of fraud.  15 U.S.C. § 78u-5(c)(1)(B)(i); *see, e.g.*, *In re Vantive

17  Corp. Sec. Litig.*, 283 F.3d 1079, 1091-92 (9th Cir. 2002) (no facts alleged to show that defendants

18  had actual knowledge that forward-looking financial forecasts were false when made).  The

19  Complaint pleads no such facts, and instead pleads allegations that are inconsistent with fraud.  For

20  example, although the Complaint alleges Andalay suffered from design defects, it points to no

21  confidential witnesses or internal documents describing these alleged defects or Defendants'

22  knowledge of such purported defects.  AC ¶ 11.  With the absence of direct allegations of scienter,

23  plaintiffs are forced to point to stock sales – sales that actually negate an inference of scienter.

24        **The Theory of the Fraud Makes No Sense as to Mr. Effren.**  The Complaint only

25  contains boilerplate allegations as to Mr. Effren, who came to Akeena in September 2007 with

26  almost 30 years of public company finance experience.  *Id.* ¶ 30.  Mr. Effren is not alleged to have

27  sold a single share of stock during the Class Period.  Plaintiffs' theory of the fraud is that Mr.

28  Effren was motivated to and agreed to issue false positive statements about the Company so that

1    Mr. Cinnamon could sell stock "to take advantage of the artificially inflated stock price." *Id.* ¶ 39.

2    This Circuit has rejected motive and opportunity to raise a strong inference of scienter. *Lipton v.*

3    *Pathogenesis Corp.*, 284 F.3d 1027, 1038-39 (9th Cir. 2002) (affirming dismissal on scienter

4    grounds where complaint pleaded motive and opportunity). Mr. Effren, however, only held

5    *unvested* stock options in the Class Period, and therefore had *no incentive* to increase the stock

6    price in the short term. Indeed, his first option grant did not first vest until September 2008. Exs.

7    18-19. The Complaint points to no other Section 16 officers that sold stock during the Class

8    Period. The Ninth Circuit recently held that the absence of sales by a key officer-defendant

9    suggests "that there was no insider information from which to benefit." *Metzler*, 540 F.3d at 1067

10   (no sales by president and COO); *In re Business Objects S.A. Sec. Litig.*, No. C 04-2401, 2005 WL

11   1787860, at *8 (N.D. Cal. July 27, 2005) (scienter negated by fact that neither the CFO or COO

12   sold stock during the Class Period). Were it true that Mr. Effren engaged in a scheme to inflate the

13   stock price, he would have purchased and sold Akeena stock on the open market. The absence of

14   such transactions negates an inference of scienter. The scienter allegations as to Mr. Effren are so

15   deficient that he should be dismissed with prejudice. The stock sale allegations against Mr.

16   Cinnamon are equally unavailing.

17          **The Alleged Stock Sales Undermine Any Inference of Scienter.** Plaintiffs allege that

18   Mr. Cinnamon was motivated to commit fraud because he entered a settlement agreement on

19   October 31, 2007 in his divorce proceedings that settled the amount he owed his ex-wife. AC ¶¶

20   16-17. Motive and opportunity are insufficient allegations to plead scienter. *See supra.* The terms

21   of the divorce agreement, referenced in the Complaint and attached here as Ex. 20, provided that

22   before January 31, 2008 Mr. Cinnamon would either pay his ex-wife $1,875,000 in cash, or

23   transfer Akeena common stock to her by that date with a gross market value of $2,533,783. *Id.* at

24   2; AC ¶ 37.[14] The divorce agreement contemplated that if Mr. Cinnamon transferred stock instead

25   _____

26          [14] In the event Mr. Cinnamon paid his ex-wife cash, it would be nontaxable to his wife. Ex.
     20 at 2. Presuming Mr. Cinnamon sold stock to fund the cash settlement, Mr. Cinnamon would
27   be required to pay the capital gains tax. If Mr. Cinnamon transferred stock to his wife, she
     would be required to pay the capital gains tax upon selling the shares. The two settlement
28   options were roughly equivalent economically to Mr. Cinnamon.

of cash, his ex-wife's broker would sell the stock over six months, ending on July 31, 2008. Ex. 20

at 3; AC ¶ 37. According to the Complaint, Mr. Cinnamon was motivated to transfer cash and not

the stock, and therefore he tried to do "whatever it took to increase the Company's stock price,

even in the short term" and "knowingly timed" the disclosures about Comerica and Suntech so he

could sell fewer shares. AC ¶¶ 16, 20, 39. There are several flaws with this supposed theory of

fraud. To constitute circumstantial evidence of scienter, stock sales must be "unusual" or

"suspicious," or "'dramatically out of line with prior trading practices at times calculated to

maximize the personal benefit from undisclosed inside information.'" *Silicon Graphics*, 183 F.3d

at 986. The Complaint fails to meet this standard because Mr. Cinnamon sold only 5% of his total

holdings during the Class Period, and all of the sales were pursuant to a 10b5-1 trading plan.

Plaintiffs' theory of the fraud is not supported by the facts.

First, noticeably absent from the Complaint is the fact that Akeena filed a Form 8-K on

December 13, 2007 announcing that Mr. Cinnamon had adopted a Rule 10b5-1 trading plan to sell

Akeena common stock in during 2008, and that the plan was "put in place at this time in order to

satisfy financial obligations incurred by Mr. Cinnamon as part of his 2006 Divorce Settlement."

Ex. 21. Contrary to the allegations that the investment community was in the dark about these

upcoming transactions, *see, e.g.*, AC ¶¶ 37, 64, Akeena issued an 8-K expressly announcing these

sales would take place in 2008. Ex. 21. Furthermore, allegations that Mr. Cinnamon tried to

increase the stock price so he could sell fewer shares are belied by the fact that pursuant to the

plan, the broker had *sole* discretion (pursuant to a formula under the plan) on when to sell Mr.

Cinnamon's shares. AC ¶ 16; Ex. 21 at 3. All of the stock sales cited in the Complaint were made

pursuant to this pre-established non-discretionary trading plan. Exs. 22-23. Recently the Ninth

Circuit found stock sales not suspicious where the majority was sold pursuant to 10b5-1 trading

plans. *Metzler*, 540 F.3d at 1067 n.11 (affirming dismissal; "[s]ales according to predetermined

plans may 'rebut[] an inference of scienter'") (citation omitted); *see McCasland v. FormFactor

Inc.*, No. C 07-5545, 2008 WL 2951275, at *10 (N.D. Cal. July 25, 2008) (finding sales pursuant

to the plan were not suspicious and did not give rise to a strong inference of scienter).

1    Second, the Complaint makes much about Mr. Cinnamon not wanting to turn over shares to

2  his ex-wife because he wanted to "retain as much control over Akeena as he could."  AC ¶¶ 9, 16.

3  Plaintiffs do not explain why, if retaining control over Akeena was so important to Mr. Cinnamon,

4  he did not simply pay his ex-wife cash under the agreement.  The Complaint is also notably quiet

5  on the percentage of Mr. Cinnamon's stock that was sold during the Class Period.  Mr. Cinnamon

6  *owned 8 million shares* of common stock and vested options at the start of the Class Period, and his

7  sales during the Class Period accounted for only *5%* of his total holdings.  (400,000 (total sales) ÷

8  8,000,000 (total holdings) = 5.0%).  *Id.*; Ex. 22.  This percentage is insufficient to raise a strong

9  inference of scienter, and actually negates scienter.  *Metzler*, 540 F.3d at 1067 (sales of 37% of an

10  insider's shares will typically be too low to raise an inference of scienter); *Vantive*, 283 F.3d at

11  1094 (CEO's sales of 13% of holdings not suspicious and "tend[ed] to negate" an inference of

12  fraud).  Defendants' retention of almost all of their stock and vested options during the Class

13  Period similarly undermines any suggestion that they sought to capitalize on artificially inflated

14  prices.  The Complaint fails to raise a strong inference of scienter and should be dismissed.[15]

15                                   **CONCLUSION**

16    For the foregoing reasons, the Complaint should be dismissed.

17  Dated: February 12, 2010                    Respectfully submitted,

18                                              WILSON SONSINI GOODRICH & ROSATI
                                                PROFESSIONAL CORPORATION
19                                              650 Page Mill Road
                                                Palo Alto, CA 94304
20                                              Telephone:  (650) 493-9300
                                                Facsimile:  (650) 493-6811
21                                              By:  /s/ Steven M. Schatz
                                                     Steven M. Schatz
22
                                                *Attorneys for Defendants Akeena Solar, Inc., Barry*
23                                              *Cinnamon and Gary Effren*

24

25
_____

26    [15] Plaintiffs seek to hold Defendants liable as a "controlling person" under Section 20(a) and
    for contemoraneous trading under 20A.  AC ¶¶ 117-21, 122-26.  Because the Complaint does not
27  adequately allege a primary violation under Section 10(b) for the reasons set forth above, these
    claims must be dismissed.  *See Lipton*, 284, F.3d at 1035 n.15; *In re Verifone Sec. Litig.*, 11 F.3d
28  865, 872 (9th Cir. 1993).

**ECF CERTIFICATION**

I, Kelley M. Kinney, am the ECF User whose identification and password are being used to file this Motion to Dismiss the Amended Complaint for Violation of the Federal Securities Laws. In compliance with General Order 45.X.B., I hereby attest that Steven M. Schatz has concurred in this filing.


Dated: February 12, 2010                      WILSON SONSINI GOODRICH & ROSATI

PROFESSIONAL CORPORATION

By:  /s/ Kelley M. Kinney
                    Kelley M. Kinney