1  SCOTT+SCOTT LLP
   ARTHUR L. SHINGLER III (181719)
2  MARY K. BLASY (211262)
   HAL CUNNINGHAM (243048)
3  DAVID H. GOLDBERGER (225869)
   600 B Street, Suite 1500
4  San Diego, CA  92101
   Telephone:  619-233-4565
5  Facsimile: 619-233-0508
   ashingler@scott-scott.com
6  mblasy@scott-scott.com
   dgoldberger@scott-scott.com
7     – and –
   DAVID R. SCOTT
8  P.O. Box 192
   156 South Main Street
9  Colchester, CT  06415
   Telephone:  860-537-3818
10 Facsimile: 860-537-4432
   drscott@scott-scott.com
11
   *Lead Counsel for Lead Plaintiffs*
12

13              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
14                   SAN JOSE DIVISION

15 SHARON HODGES, On Behalf of Herself and          No.  C-09-02147 JW-RS
   All Others Similarly Situated,
16                                                   MEMORANDUM IN OPPOSITION TO
                              Plaintiff,             DEFENDANTS' MOTION TO DISMISS
17                                                   AMENDED COMPLAINT FOR
          vs.                                        VIOLATIONS OF THE FEDERAL
18                                                   SECURITIES LAWS
   AKEENA SOLAR, INC., BARRY CINNAMON
19 and GARY EFFREN,
                              Defendants.            Hearing Date:  May 24, 2010
20                                                   Time:  9:00 a.m.
                                                     Dept:  Courtroom 8
21
                                                     Judge: Hon. James Ware
22

23

24

25

26

27

28
   MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED
   COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

## **TABLE OF CONTENTS**

2

3   I.      INTRODUCTION ....................................................................................1

4   II.     STATEMENT OF THE CASE...............................................................4

5   III.    ARGUMENT ..........................................................................................5

6           A.      The Complaint Alleges Cinnamon Violated §10(b) and Rule 10b-5 by
                    Trading on Material, Non-Public Information........................................7
7
8           B.      The Complaint Alleges Material Misstatements with Particularity......13

                            1)      Defendants' Backlog Provision Was False and Misleading....................13
9
10                          2)      Defendants' Announcement of Akeena's $17.5 Million Line of
                                    Credit "Extension" Was Misleading..........................15

11                          3)      Defendants' Active Concealment of Andalay's Known Defects ...........16

12                          4)      Defendants' False and Misleading Statements Lauding the
                                    Purportedly Lucrative Suntech Supply and License Contracts.............17
13
                            5)      Akeena's Defective Internal Controls Precluded Accurate
14                                  Financial Reporting or Forecasting...........................................19

15                          6)      Defendants' Unchallenged False and Misleading Class Period
                                    Statements Contributed to the Scheme to Defraud ..................20
16
            C.      The Complaint Raises a Strong Inference of Scienter .........................21
17
            D.      Lead Plaintiffs Adequately Allege that Defendants' False Statements and
18                  Material Omissions Are the Proximate Cause of the Class's Losses .................22

19  IV.     CONCLUSION......................................................................................25

20

21

22

23

24

25

26

27

28

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED        i
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

09-cv-02147-JW-RS

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

CASES

4

*Atlas v. Accredited Home Lenders Holding Co.*,
    556 F. Supp. 2d 1142 (S.D. Cal. 2008)................................................................23

5

*Backman v. Polaroid Corp.*,
    910 F.2d 10 (1st Cir.1990)......................................................................................14

6

7

*Berson v. Applied Signal Tech*
    527 F.3d 982 (9th Cir. 2008). ...............................................................8, 13, 17, 22

8

9

*Central Laborers' Pension Fund v. Integrated Elec. Services Inc.*,
    497 F.3d 546 (5th Cir. 2007) ............................................................................10, 12

10

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)................................................................................................10

11

12

*Citiline Holdings, Inc. v. Istar Fin. Inc.*,
    No. 08 Civ. 3612.....................................................................................................17

13

14

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)..................................................................................1, 17, 22, 23

15

*Eberle v. City of Anaheim*,
    901 F.2d 814 (9th Cir. 1990) ..................................................................................23

16

17

*Gompper v. VISX, Inc.*,
    298 F.3d 893 (9th Cir. 2002) ..................................................................................22

18

19

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ..................................................................................17

20

*Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001) ..........................................................................*passim*

21

22

*In re Amgen, Inc. Sec. Litig.*,
    544 F. Supp. 2d 1009 (C.D. Cal. 2008) .................................................................24

23

*In re Cardinal Health Inc. Sec. Litig.*,
    426 F. Supp. 2d 688 (S.D. Ohio 2006) ....................................................................9

24

25

*In re Countrywide Fin. Corp. Deriv. Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) .................................................................11

26

27

*In re Cray Inc.*,
    431 F. Supp. 2d 1114 (W.D. Wash. 2006)...............................................................9

28

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

ii

09-cv-02147-JW-RS

*In re Daou Sys., Inc., Sec. Litig.*,
    411 F.3d 1006 (9th Cir. 2005) ...................................................................21

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ........................................................... passim

*In re ICG Comm'ns, Inc. Sec. Litig.*,
    No. 1:00-cv-01864, 2006 WL 416622 (D. Colo. Feb. 7, 2006)....................24

*In re Interlink Electronics, Inc. Sec. Litig.*,
    No. SACV 05-8133, 2008 WL 4531967 (C.D. Cal. Oct. 6, 2008)..................23, 24

*In re Juniper Networks, Inc. Sec. Litig.*,
    542 F. Supp. 2d 1037 (N.D. Cal. 2008) .......................................................23

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) ..................................................23, 24

*In re LDK Solar Sec. Litig.*,
    No. C 07-05182, 2008 WL 4369987 (N.D. Cal. Sept. 24, 2008) ...........................14

*In re Petco Animal Supplies Inc. Sec. Litig.*,
    No. 05-CV-0823, 2005 WL 5957816 (S.D. Cal. Aug. 1, 2005) ..................... *passim*

*In re Phillips Petroleum Sec. Litig.*,
    881 F.2d 1236 (3rd Cir. 1989) ...................................................................15

*In re Prudential Secs. Inc. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y.1996)....................................................................8

*In re Silicon Graphics, Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) .....................................................................8

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2nd Cir. 1993) .................................................................12, 16

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal., 2009) ........................................................9

*In re Verity, Inc. Sec. Litig.*,
    No. C99-5337, 2000 WL 1175580 (N.D. Cal. Aug. 11, 2000) ...........................14

*Johnson v. Aljian*,
    394 F. Supp. 2d 1184 (C.D. Cal. 2004), *aff'd*, 490 F.3d 778 (9th Cir. 2007)...................7, 8, 9

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) .............................................................6, 10, 22

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED            iii
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

09-cv-02147-JW-RS

*Lefkoe v. Jos. A. Bank Clothiers*,
No. 06-1892, 2007 WL 6890353 (D.Md. Sept. 10, 2007)..................................................9

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
437 F.3d 588 (7th Cir. 2006) .......................................................................................17

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
513 F.3d 702 (7th Cir. 2008) .......................................................................................17

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding
Corp.*, 320 F.3d 920 (9th Cir. 2003) ...................................................................... passim

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) .....................................................................................12

*Omega Environmental, Inc. v. Gilbarco, Inc.*,
127 F.3d 1157 (9th Cir. 1997) .....................................................................................23

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*,
411 F. Supp. 2d 1172 (N.D. Cal. 2005) .......................................................................24

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) .......................................................................................12

*Rothman v. Gregor*,
220 F.3d 81 (2nd Cir. 2000)........................................................................................12

*S.E.C. v. Adler*,
137 F.3d 1325 (11th Cir.) ..............................................................................................7

*S.E.C. v. Rubera*,
350 F.3d 1084 (9th Cir. 2003) .....................................................................................21

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009) ...............................................................................6, 14

*Sirota v. Solitron Devices, Inc.*,
673 F.2d 566 (2nd Cir. 1982)......................................................................................12

*South Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ................................................................................ passim

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).............................................................................................21, 22

*U.S. v. O'Hagan*,
521 U.S. 642 (1997)......................................................................................................7

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

iv

09-cv-02147-JW-RS

*U.S. v. Bohn,*
    956 F.2d 208 (9th Cir. 1992) ................................................................................23

*U.S. v. Boyce,*
    148 F. Supp.2d 1069 (S.D. Cal. 2001) ................................................................23

*U.S. v. Dunkel,*
    927 F.2d 955 (7th Cir. 1991) ..............................................................................14

*Weiner v. Quaker Oats Co.,*
    129 F.3d 310 (3rd Cir. 1997) ........................................................................15, 16

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78t-1(a) .................................................................................................................5
    §78t(a) ....................................................................................................................5
    §78u-4(b)(1)(B) .............................................................................................13, 14
    §78u-4(b)(2) ..........................................................................................................21
    §78j(b) ....................................................................................................................5

Fed. R. Civ. P.
    Rule 12(h)(2) ...........................................................................................................5
    Rule 15(a) ..............................................................................................................25

**OTHER AUTHORITIES**

17 C.F.R.
    §240.10b-5 ...............................................................................................................5
    §240.10b-5-1(b) ......................................................................................................7
    §240.10b5-1(c)(1)(i)(A) ..........................................................................................9

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED          v
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

09-cv-02147-JW-RS

1          **ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))**

2          1.       ***Insider Trading Claim***: Whether the Complaint states a cognizable claim for

3    unlawful insider trading against Barry Cinnamon ("Cinnamon"), Akeena Solar Inc.'s ("Akeena" or

4    the "Company") founder, Chief Executive Officer and Chairman, while in possession of material,

5    adverse information unknown to the investing public.

6          2.       ***Securities Fraud Claim - Falsity/Scienter/Loss Causation:*** Whether the false and

7    misleading statements are actionable as alleged where defendants concede materiality and the

8    Amended Complaint for Violation of the Federal Securities Laws (the "Complaint") sets forth: (a)

9    specific false statements made to the market and to securities analysts who repeated them to the

10   market, detailed explanations why each statement was misleading, and sufficient allegations that

11   defendants' pre-Class Period statements remained "alive" and uncorrected in the market during the

12   Class Period; (b) a strong inference of scienter based both on "usual amounts" of stock sold "at

13   suspicious times" and circumstantial evidence of knowing misstatements involving "core

14   operations" these defendants would have been intimately involved in; and (c) the requisite short and

15   plain statement showing what the relevant loss "might be" and "what the causal connection might

16   be" between the revelation of defendants' fraudulent scheme and the Class's losses, where the

17   Complaint explicitly links movements in Akeena's stock price to defendants' statements. *Dura*

18   *Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

19         3.       ***Control Person Liability:*** Whether the Complaint states a claim for control person

20   liability by pleading a primary violation of the securities laws.

21   **I.       INTRODUCTION**

22         The Complaint outlines a classic "pump and dump" scheme.  In 2005, Cinnamon's wife sued

23   him for divorce.  The proceedings were extremely acrimonious.  Not only did Ms. Cinnamon want

24   his children and his money, she demanded that Cinnamon ***immediately*** have Akeena appraised and

25   apportioned in the divorce.  Adding insult to injury, though the burgeoning California solar industry

26   Cinnamon helped father was blossoming, he knew it would be years - *if ever* – before Akeena's new

27   "Andalay" integrated solar application would become profitable.  The product was riddled with

28   design defects requiring that he approve refunds and discounts to keep units in the field.  California

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED                1
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
                                                                      No.  C-09-02147 JW-RS

1  utility companies were also balking at authorizing payment of the solar rebates they controlled,

2  causing certain customers to renege on purchase agreements.  Cinnamon knew the only way to avoid

3  relinquishing significant control to his former spouse's demands was to obtain a public stock listing,

4  giving him access to the capital markets – *and to public capital*.

5        As a first order of business, in 2006, Cinnamon acquired a defunct Canadian company *that*

6  *already had a public listing on the pink sheets* through a transaction designed to avoid SEC-

7  scrutiny of Akeena's financial statements.  In 9/07, Cinnamon switched that listing to the NASDAQ

8  to provide more liquidity to encourage public shareholders to buy the Company's stock.

9        With those measures being set into place, Cinnamon attended a 10/31/07 Judicially

10  Supervised Settlement conference with his former spouse and hammered out a multi-million dollar

11  settlement agreement.  Unbeknownst to the investment community, that settlement agreement

12  required Cinnamon to sell stock to fund his settlement *no later than 1/31/08*.  Not wanting to dilute

13  his control over Akeena even more than the public stock listing transaction already had, or be forced

14  to transfer the stock to *her broker to sell* on the open market over a six-month period if Cinnamon

15  could not fund though stock sales, Cinnamon threw some gasoline on the fire.  Cinnamon knew that

16  for every dollar he could increase Akeena's market price, he would have to sell fewer shares of his

17  stock.  Cinnamon had already directed that Akeena disclose fabricated sales "backlog" figures *for*

18  *the first time ever* in 8/07, which were confirmed on 11/17/07, and on 12/6/07 caused Akeena to

19  announce that its line of credit had been tripled.  Cinnamon knew all three disclosures – but that each

20  would be well-received by investors who, according to Defendants' motion to dismiss, were just

21  foolhardy enough to believe what Defendants told them and that this might halt the rapid cash drain

22  then threatening Akeena's existence.[1]  Having achieved significant stock price inflation already, on

23  1/2/08 Cinnamon would finally deliver the big "high margin" licensing contract, *"demonstrating a*

24

25  [1]     *See* Motion to Dismiss Amended Complaint for Violations of the Federal Securities Laws
    filed herein on February 12, 2010, Dkt. No. 23 ("Defs.' Mtn."), at 18-19.  "Defendants" include

26  Akeena, Cinnamon and Barry Effren ("Effren") who joined as Akeena's CFO in 9/07 and
    immediately observed what was happening, but failed to disclose what he knew until it was too late

27  *See* Complaint, ¶¶ 11, 13, 23, 30-31, 47, 56, 61-62, 85, 90, 96.  All "¶_ and ¶¶_" references are to
    the Amended Complaint for Violations of the Federal Securities Laws, filed 12/11/09.

28

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED     2
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    *clear 'path to profitability,'"* that specific analysts had been demanding of him for months in order

2    to increase Akeena's stock ratings. All the while Defendants concealed that Akeena also had had to

3    promise to pay that same Chinese solar retailer above-market prices for the very Akeena product it

4    would soon be "selling" – *if any*.

5        These, coupled with other false statements Cinnamon directed Akeena to make before and

6    during the ***short*** period of time between 12/26/07 and 3/13/08 (the "Class Period"), had their intended

7    effect – ***nearly tripling Akeena's stock price by 1/7/08*** and permitting Cinnamon to sell roughly half

8    the shares he had contemplated having to sell in 10/07 to fund his divorce settlement:

9

10

11

12

13    

14

15

16

17

18        ***Indeed, by virtue of this timing deception, rather than being required to sell 700,000 shares***

19    ***of Akeena stock at the approximately $7 per share the stock closed at on December 24, 2007 – or***

20    ***8% of Cinnamon's stock – this ruse permitted Cinnamon to sell just 400,000 shares for proceeds***

21    ***of over $5.6 million. Cinnamon's stock sales were unusual in both amount and timing as he had***

22    ***not previously sold a single share during the entirety of Akeena's history as a publicly traded***

23    ***company***.

24        Defendants' motion to dismiss is notable, not for what it says, but for what it fails to say.

25    Defendants do not challenge the materiality of the alleged misstatements or that they knew the

26    relevant, undisclosed truth underlying those false statements. Indeed, Ninth Circuit case law

27    squarely permits an inference of scienter where, as here, ***it is "'absurd' to suggest" that defendants***

28    ***did not know about critical aspects of their business***. *South Ferry LP, No. 2 v. Killinger*, 542 F.3d

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          3

No. C-09-02147 JW-RS

1   776,786 (9th Cir. 2008).[2]  Defendants do not deny Cinnamon sold stock while in possession of

2   material, non-public information, or that his Class Period statements caused the perverse inflation he

3   personally profited from.  Instead, Defendants claim Cinnamon was shielded from liability because

4   these types of trades are allowed by executives who want to "diversify."  Indeed, they argue that

5   Cinnamon's sales negate scienter because Cinnamon's Form 4s attribute his sales to a Rule 10b5-1

6   trading plan – despite that courts in this Circuit, including this one, have consistently recognized that

7   pre-set trading plans result in ***regular pattern sales*** – the polar opposite of what occurred here.[3]

8            Defendants' oft-repeated claim that the Complaint lacks particulars is ironic given their

9   failure to address these and many other allegations in the Complaint.  Indeed, while Defendants

10  accuse Plaintiffs of "misleadingly pick[ing] and choos[ing] portions of great many of the Company's

11  disclosures in an effort to cast doubt" on what they characterize as "***perfectly appropriate stock sales***

12  ***and accurately stated public announcements***," it is Defendants who ignore the Complaint's fraud

13  allegations, and instead, ask this Court to improperly end before it starts this meritorious action.

14  Defs.' Mtn. at 2. Rather than challenge detailed allegations outlining their false statements over a

15  short ***86-day Class Period***, Defendants submit ***23 exhibits*** to their motion they self-servingly claim

16  support a litany of contrary factual propositions the Court can adopt.  *Id.*  Beyond that their

17  purported "innocent explanations" are nowhere as credible as Defendants portend, because these

18  improper factual proffers, and the arguments they purportedly "support," bear no weight during this

19  pre-discovery phase, Defendants' motion should be denied.

20  **II.    STATEMENT OF THE CASE**

21            Cinnamon sees Akeena as ***his*** company that ***he founded*** in an industry ***he helped father***.

22  ¶¶3-4.  Shortly after Cinnamon's wife filed very acrimonious divorce proceedings in 2005,

23  demanding that he have Akeena appraised and relinquish her "fair share" in 2006, Cinnamon

24  _____

25  [2]      All internal citations are omitted and emphasis added, unless otherwise noted.

26  [3]      *In re Infineon Tech. AG Sec. Litig.*, No. C 04-04156, Order Granting in Part and Denying in
    Part Defendants' Motions to Dismiss (N.D. Cal. Jan. 25, 2008) (Appx. 2); *see also In re Petco
    Animal Supplies Inc. Sec. Litig.*, No. 05-CV-0823 2005 WL 5957816, at *10, *12-*13 (S.D. Cal.
27  Aug. 1, 2005).  All "Appx." references are to the Appendix submitted herewith.

28

1    obtained a public stock listing for Akeena.  ¶7.  In 9/07 he obtained a more liquid NASDAQ listing.

2    *Id.* "Going public" accomplished two important goals for Cinnamon: it allowed him to fund his

3    divorce settlement with public capital (rather than his own) and it facilitated his relinquishing far less

4    control of Akeena than California's community property laws would have required.   ¶¶6, 10.

5    Cinnamon had never before, during the Company's existence as a publicly traded company, sold a

6    single share of his Akeena stock.  ¶21.  And while Cinnamon had agreed on 10/31/07 to sell ***some***

7    Akeena stock to fund his former spouse's settlement, he agreed to sell a specific dollar-amount of his

8    Akeena stock – ***not to sell a certain number of shares.***  ¶¶16-17, 20, 36-39, 59, 64.  As such, by

9    doubling Akeena's stock price before the 1/31/08 deadline by which Cinnamon had to fund his

10   divorce settlement through stock sales, Cinnamon could – ***and indeed did*** – reduce the control over

11   Akeena he otherwise would have had to relinquish by nearly 50%.  ¶¶8, 10, 16, 34, 118-19.

12   **III.    ARGUMENT**

13          Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule

14   10b-5 make it unlawful for any person to: (1) to engage in fraud, (2) to make an untrue statement

15   regarding a material fact or (3) to make a misleading statement by omitting a material fact, in

16   connection with the purchase or sale of any security. 15 USC §78j(b); 17 CFR §240.10b-5.[4] To state

17   a claim under §10(b), plaintiffs must allege: "'(1) a material misrepresentation or omission of fact

18   [falsity], (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss

19   causation, and (5) economic loss.'"  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

20   2008).  ***Defendants only challenge falsity, scienter and loss causation, conceding the sufficiency of***

21   ***the remaining elements.***  *See* Fed. R. Civ. P. 12(h)(2).

22   _____

23   [4]      Section 20A of the Exchange Act provides a private cause of action against corporate
         insiders who sell stock while in possession of material, non-public information in favor of investors
24       who contemporaneously purchase at or about the same time. 15 U.S.C. §78t-1(a). Section 20(a) of
         the Exchange Act imposes derivative liability on individuals who control a Section 10(b) violator.
25       15 U.S.C. §78t(a).  Other than claiming Lead Plaintiffs do not "adequately allege a primary violation
         of 10(b)," a required predicate violation for 20A/20(a) liability, ***Defendants do not challenge the***
26       ***sufficiency of Lead Plaintiffs' 20A or 20(a) claims and in so doing waived any challenges to their***
         ***sufficiency***.  *See* Fed. R. Civ. P. 12(h)(2).

27

28

1    On a motion to dismiss, "[a]ll allegations of material fact made in the complaint are taken as

2  true and construed in the light most favorable to the plaintiff." *No. 84 Employer-Teamster Joint*

3  *Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003).  "A

4  complaint should not be dismissed unless it appears beyond a doubt that the plaintiff cannot prove

5  any set of facts in support of the claim that would entitle him or her to relief."  *Id.*  A complaint's

6  allegations **must be** weighed "in their totality" not "individually."  *Id.* at 945; *see also South Ferry*,

7  542 F.3d at 784 ("*Tellabs* counsels us to consider the totality of circumstances" and "permits a series

8  of less precise allegations to be read together to meet the PSLRA requirement, the prior holdings of

9  *Silicon Graphics*, *Vantive*, and *Read-Rite* notwithstanding."); and *Siracusano v. Matrixx Initiatives,*

10  *Inc.*, 585 F.3d 1167, 1183 (9th Cir. 2009) (same).

11    Critically, here, where Defendants improperly submit a three-inch stack of exhibits they ask

12  the Court to take judicial notice of in support of their purported motion for ruling **on the pleadings,**

13  claiming that, **as a matter of law,** the Complaint must be dismissed **before discovery commences** –

14  the Court cannot consider matters outside the complaint with exceptions for (1) authenticated

15  documents that have been incorporated into the complaint and (2) facts that are subject to judicial

16  notice.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001).  Importantly, the

17  district court may take judicial notice of matters of public record, but "**[d]isputed factual questions**

18  **are not suitable for judicial notice**."[5]  As such, Lead Plaintiffs move separately to strike Defendants'

19  improper submissions – the arguments "supported" by those submissions – and Defendants' other

20  arguments based on conjecture arising outside the four corners of the Complaint.

21  _____

22  [5]    *Petco*, 2005 WL 5957816, at *3, (for instance "a newspaper article, is not suitable for judicial notice"); *In re Countrywide Sec. Litig.*, No. CV-07-05295-MRP OMNIBUS ORDER on Motions
23  Related to the Second Amended Complaint and the Unopposed Motion to Correct the Order of December 1, 2008 (C.D. Cal. April 6, 2009) (Appx. 1 at 5-6) ("The Court cannot take notice of the
24  transcript **and** accept its identification of the speaker over the SAC's identification without converting Sieracki's motion into one for summary judgment. Fed. R. Civ. Proc. 12(d)").

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                6

No. C-09-02147 JW-RS

### A.   The Complaint Alleges Cinnamon Violated §10(b) and Rule 10b-5 by Trading on Material, Non-Public Information

Insider trading can serve as an independent violation of §10(b).  *U.S. v. O'Hagan*, 521 U.S. 642, 651-52 (1997); *Petco*, 2005 WL 5957816, at *9.  For an insider trading violation, a plaintiff need only allege that defendants possessed (and failed to disclose) material inside information before trading. *Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1198-99 (C.D. Cal. 2004), *aff'd*, 490 F.3d 778 (9th Cir. 2007); *S.E.C. v. Adler*, 137 F.3d 1325, 1337-39 (11th Cir.).  "A purchase or sale of a security of an issuer is 'on the basis of' material nonpublic information about that security or issuer if the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale."  17 C.F.R. §240.10b-5-1(b).  "Scienter is an element of … insider trading, therefore, must be plead with particularity under the PSLRA."  *Petco*, 2005 WL 5957816, at *35. The Complaint does so.

First, there can be no doubt Cinnamon sold stock while in possession of material, non-public adverse information on 1/2/08 and 1/7/08 regarding, among other things, the falsity of the purported "$17.5 million 'increase' in [Akeena's] line of credit" announced 12/26/07, the perceived "profitability of the Suntech supply contract and licensing agreements" heralded on 1/2/08, "the purported sales 'backlog' of $13.6 million" that still remained alive and uncorrected in the market, the overstated "marketability of the Andalay system" and that ***unbeknownst to investors,*** "Akeena's 4Q 2007 quarterly loss (***for the period that had already ended [12/31/07]***) had increased more than 300%." ¶¶22, 81.  Defendants do not even contest that Effren expressly conceded at the end of the Class Period that Akeena's previous CFO had been employing an improper "***looser***" backlog "***definition***" than the explicit ***"soup to nuts, in the range of one to two months"*** definition provided to the investment community ***with great fanfare*** in 8/07 – as the ***"critical state of Akeena's cash position and burn rate" unraveled***, or that given the opportunity to disclose what he then knew during the Company's 11/13/07 conference call, Effren instead reconfirmed that "***on a comparable basis to the $13.6 million of backlog disclosed at the end of Q2, the Q3 backlog was bigger***." ¶¶14-15, 18, 40-44, 54-56, 81-85, 96; *see also Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (disregard of most current factual information before making statements indicative of scienter); and

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

No. C-09-02147 JW-RS

7

*In re Prudential Secs. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y.1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."); *see also* Securities & Exchange Commission, Amicus Curiae Brief, *Slayton v. Am. Express Co.,* No. 08-5442-cv (2nd Cir. Jan. 21, 2010) (Appx. 4 at 2 and 9-14) (**"It is misleading and therefore insufficient for a company to warn of a potentiality that it is aware currently exists."**).

Similarly, because the SunTech contract was Akeena's largest and most important in its history, it would be "absurd to suggest" that Defendants were unaware of its terms when Cinnamon sold stock to fund his divorce settlement. *Berson v. Applied Signal Tech.*, Inc., 527 F.3d 982, 988 (9th Cir. 2008). Under these circumstances, Lead Plaintiffs' allegations that Cinnamon directed the Company's misstatements while $5.6+ million of his stock was being sold at exuberantly inflated prices more than adequately alleges Cinnamon violated §10(b) and Rule 10b-5. Ninth Circuit authority expressly rejects Defendants' demand for even greater specifics on how "defendants knew of this information," including through "CWs." *See South Ferry*, 542 F.3d at 785; Defs.' Mtn. at 22.

Second, the "relevant factors from which the court may infer an indicia of scienter are: (a) the amount and percentage of shares sold by insiders; (b) the timing of the sales; and (c) whether the sales were consistent with the insider's prior trading history." *Johnson*, 394 F. Supp. 2d at 1199-1201 (citing *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999). "It is clear that courts should consider how the three factors regarding suspicious trading may be interrelated." *Id.* As to the first factor, contrary to Defendants' claims, "the Court considers the **amount and** percentage of the shares sold," with unusually large sales alone being indicative of scienter, regardless of the percentage sold. *Id.* at n.10 (distinguishing 9th Circuit decisions focusing singularly on percentage of stock sold). Here, Cinnamon sold $5.6+ million of Akeena stock in **two sales,** mostly at $15 per share, **just five days apart**, **right after** Akeena's stock spiraled up from its Class Period start of $6.84 on 12/26/07 to above $16 on Defendants' false statements and omissions, and **right before** it plummeted back down to below $10 **just days later** as Defendants' fraud was **partially** disclosed to the market. ¶¶21, 29, 61-73, 76-81. Sales of such large amounts of stock not

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

8

No. C-09-02147 JW-RS

1   "*near* the stock's peak," but *at "the stock's peak,"* are suspicious, indicative of scienter, and

2   downright "troubling." *Am. West*, 320 F.3d at 939; *see also Helwig*, 251 F.3d at 552 (insider trading

3   at suspicious times/in unusual amounts and closeness in time of allegedly fraudulent statement or

4   omission and later disclosure of inconsistent information both indicative of scienter).

5        Likewise, as to the second "timing" factor, "the fortuitous timing of [Cinnamon's] stock sales

6   remain suspect" and Lead "Plaintiff's allegations regarding the timing of the stock sales … tend to

7   support the element of scienter." *Johnson*, 394 F. Supp. 2d at 1199-1201.  Finally, because

8   Cinnamon too "began to sell large blocks of [Akeena] stock *for the first time* in [January 2008]," the

9   third "prior trading history" factor also supports finding a strong inference of scienter.  *Indeed,*

10  *before selling $5.6+ million worth of Akeena stock in 1/08, Cinnamon had never sold another*

11  *share of Akeena stock during its entire history as a publicly traded company,* raising a strong

12  inference of scienter.  ¶22.  *Am. West*, 320 F.3d at 940 ("the sudden flurry of massive insider trading

13  over this three month period of time, after an extended period of inactivity, appears unusual"); *see*

14  *also Gilead*, 536 F.3d at 1054 (stock sales were "proof" of scienter where "this was the first month

15  in which all of the Officers sold stock").  As such, Lead Plaintiffs have adequately pled an

16  independent violation of §10(b) and Rule 10b-5.

17       Defendants improperly claim the strong inference of scienter Cinnamon's sales raises is

18  negated by mere supposition they make that those shares were sold "pursuant to a validly executed

19  Rule 10b5-1 trading plan."[6] Defs.' Mem. at 4.  Once again, Defendants proffer conjecture as "fact"

20  that Cinnamon's "broker had *sole* discretion (pursuant to a formula under [a validly entered 10b5-1

21  trading] plan) on when to sell Mr. Cinnamon's shares," which would not negate his scienter even if

22  the Court could credit Defendants' contested "factual assertions" derived outside the Complaint.  *Id.*

23

---

24  [6]      Whether Cinnamon had an effective, written 10b5-1 plan and his sales complied with that
    plan presents an "affirmative defense" that must be pled and proved.  17 C.F.R. §240.10b5-
25  1(c)(1)(i)(A); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal., 2009) (where
    this Court found the discretionary nature of trades an affirmative defense to be pled and proved);
26  *Lefkoe v. Jos. A. Bank Clothiers*, No. 06-1892, 2007 WL 6890353, at *6 (D.Md. Sept. 10, 2007)
    (same: 10b5-1 affirmative defense "premature" at motion to dismiss"); *In re Cardinal Health Inc.*
27  *Sec. Litig.*, 426 F. Supp. 2d 688, 734 (S.D. Ohio 2006) (same); *In re Cray Inc.*, 431 F. Supp. 2d
    1114, 1131 (W.D. Wash. 2006) (same).

28

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED          9
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   First, Defendants' Exhibit 21 does not state (much less **prove**) that Cinnamon's broker had **any**

2   discretion over his Class Period stock sales.  *See* Defs.' Mtn. at 24 and Ex. 21.  Second, Defendants'

3   argument (and their Form 8-K) confirms that, at best, the investment community was told Cinnamon

4   would sell some of his stock "**during 2008**," not that he directed that **all of it** be sold **by 1/31/08.**  *Id.*

5   and ¶¶16-17.  As Defendants note, neither the existence of, nor Cinnamon's compliance with, a

6   validly adopted10b5-1 trading plan were alleged in the Complaint.  *Id.*  Because the existence of a

7   valid 10b5-1 trading plan and Cinnamon's compliance with it are disputed matters of fact, even if

8   Defendants' contested factual assertions supported their arguments (**which they do not**), the Court

9   could not consider those "facts" for "the truth of the facts recited therein" to reach the inferences of

10  non-culpability Defendants proffer.  *Id.* and *City of Los Angeles*, 250 F.3d at 689-90.

11      Not only have the *bona fides* of Cinnamon's 10b5-1 "trading plan" not been pled, much less

12  proved, there are several critical problems with eventually proving them.  First, rather than

13  Cinnamon's broker having "**sole** discretion to sell **during 2008"** (as Defendants argue and the Form

14  8-K states), Cinnamon's divorce settlement order required that the stock be **sold no later than**

15  *1/31/08*.  *See* Defs.' Mtn. at 24 and Ex. 21 and ¶¶16-17, 30-39.  Second, by his own admission,

16  Cinnamon only adopted his 10b-5 trading plan **after agreeing to sell stock to fund his divorce**

17  **settlement** and so it cannot negate scienter.  *Id.*; *Integrated Elec. Services*, 497 F.3d at 554 (plaintiff

18  "convincingly suggests that the attempt to use the 10b5-1 Plan as a non-suspicious explanation is

19  flawed because, *inter alia*, [defendant] entered into the Plan during the Class Period … Accordingly,

20  the insider trading allegations contribute to an inference of scienter on the part of" defendant).[7]  The

21  _____

22  [7]     Cinnamon's use of a 10b5-1 plan for one-time sales at the stock's all time high price is not
    condoned by the SEC's interpretations of Rule 10b5-1, whose interpretations of the federal securities
23  laws and its own rules are entitled to substantial deference.  *See Chevron, U.S.A., Inc. v. Natural Res.
    Def. Council, Inc.*, 467 U.S. 837, 844 (1984).  In fact, the SEC Division of Corporation Finance
24  recently updated its Exchange Act Rules Compliance and Disclosure Interpretations to specifically
    emphasize that the "**absence of good faith or presence of a scheme to evade would eliminate the**
25  **Rule 10b5-1(c) defense for prior transactions under the plan**" and that the Rule 10b5-1(c)
    affirmative defense is not available as an affirmative defense in instances where a person establishes
26  a Rule 10b5-1 written trading plan **while aware of material nonpublic information**. (Appx. 5 at 7)
    Indeed, on 3/4/09, the SEC charged several Krispy Kreme executives with illegal insider trading
27  violations, though their sales were purportedly made pursuant to 10b5-1 plans.  (Appx. 6 at 22)  The
    SEC charged that because the executives' stock sales were made immediately following

28

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

10

No. C-09-02147 JW-RS

1    timing of the adoption of this "plan," **were it pled by either party,** would actually indicate a strong

2    inference of scienter, because Cinnamon had never before sold a single share of Akeena stock during

3    the Company's entire history as a publicly traded company.  *See In re Countrywide Fin. Corp.*

4    *Deriv. Litig.*, 554 F. Supp. 2d 1044, 1068-69 (C.D. Cal. 2008) ("Mozilo's actions appear to defeat

5    the very purpose of 10b5-1 plan, which were created to allow corporate insiders to 'passively' sell

6    their stock based on triggers, such as specified dates and prices, without direct involvement …

7    Accordingly, his amendments of 10b5-1 plans at the height of the market does not support the

8    inference 'that the sales were pre-scheduled and not suspicious.'"); *see also In re Countrywide Sec.*

9    *Litig.* (Appx. 1 at 7) ("unusual 10b5-1 plan modifications" support a strong inference of scienter of

10   insider trading).

11           Cinnamon's actions stand in stark contrast to situations where defendants adhered to Rule

12   10b5-1 trading plans.  *See, e.g., Petco*, 2005 WL 5957816, at *26 ("The regular, steady pattern of

13   sales on the first of each month by the Petco Defendants greatly diminishes any inference of scienter

14   on this aspect of the case.").  Indeed, these stock sales did not "gradually diversify [Cinnamon's]

15   investment portfolio[]" and they were certainly not "spread … out over a extended period of time" as

16   the Form 8-K Defendants proffer promised – they were dumped **right after** the stock reached an

17   absurdly inflated price and **just before** it plummeted just as rapidly.  ¶¶21, 29, 61-73, 76-81.

18           Finally, Defendants' argument that Cinnamon's scienter is negated **because his efforts to**

19   **defraud investors were successful**, *i.e.* **because he was able to artificially inflate Akeena's stock**

20   **price and sell only 4,000 shares (or 5%) rather than the 7,000 shares (or 8%) of his stock he stated**

21   **he anticipated having to sell in the Form 8-K, is also absurd.**[8]  Courts in this Circuit have

22

23   misstatements that inflated that company's stock price above their "limit order" prices, "defendants'
     instructions essentially guaranteed that their Rule 10b5-1 plans would be executed immediately, and
24   all stock identified within their plans promptly sold." *Id.* at 22-23.  That same day, a consent order
     was entered "permanently enjoining the defendants from future violations, **disgorgement of ill-**
25   **gotten gains with prejudgment interest**, and the imposition of civil penalties against defendants."
     (Appx. 7)
26   [8]     Defendants also nefariously fault Lead Plaintiffs for "not explain[ing] why, if retaining
     control over Akeena was so important to Mr. Cinnamon he did not simply **pay his ex-wife cash**
27   under the agreement." Defs.' Mtn. at 25.  While Lead Plaintiffs do not consent to the Court taking
28   judicial notice of the Form 8-K they submit as Ex. 21 "for the truth" of the matters asserted therein,

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                           11

No. C-09-02147 JW-RS

1   repeatedly held that unusual stock sales at peak prices support a strong inference of scienter.  *Am.*

2   *West*, 320 F.3d at 938 (sales of $12 million at near peak prices right before negative disclosure raised

3   strong inference of scienter); *Petco*, 2005 WL 5957816, at *19 (sale of almost all shares at a peak

4   price 15 days before the company's negative disclosure was sufficient to plead scienter); *Nursing*

5   *Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (sales one

6   month prior to disclosure were suspicious).  More importantly, Lead Plaintiffs' allegation that

7   Cinnamon intentionally caused artificial inflation in the Company's stock price ***so that he would not***

8   ***have to relinquish any more control of Akeena to fund his divorce settlement*** supports a strong

9   inference of scienter and certainly does not negate it.[9]  *See Central Laborers' Pension Fund v.*

10  *Integrated Elec. Services Inc.*, 497 F.3d 546, 554 (5th Cir. 2007) (finding the "implications of the

11  divorce decree … do not counsel a conclusion that it renders the sale non-suspicious" and, instead,

12  that "the insider trading allegations contribute to an inference of scienter"); and *Helwig,* 251 F.3d at

13  552 (self-interested motivation of defendants indicative of scienter).  Here too, Cinnamon's stock

14  sales at the peak of their artificially inflated prices in order to fund his divorce settlement support a

15  strong inference of scienter and an independent §10(b) violation.  *See Ronconi v. Larkin*, 253 F.3d

16  423, 435 (9th Cir. 2001) ("Had the insiders been 'talking the stock up' and liquidating their holdings

17  at [the peak price], that might show that they knew it was overpriced even as they 'talked it up.'").

18  _____

19  it provides, *inter alia*, that Cinnamon was selling stock "in order to satisfy financial obligations"
    arising out of his divorce.  *Id.*

20  [9]      ***Analogously, many courts, including this one, have held allegations that defendants***

21  ***sought to artificially inflate a company's stock price to use it as acquisition currency without***
    ***causing significant dilution "sufficient to provide a strong inference" of scienter***.  *Infineon* (Appx.

22  2 at 13); *Rothman v. Gregor*, 220 F.3d 81, 93 (2nd Cir. 2000) ("the artificial inflation of stock price
    in the acquisition context may be sufficient for securities fraud scienter"); *In re Time Warner Inc.*

23  *Sec. Litig.*, 9 F.3d 259, 270 (2nd Cir. 1993) (sufficient pleading of motive that company allowed
    prior statements to become misleading by material nondisclosure of company's active consideration

24  of rights offering in order to maintain high stock price before announcing new rights offering to
    lessen dilutive effect on stock price); *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 573 & n.2 (2nd

25  Cir. 1982) (sufficient evidence to support jury finding of defendants' fraudulent intent to overstate
    inventory, including that company benefitted from overstated inventory because stock price followed

26  rising reported earnings, "enabling [the company] to make numerous acquisitions after a five-for-one
    split").

27

28

**B.     The Complaint Alleges Material Misstatements with Particularity**

Under the PSLRA, a plaintiff must plead the falsity of a defendant's misrepresentations by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). Lead Plaintiffs more than adequately satisfy this standard.

**1)  Defendants' Backlog Provision Was False and Misleading**

Defendants do not dispute their statements about Akeena's backlog ***were material to the investment community***. They cannot. As Lead Plaintiffs alleged, backlog provides material information to investors as to: (i) the company's historical, and then-present, sales demand; (ii) sales contracts the company has a legally cognizable right to collect on; and (iii) where, as here, the backlog definition contains both a financial component and a temporal proximity, sales revenues that have already been "realized" that investors are entitled to presume will be "recognized" by a date certain. *See gen. Applied Signal*, 527 F.3d at 990. As such, as the Complaint alleges, the investment community was fixated on backlog when Akeena first began disclosing it on 8/9/07 (¶¶12-14, 40-42) and continued heralding it (¶44) until Defendants belatedly disclosed on 3/13/08 that the backlog provision alive in the market at the start of the Class Period was a farce. ¶81.

Instead, Defendants dispute Lead Plaintiffs' allegation that their pre-Class Period backlog provision on 11/13/07 "remained 'alive' in the market" during the Class Period, and thus actionable, and whether "the investment community's reliance on the transparency the backlog reports purportedly provided into then-present sales demand and booked sales was justified." ¶13 and Defs.' Mtn. at 8 and 10-13. Defendants also apparently dispute whether black letter Ninth Circuit law that "[b]acklog is much like accounts receivable: It represents [a company's] contractual entitlement to perform certain work, just like accounts receivable represents the company's contractual entitlement to be paid for work already performed" applied to them. *Id.*, citing *Applied Signal*, 527 F.3d at 990; Defs.' Mtn. at n.4. In so doing, Defendants ask the Court to ignore the alleged explicit ***"soup to nuts, in the range of one to two months"***-until-sales-would-close definition of backlog provided to the investment community ***with great fanfare*** on 8/9/07 and that

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    13

No. C-09-02147 JW-RS

1   an accurate portrayal of backlog was particularly crucial to investors in light of the "***critical state of***

2   ***Akeena's cash position and burn rate***" when Effren misleadingly stated on 11/13/07 that compared

3   to Akeena's 8/9/07 backlog provision, Akeena's 9/30/09 "***backlog was [now] bigger.***" ¶¶14-15, 18,

4   40-44, 54-56, 81-85, 96.

5          If the Company had more than $13.6 million in "backlog" on 9/30/07, it should have taken

6   in at least that in sales during ***all of*** 4Q 2007.  ¶¶22, 56, 82.  Defendants contest this based on

7   Effren's statement on 11/13/07 that the Company's increase in commercial contracts (a false

8   statement in and of itself) rendered its 11/13/07 backlog provision completely meaningless.  ¶56.

9   The *Applied Signal* court specifically rejected this, holding such a "passage ... speaks entirely of as-

10  yet-unrealized risks and contingencies.  ***Nothing alerts the reader that some of these risks may***

11  ***already have come to fruition, and that what the company refers to as backlog includes work that***

12  ***is substantially delayed and at serious risk of being cancelled altogether***." *Id.* at 986-87 (reversing

13  the district court and holding "once defendants chose to tout the company's backlog, they were

14  bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of");

15  *Matrixx,* 585 F.3d at 1181 (9th Cir. 2009) (same); *South Ferry*, 2009 WL 3153067, at *8 (same).[10]

16

17  [10]      Besides requiring the Court to weigh inferences based on purported "facts" outside the
    Complaint, Defendants' insinuation that investors could have discovered the falsity of the backlog

18  provision themselves by "root[ing] through" Akeena's  1Q, 2Q and 3Q 2007 interim financial
    reports "like a pig hunting for truffles," tallying up its revenue reports, subtracting that result from

19  the Company's FY 2006 revenues, and then comparing that result to Akeena's FY 2007 revenue
    projections, where they would have – *voila* – discovered that Akeena was covertly "predicting

20  around $9.5 million in revenue for 4Q 2007," again misses the point. Defs.' Mtn. at 11-12; *U.S. v.
    Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (*per curiam*); *see gen. Helwig*, 251 F.3d at 552

21  (divergence between internal reports and external statements on same subject and disclosure of
    accounting information in such a way that its negative implications could only be understood by

22  someone with high degree of sophistication indicative of scienter).  Having "chose[n] to tout the
    company's backlog," Defendants assumed a "duty to correct" ***that misstatement***.  *See In re LDK*

23  *Solar Sec. Litig.*, No. C 07-05182, 2008 WL 4369987, *10-*11 (N.D. Cal. Sept. 24, 2008) ("acts or
    circumstances occurring ***after*** the statements were made could be relevant-if defendants made false

24  statements unknowingly but learned of the falsity of their statements thereafter, ***they had a duty to***
    ***disclose the information necessary to correct the misstatements, and the failure to do so can give***

25  ***rise to Section 10(b) liability***") (citing *In re Verity, Inc. Sec. Litig.*, No. C99-5337, 2000 WL
    1175580 (N.D. Cal. Aug. 11, 2000)) and *Backman v. Polaroid Corp.*, 910 F.2d 10, 16-17 (1st

26  Cir.1990) (*en banc*)).  Because they did not correct these statements that remained alive in the
    market, by virtue of their import to investors, Defendants' pre-Class Period statements are indeed

27  actionable.  *Id.*

28

## 2) Defendants' Announcement of Akeena's $17.5 Million Line of Credit "Extension" Was Misleading

Again unable to challenge materiality of the line of credit extension, Defendants ignore the allegations that the $17.5 million extension of the Company's line of credit announced on 12/26/07 ***"would be available for borrowing on a non-formula basis"*** (¶¶18, 61), and were heralded by the financial community (¶¶19, 46, 62) until Defendants disclosed on 1/16/08 it was "***subject to satisfaction by the Company of a cash collateral balance requirement***" (¶81), causing one analyst to aptly inquire on 8/6/08: "I don't really understand why you'd even have a line of credit where for every dollar -- for every dollar you take, you need to keep a dollar restricted?" ¶90 (similar question raised on 11/6/08, ¶96).

Instead of challenging materiality, Defendants now proffer their 12/26/07 statement that the "availability of the credit line was subject to final execution" of the loan documents ***somehow apprised investors*** that this was ***not*** a "line of credit." Defs.' Mtn. at 18-19 (citing Ex. 9 at 4). They also argue this Court should deem their contrary inference that ***investors were essentially foolhardy to believe that a company like Akeena that had never reported a profit would qualify for this line of credit extension in the first instance*** is "more plausible" than the inference that Defendants contemplated the effect their announcement would have on Akeena's stock price while Cinnamon's broker was about to start selling $5.6+ million in stock to fund his divorce settlement by 1/31/08. *Id.* Beyond adding insult to injury, this is just misguided. Even if the Court ***could*** consider the disputed "factual" proffer contained in Defs.' Ex. 9 that Defendants didn't know until Effren signed the documents formalizing the line of credit on 1/11/08 that it was subject to a cash collateralization provision (Defs.' Mtn. at 18-19), ***which it cannot***, Defendants had an affirmative duty to update their previous statements that remained "alive" in the market due to their alleged import to investors, but had become inaccurate.[11]

---

[11]    *See e.g.*, *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1245-46 (3rd Cir. 1989) ("[t]here can be no doubt that a duty exists to correct prior statements, if the prior statements were true when made but misleading if left unrevised."  To avoid liability in such circumstances, "notice of a change of intent [must] be disseminated in a timely fashion."); *Weiner v. Quaker Oats Co.*, 129 F.3d 310 (3rd Cir.1997) (holding that a company that had stated its policy to maintain a stable debt-

### 3)  Defendants' Active Concealment of Andalay's Known Defects

Again unable to legitimately challenge the materiality of Akeena's top executives being aware that "the Andalay product … was riddled with design defects that significantly diminished its aesthetics," and that "Cinnamon and Effren were aware of these defects, as they were forced to approve discounts on units installed in the field and refunds on returns" (¶11), "requiring significant refunds and price discounts" (¶22), Defendants again attempt to contravene the Complaint's allegations with contrary claims of innocent non-culpability. Defs.' Mtn. at 13-15.  Yet, throughout the Class Period, Defendants repeatedly trumpeted the "state-of-the-art 'Andalay' solar system," "promising that "*sales of Andalay [would] contribute towards gross margin improvement in the range of 10% to 15% as we benefit from our cost savings and charge a premium price that is commensurate with Andalay's customer benefits.*" ¶¶11, 49-50, 57, 59-60, 65-74.  Discounting the Complaint's detailed, *reliable* post-Class Period third-party revelations detailing how, *instead,* "[i]nstaller, supply chain reveal[ed] defects in Andalay," though the full "[i]mpact to the model [was] unknown," and that because *"Akeena touts the aesthetically pleasing nature as a key contributor to charging a premium price for Andalay … margins should be affected,"* Defendants characterize these claims as just "an analyst report overhearing from [an] installer that the panels had defects," Defs.' Mtn. at 15.  Defendants' also urge their statements about Andalay's "ability to increase profits or margins" were "nothing more than corporate puffery." *Id.*

---

equity ratio came under a duty to disclose negotiations of a merger that would have added significant new debt); and *In re Time Warner Sec. Litig.,* 9 F.3d 259 (2nd Cir.1993) (finding that the public announcement of a plan to find a financial partner to mend over-leveraged capital structure triggered a duty to update when the company began to consider a dilutive stock offering as an alternate financing plan).  Directly on point, the *Quaker Oaks* court rejected claims that because Quaker and Snapple "had not yet agreed on the precise terms of their merger" at the start of that class period, there was no duty to correct previous misstatements.  129 F. 3d at 318.  Instead, *Quaker* held that "plaintiffs … urge that, whatever the terms of the agreement may have been by the time of the purported false or misleading statements, *it must by then have been clear to defendants that the merger would compel Quaker to*" violate those guidelines. *Id.*  Here too, because "the "complaint alleges facts on the basis of which a reasonable factfinder could determine that [Akeena's] statements" about the $17.5 million line of credit extension being "non-formula" were "material to … investor[s]," *Akeena* "*had a duty to update such statements when they became unreliable.*" *Id.*

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

16

No. C-09-02147 JW-RS

1    Given that Andalay panels comprised 65%-70% of the Company's sales during the Class

2    Period, any claim by Defendants to have not known of this critical information is the type of

3    suggestion that the Ninth Circuit has referred to as "absurd." *Applied Signal*, 527 F.3d at 988; *South*

4    *Ferry*, 542 F.3d at 786; ¶56.  Furthermore, "the exception for puffery is narrowly drawn" and only

5    "statements on the extreme edge of generality and vagueness may be insufficient as a basis for a

6    securities fraud claim." *Id*.  That is not the case here.[12]  As such, Defendants' argument should be

7    rejected. [13]

8             **4)  Defendants' False and Misleading Statements Lauding the Purportedly
                     Lucrative Suntech Supply and License Contracts**

9

10   Defendants reject the Ninth Circuit's *South Ferry* admonition that the Complaint's

11   allegations throughout the Class Period ***must be considered "holistically"*** (542 F.3d at 784),

12   including that Defendants repeatedly "promise[ed] that '***sales of Andalay [would] contribute***

13   ***towards gross margin improvement in the range of 10% to 15% as we benefit from our cost***

14   ***savings and charge a premium price that is commensurate with Andalay's customer benefits,"***

15   based in large part on the value of the Suntech supply and licensing agreements announced in 9/06

16

17   [12]    Defendants' remarks were hardly the type of statements that could be characterized as
         bordering "on the extreme edge of generality and vagueness." *Makor Issues & Rights, Ltd. v.*

18   *Tellabs, Inc.,* 437 F.3d 588, 598 (7th Cir. 2006), (holding "'[i]nterest in and demand for the 6500
         continues to grow. . . . We continue to ship the . . . 6500 through the first quarter.  We are satisfying

19   very strong demand and growing customer demand'" to be actionable and not puffery); *Hanon v.*
         *Dataproducts Corp.,* 976 F.2d 497, 502 (9th Cir. 1992) (defendants' statements emphasizing

20   superior quality were material because "a reasonable jury could conclude that [the company]
         publicly released optimistic statements . . . when it knew [its product] could not be built reliably");

21   and *Citiline Holdings, Inc. v. Istar Fin. Inc.*, No. 08 Civ. 3612, Memorandum and Order (S.D.N.Y.
         March 26, 2010) (Appx. 3 at 8) ("While the Exchange Act does not impose independent duties to

22   speak, it does require speech where its absence would render other statements false or misleading.").

      [13]    Defendants cannot escape liability under the "safe harbor" either. Defs.' Mtn. at 9. The

23   statements that Defendants attack are not forward-looking, are not accompanied by meaningful
         cautionary language, or mix representations of historical and present facts.  *See Makor Issues &*

24   *Rights, Ltd. v. Tellabs, Inc.,* 513 F.3d 702, 705 (7th Cir. 2008) ("a mixed present/future statement is
         not entitled to the safe harbor" protection). Regardless, Lead Plaintiffs have alleged Defendants had

25   actual knowledge that their statements were false, and therefore the safe harbor provision does not
         apply. *Dura,* 548 F. Supp. 2d at 1143 ("even when a forward-looking statement is accompanied by

26   the requisite cautionary language, the speaker may still be liable if the statement is made with actual
         knowledge"); *see also* 1/21/10 *SEC Amicus Curiae Brief* (Appx. 4 at 2 and 9-14) *("It is misleading*

27   *and therefore insufficient for a company to warn of a potentiality that it is aware currently*
         *exists.")*.

28

1   and 1/08, respectively.  Defendants do so despite their alleged knowledge that "the Suntech supply

2   contract and licensing agreement would add very little to the Company's bottom line and would

3   diminish rather than augment the Company's gross margins going forward," that the "Suntech

4   licensing agreement was legally unenforceable," that "Akeena was buying more product from

5   Suntech under the supply contract than it could marketably sell under the diminishing demand,

6   leading to rapidly increased inventories," and that the "Suntech supply contract was priced well

7   above market rate, making the Andalay system more expensive than comparable products available

8   in the market, significantly diminishing demand for them in the market." ¶¶15, 22-23, 50-52, 65-73,

9   75 (b-e).  Defendants instead challenge the falsity of these allegations arguing – like they had as to

10  the fake line of credit expansion allegations – this was something Akeena's investors knew better

11  than to believe.  Defs.' Mtn. at 15-18.

12          Specifically, Defendants urge that when they touted they had locked in prices **to avoid costly**

13  "fluctuations in price for those components [that] could have a disastrous effect on revenue and

14  demand for Akeena's service," **investors should have read between the lines and interpreted that to**

15  **mean:** "Suntech was 'charging AKNS a premium price' for the solar panels," and rather taking at

16  face-value Defendants' statement that the Suntech licensing agreement would lead to "**sales of over**

17  **10MW in 2008"** and that Akeena was then "**experiencing very strong demand for Andalay,"**

18  investors should have surmised "Suntech had no intention to pay meaningful loyalty licensing fees

19  pursuant to the licensing agreement" and that Akeena's Andalay sales were dramatically

20  diminishing, later forcing Akeena to write-down **$2.6 million of unsalable inventory** at the end of

21  FY 2008. *Id.* and ¶¶87 and 93-100.  But in putting at issue the financial benefits the Suntech

22  agreements would purportedly entail, Defendants assumed the duty to **speak** fully and truthfully.

23  *Helwig,* 251 F.3d at 561 ("with regard to future events, uncertain figures, and other so-called soft

24  information, a company may choose silence or speech elaborated by the factual basis as then known

25  – but it may not choose half-truths").

26

27

28

**5) Akeena's Defective Internal Controls Precluded Accurate Financial Reporting or Forecasting**

On 1/9/08, RiskMetrics Group, a highly regarded, independent research company "issued a damning report challenging Akeena's financial reporting" that was highly material to Akeena's reputation in the investment community because the Company had already conceded it "lacked meaningful internal controls, and thus the ability to accurately project or report its financial results." ¶77. For a company that had been repeatedly heralding a "10-15% Gross Margin Improvement" (¶¶52, 57) in response to the investment community's demands that its "[m]anagement … demonstrate a clearer path to profitability" (¶¶10, 45, 59), these critical challenges to the veracity of its purported "profitability" were detrimental. Specifically, the 1/9/08 RiskMetrics report disclosed that Akeena's 345% inventory growth to a new "historical high" that "exceed[ed] revenue growth expectations," which RiskMetrics warned was ***indicative "that demand was weaker than anticipated"*** and that ***excessive inventory could "result in future quarter margin pressure."*** ¶78. The 1/9/08 RiskMetrics report also disclosed that Akeena had likely been under-accruing for warranty reserves ***which "may have benefited [reported] earnings in recent quarter."*** ¶79. The Complaint alleges that disclosure of the RiskMetrics' report caused "the Company's stock, which had traded as high as $16.80 per share in intraday trading on 1/7/08, [to] f[a]ll precipitously to close below $10 per share on unusually high volume of … trading – ***more than 13 times the average daily trading volume during"*** 12/07. ¶80.

The Complaint alleges the Company's false financial reporting dramatically impacted its ability to accurately forecast its own profit and profit margin targets, causing dramatic stock price "deflation" when the Company's true financial prospects were disclosed at the end of the Class Period. When the Company announced on 3/13/08 that the ***"loss for the Company's 4Q 2007 quarter that ended [12/31/07]*** – well in advance of Cinnamon's [1/2/08 and 1/7/08] stock sales – had actually ***increased to $4.47 million,*** … from $1.19 million, … a year earlier," ***almost 4x,*** and its 4Q 2007 "[g]ross margin" had fallen over 13% from 21% in the 3Q 2007 to $18.2% in the 4Q 2007, the Company's stock price fell another 8.4% on high trading volume. ¶85. Defendants' claim that the 4Q 2007 financial results – including profits and profit margins – are somehow irrelevant are just

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    19

No. C-09-02147 JW-RS

1    wrong, especially since Akeena was later forced to take a substantial $2.6 million write-down on its

2    inventory at the end of FY 2008.  ¶100.  Indeed, the Company's FY 2008 financial report would

3    specifically disclose that its FY 2008 "increase in inventory was primarily the purchase of solar

4    panels" and that the "increase in accounts payable was primarily the timing of payments related to

5    the purchase of solar panels *at the end of 2007*."  *Id.*

> **6)  Defendants' Unchallenged False and Misleading Class Period Statements
>      Contributed to the Scheme to Defraud**

6
7            Lead Plaintiffs also alleged – *and Defendants did not challenge* - that during the Class

8    Period that they knew "(g) Akeena was under accruing warranty reserves, which would negatively

9    impact future earnings, particularly the 25% margins promised on November 13, 2007;" "(h) … the

10   Company's 4Q 2007 gross profit margins – for the quarter that had already ended December 31,

11   2007 – had dramatically decreased;" "(i) … the Company's net loss in the 4Q 2007 that had already

12   ended had increased nearly four times over its 4Q 2006 loss;" "(j) … the electric utilities the

13   California Solar Initiative made administrators for the program had not yet certified the Andalay

14   system, such that customer rebates were not being made, forcing Akeena to fund the installations

15   itself and forgo sales where it was unable to do so;" and "(l) … Akeena was still operating with

16   significantly defective internal controls, rendering its publicly-disclosed financial results and

17   projections meaningless." ¶75; Defs.' Mtn. at 8-19.   While these misstatements were each

18   individually detailed, they also contribute to *the "totality" of the Complaint's other falsity*

19   *allegations*.  *Am. West,* 320 F.3d at 945; *South Ferry*, 542 F.3d at 783.[14]

20

---

21   [14]       For instance, as to why Akeena's Solar Initative payments were being delayed, Defendants
22   misleadingly argue elsewhere that they adequately disclosed Andalay had not yet been certified
     when they advised the investment community the "paperwork requirement stretched out the payment
23   terms." Defs.' Mtn. at 13 and Ex. 2 at 13.  But that did not disclose that "the electric utilities the
     California Solar Initiative made administrators for the rebate program had not yet certified the
24   Andalay system, such that customer rebates were not being paid, forcing Akeena to fund the
     installations itself, *or forgo sales where it was unable to do so*."  ¶¶14, 83.  Conversely, the
25   Complaint's allegations that inventory was overstated (¶78), warranty costs were understated (¶79),
     revenue recognition was misleadingly aggressive (¶92) and defective internal controls prevented
26   accurate financial reporting or forecasting (¶75(l)), resulting in a relatively massive $2.6 million
     (*based on Akeena never having reported a profit*) inventory write-down and cash flow overruns by
27   the end of FY 2008.  ¶100.

28

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED          20
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
                                                                  No. C-09-02147 JW-RS

1          **C.       The Complaint Raises a Strong Inference of Scienter**

2          A securities fraud complaint must "state with particularity facts giving rise to a strong

3   inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2).  In the

4   Ninth Circuit, this means allegations that defendants acted either intentionally or with deliberate

5   recklessness.  *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1022 (9th Cir. 2005).  In addition to

6   Cinnamon's stock sales detailed in §III.A, Defendants' scienter was established by showing "an

7   extreme departure from the standards of ordinary care, and which presents a danger of misleading

8   buyers or sellers that is either known to the defendant or is so obvious that the actor must have been

9   aware of it."  *S.E.C. v. Rubera*, 350 F.3d 1084, 1094 (9th Cir. 2003).

10         The U.S. Supreme Court's recent decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*

11   551 U.S. 308 (2007), specifically addressed the analysis of scienter under the PSLRA.  The Court

12   reaffirmed that it had "long recognized that meritorious private actions to enforce federal antifraud

13   securities laws are an essential supplement to criminal prosecutions and civil enforcement actions"

14   by the DOJ and the SEC. *Id.* at 313.  With that goal in mind, the Court set out three "prescriptions."

15   First, that courts must "accept all factual allegations in the complaint as true."  *Id.* at 322.  Second,

16   that "courts must consider the complaint *in its entirety*" and consider "whether *all* of the facts

17   alleged, *taken collectively*, give rise to a strong inference of scienter, not whether any individual

18   allegation, scrutinized in isolation, meets that standard."  *Id.* at 323.  And third, when evaluating a

19   defendant's scienter, courts must consider whether an inference of scienter is "cogent" and "at least

20   as likely as" – *but not more likely than* – "any plausible opposing inference."  *Id.*  "The inference

21   that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, *or*

22   *even the 'most plausible of competing inferences.*'"  *Id.* at 324.  Rather, a strong inference exists "if

23   a reasonable person would deem the inference of scienter cogent and at least as compelling as any

24   opposing inference one could draw from the facts alleged."  *Id.*  In this case, however, Lead

25

26

27

28

1   Plaintiffs submit that the allegations of the Complaint surpass the "at least as strong as any opposing

2   inference" standard and approach the "smoking gun" category.[15]

3       Specifically, the Ninth Circuit has repeatedly held that allegations regarding fraud in a

4   company's "core business" operations are sufficient to plead scienter.  In *Applied Signal*, 527 F.3d

5   982, the Ninth Circuit recently reiterated its holding in *America West* that courts may infer that high-

6   level managers knew about problems and customer cancellations in a company's core business

7   operations.  *Id.* at 987.  As in *Applied Signal,* it is "absurd to suggest" that Akeena's top executives

8   were unaware of the terms being negotiated on the line of credit "extension," the former CFO's

9   improper tally of "backlog," Andalay defects resulting in refunds and discounts and the concealed

10  terms of the Suntech supply and license agreements that precluded either agreement from

11  contributing to Akeena's forecasts.  *Id.* at 988.  *South Ferry*, 542 F.3d at 785 (holding the "core

12  operations inference" of *Applied Signal* is strengthened when coupled with defendants' "'specific

13  admissions from top executives that they are involved in every detail of the company'").

14  **D.    Lead Plaintiffs Adequately Allege that Defendants' False Statements and Material Omissions Are the Proximate Cause of the Class's Losses**

15      Loss causation is "a causal connection between the material misrepresentation and the loss."

16  *Dura*, 544 U.S. at 342.  Where the complaint alleges facts that, if taken as true, plausibly establish

17  loss causation, *a Rule 12(b)(6) dismissal is inappropriate*.  *Gilead*, 536 F.3d at 1057.  This is not "'a

18  probability requirement . . . it simply calls for enough facts to raise a reasonable expectation that

19  discovery will reveal evidence of'" loss causation.  *Id.*  Indeed, the Court must "accept Plaintiffs'

20  allegations as true and construe them in the light most favorable to Plaintiffs" in determining loss

21  causation.  *America West,* 320 F.3d at 935-36.  Defendants' misstatements need not be the "sole

22

23  [15]    Instead of addressing the Complaint's cogent scienter allegations, Defendants proffer
24  strawmen versions of the facts they believe are easier to topple.  Plaintiffs' Motion to Strike
     challenges the worst of these offenses.  While the Ninth Circuit requires that "when determining
25  whether plaintiffs have shown a strong inference of scienter, the court must consider *all reasonable
     inferences to be drawn from the allegations*, including inferences unfavorable to the plaintiffs," that
26  does not authorize the fabrication of a completely contrary set of new "facts" the Court can consider
     in the pre-discovery stages. *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002).  Defendants'
27  request that the Court do so here speaks volumes about their apparent inability to proffer a cogent
     argument why the facts actually pled are not cognizable. *City of Los Angeles*, 250 F.3d at 689-90
28  and *Petco*, 2005 WL 5957816, at *3.

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED       22
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
No. C-09-02147 JW-RS

1   cause" of the Class's losses, so long as they "played a substantial role" in those losses. *Id.*; *see also*

2   *LDK Solar*, 584 F. Supp. 2d at 1251.  Pleading loss causation "should not prove burdensome for a

3   plaintiff."  *Atlas v. Accredited Home Lenders Holding Co.,* 556 F. Supp. 2d 1142, 1157 (S.D. Cal.

4   2008).   The Complaint far exceeds the requirement that it provide an "indication" of the causal

5   connection by pleading both the stock price increases and decreases attributable to Defendants' false

6   statements.  *Dura*, 544 U.S. at 347.  Specifically, the Complaint contains detailed allegations that:

- On 12/26/07: Akeena's stock "open[ed at] $6.84" but "close[d] at $8.10 …, on unusually high volume of more than six times the average daily trading volume for the previous 30 days" on Defendants' deceptive credit line "expansion" announcement that augmented other false pre-Class Period statements still "alive in the market." ¶¶10-15, 18, 20, 45, 59, 63;

- On 1/2/08: Akeena stated it "entered into a substantial *licensing agreement* with Suntech that promised additional sales of over 10 MW of Andalay system panels in 2008, *causing an incredible 43+% spike in Akeena's stock price in a single trading session*," "to close at $11.45." ¶19;

- Between 1/9/08 – 2/22/08: Immediately following Cinnamon's stock sales, "[a]s the truth leaked into the market, including the illusory nature of the credit line 'increase,' problems with the Company's financial reporting, the Company's actual 4Q 2007 sales volume, and the fact that Cinnamon had sold $5.6 million of shares at the highest prices the stock traded at [on 1/2/08 and 1/5/07] the Company's stock price plummeted, closing at $6.20 per share by [2/22/08], erasing tens of millions of dollars in market capitalization." [16] ¶23;

- On1/9/08:  *RiskMetrics* challenged Akeena's accounting of inventory and warranty costs causing "the Company's stock, which had traded as high as $16.80 … in intraday trading on [1/7/08 to fall] precipitously to close below $10 … on unusually high volume of … more than 13 times the average daily trading volume during" 12/07 ¶80[17];

[16]     *See In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1048-50 (N.D. Cal. 2008) (loss causation adequately alleged where defendants misrepresented the company had effective internal financial controls and the stock price drop after revelations of the company's involvement in backdating stock options); *In re Interlink Electronics, Inc. Sec. Litig.,* No. SACV 05-8133, 2008 WL 4531967, at *4 (C.D. Cal. Oct. 6, 2008) (finding plaintiffs had adequately alleged loss causation as to the first of the four partial disclosures since the corrective announcement signaled to the markets that Interlink had accounting and internal control issues rendering the cost of its SOX compliance higher than anticipated).

[17]     Defendants did not challenge that the January 9, 2008 disclosures adequately pled loss causation in their opening brief and they are not permitted to make contrary assertions on reply. *Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1167 (9th Cir. 1997) (declining to address argument raised for first time in reply brief); *U.S. v. Bohn*, 956 F.2d 208, 209 (9th Cir. 1992); *Eberle v. City of Anaheim*, 901 F.2d 814, 817 (9th Cir. 1990); *see also U.S. v. Boyce*, 148 F. Supp.2d 1069, 1085 (S.D. Cal. 2001).  And, while the Ninth Circuit has rejected the need to allege a "mirror image" curative disclosure matched to a contemporaneous drop in the price of the stock (*see Gilead*, 536 F.3d at 1056-58), because Defendants' promises of a "10-15% Gross Margin Improvement" were alive during the Class Period (¶¶ 52, 57) and Defendants had stated Akeena was

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          23

No. C-09-02147 JW-RS

- On 1/16/08: upon disclosing that Akeena's credit line "expansion" was merely a "cash collateralization agreement," its "stock continued plummeting, closing at $8.50 … that day – almost half of what it had traded at on" 1/7/08 ¶81;

- On 2/22/08: Following Akeena's disclosure of its 4Q 2007 and FY 2007 financial results … revealing that its *"4Q 2007 sales were only $10.3 million – far less than the 'backlog' exceeding $13.6 million that defendants had promised on [11/17/07] -- existed as of the end of the 3Q 2007 on [9/30/07]'"* and that Akeena "was lowering its fiscal 2008 annual sales growth guidance *by more than 25%*, from 135% to 100% for FY 2008, the Company's stock price plummeted to close at $6.20 …, again erasing hundreds of million of dollars in market capitalization." ¶82;

- On 3/3/08: "Global Hunter Securities … disclosed … "*the utilities ha[d] been delaying the systems' certification and activation and consequently, the payout on rebates,"* stating "*[t]his ha[d] created some working capital strain on the installers,"* including Akeena, resulting in customers … reneging on previous purchase agreements and "caus[ing] Global Hunter Securities to assign a value of just $7.20 … to Akeena's stock"[18] ¶¶83; 84;

- On 3/13/08: upon disclosure of Akeena's 4Q 2007 larger than expected loss and lower than expected gross margins (for a quarter that had closed 12/31/07), that the Suntech licensing agreement would have "no meaningful financial impact during 2008" and that the previously-provided backlog was misleading, "Akeena's stock 'fell … 8.4 percent, to $6.15 … in NASDAQ stock market composite trading of 2.18 million'" shares." ¶¶23, 85; 86;

- The "Class Period stock price inflation was due to Company-specific misstatements as the S&P 500 Index, and solar giants Suntech (STP), LDK Solar (LDK) and Energy Conversion Devices, Inc. (ENER), were all relatively flat on a comparative basis during this same period." ¶24.[19]

---

then *"experiencing very strong demand for Andalay"* during the Class Period (¶65), the market reacted harshly to Risk Metric's warning that Akeena's financial reporting was aggressive and unreliable causing real loss. *See, e.g., In re ICG Comm'ns, Inc. Sec. Litig.*, No. 1:00-cv-01864, 2006 WL 416622, at *10 (D. Colo. Feb. 7, 2006) ("These announcements of substantially reduced earnings expectations, and other serious problems with ICG's business, reasonably can be seen as revelation of the negative truth about ICG's business.").

[18] An immediate stock price reaction is not required and the 3/13/08 drop can be partially attributed to this disclosure. *See Gilead*, 536 F.3d at 1057-58 (rejecting "'a bright-line rule requiring an immediate market reaction'"); *Am. West*, 320 F.3d at 934 (injurious stock drop occurred more than one and a half months after the market learned the truth about the misrepresentations); *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 411 F. Supp. 2d 1172, 1177-78 (N.D. Cal. 2005) (where stock drop of about 36% occurred over 8 days); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1251 (N.D. Cal. 2008) (stock price drop of 45.1% over five days with trading volume extremely high when the corrective announcements first came out).

[19] Because certain of these stock price movants support loss causation, whether lead plaintiffs are entitled to recover on all of them presents a factual matter that need not be resolved on a motion to dismiss. *See In re Interlink Elec., Inc. Sec. Litig.*, No. SACV 05-8133-AG(SHx), 2008 WL 4531967, at *4 (C.D. Cal. Oct. 6, 2008) (where plaintiff adequately pled loss causation as to at least one of the four dates, the Court need not address the others). No more is required to plead loss causation. *See In re Amgen, Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1028 (C.D. Cal. 2008) ("Because these statements 'affirmatively create[d] an impression of a state of affairs which differ[ed] in a material way from the one that actually exist[ed],' the Court finds that Plaintiffs have sufficiently pled loss-causation.").

---

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

24

No. C-09-02147 JW-RS

1   **IV.   CONCLUSION**

2         For the above reasons, Lead Plaintiffs respectfully request the Court deny Defendants'

3   motion to dismiss in its entirety.  If, however, the Court dismisses all or part of the Complaint,

4   plaintiffs respectfully request leave to amend.  *See* Federal Rule of Civil Procedure 15(a).

5

    DATED: March 31, 2010                         Respectfully submitted,
6                                                 SCOTT+SCOTT LLP

7                                                 /s/ Mary K. Blasy
                                                  MARY K. BLASY
8                                                 ARTHUR L. SHINGLER III
                                                  HAL D. CUNNINGHAM
9                                                 DAVID H. GOLDBERGER
                                                  600 B Street, Suite 1500
10                                                San Diego, CA 92101
                                                  Telephone: 619-233-4565
11                                                Facsimile: 619-233-0508
                                                  ashingler@scott-scott.com
12                                                mblasy@scott-scott.com
                                                  hcunningham@scott-scott.com
13                                                      – and –
                                                  DAVID R. SCOTT
14                                                P.O. Box 192
                                                  156 South Main Street
15                                                Colchester, CT  06415
                                                  Telephone:  860-537-3818
16                                                Facsimile: 860-537-4432
                                                  drscott@scott-scott.com
17
                                                  *Lead Counsel for Lead Plaintiffs*
18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED          25
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
                                                              No.  C-09-02147 JW-RS

1

<u>**CERTIFICATE OF SERVICE**</u>

2      I hereby certify that on March 31, 2010, I caused the foregoing to be electronically filed with

3 the Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4 e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the

5 foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF

6 participants indicated on the Manual Notice List.

7      I certify under penalty of perjury under the laws of the United States of America that the

8 foregoing is true and correct.  Executed on March 31, 2010.

9

10                           /s/ Mary K. Blasy
                          MARY K. BLASY
11                          SCOTT+SCOTT LLP
                          600 B Street, Suite 1500
12                          San Diego, CA 92101
                          Telephone: 619-233-4565
13                          Fax: 619-233-0508
                          E-mail: mblasy@scott-scott.com
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED          26
    COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
                                                    No.  C-09-02147 JW-RS