1  STEVEN M. SCHATZ, State Bar No. 118356
   sschatz@wsgr.com
2  DOUGLAS J. CLARK, State Bar No. 171499
   dclark@wsgr.com
3  KELLEY M. KINNEY, State Bar No. 216823
   kkinnney@wsgr.com
4  DOMINIQUE-CHANTALE ALEPIN, State Bar No. 241648
   dalepin@wsgr.com
5  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
6  650 Page Mill Road
   Palo Alto, CA 94304-1050
7  Telephone:  (650) 493-9300
   Facsimile:   (650) 565-5100
8
   Attorneys for Defendants
9  Akeena Solar, Inc., Barry Cinnamon and
   Gary Effren
10

11                  UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13                         SAN JOSE DIVISION

14

15  SHARON HODGES, On Behalf of Herself and All        CASE NO.:  CV-09-02147-JW
    Others Similarly Situated,
16                                                     **REPLY BRIEF IN SUPPORT OF
                   Plaintiff,                          DEFENDANTS' MOTION TO
17                                                     DISMISS AMENDED COMPLAINT
          v.                                           FOR VIOLATIONS OF THE
18                                                     FEDERAL SECURITIES LAWS**
    AKEENA SOLAR, INC, *et. al,*
19                                                     Date:  May 24, 2010
                   Defendants.                         Time:  9:00 a.m.
20                                                     Dept:  Courtroom 8

21                                                     Before:  Hon. James Ware

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3      INTRODUCTION ............................................................................................................. 1

4      ARGUMENT ..................................................................................................................... 1

5          A.    Defendants Cannot Be Liable for Pre-Class Period Statements ................................... 2

6          B.    The Complaint Fails to Plead the Falsity of Any Statement ........................................ 2

7          C.    The Complaint Has Not Pleaded an Insider Trading Claim ........................................ 10

8          D.    The Complaint Fails to Plead Loss Causation ............................................................ 11

9          E.    The Complaint Fails to Raise a Strong Inference of Scienter ...................................... 12

10     CONCLUSION ................................................................................................................. 15

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ................................................................. 2, 9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................2

*Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008) ............................... 3, 5, 15

*Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104 (N.D. Cal. 2009) ..................................... 15

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783
(11th Cir. 2010) ..............................................................................................6

*Gompper v. VISX, Inc.*, 298 F.3d 893 (9th Cir. 2002) .........................................................1

*In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006) .................. 10

*In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993) .................................5

*In re Duane Reade Inc. Sec. Litig.*, No. 02-civ-6478, 2003 WL 22801416 (S.D.N.Y.
Nov. 25, 2003), *aff'd.* 107 Fed. Appx. 250 (2d Cir. 2004) .....................................5

*In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434 (S.D.N.Y. 2006) ......................... 8, 9

*In re Int'l Bus. Mach. Corp. Sec. Litig.*, 163 F.3d 102 (2d Cir. 1998) ...............................8

*In re LDK Solar Sec. Litig.*, No. C 07-05182, 2008 WL 4369987
(N.D. Cal. Sept. 24, 2008) ................................................................................2

*In re Portal Software, Inc. Sec. Litig.*, No. 03-5138, 2006 WL 2385250
(N.D. Cal. Aug. 17, 2006) .................................................................................6

*In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999) ......................... 12, 13, 15

*In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964 (N.D. Cal. 2009) ......................... 14

*Johnson v. Aljian*, 394 F. Supp. 2d 1184 (C.D. Cal. July 30, 2004), *aff'd in part*,
490 F.3d 778 (9th Cir. 2007) ........................................................................... 13

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049 (9th Cir. 2008) ......................*passim*

*National Junior Baseball League v. Pharmanet Development Group, Inc.*, No. 08-5723,
2010 WL 1379735 (D.N.J. Mar. 30, 2010) ......................................................... 12

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding
Corp.*, 320 F.3d 920 (9th Cir. 2003) .............................................................. 3, 15

*Pennsylvania Avenue Funds v. Borey*, No. C06-1737, 2009 WL 902070
(W.D. Wash. Mar. 30, 2009) ............................................................................ 10

*Pollio v. MF Global, Ltd.*, 608 F. Supp. 2d 564 (S.D.N.Y. 2009) ..................................... 10

*Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001) ...................................................................6

*South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008) ..................................... 3, 15

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004) ...............9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ................................. 12, 13

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998) ............................................... 10

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) ............................... 15

**STATUTES**

15 U.S.C. 78u-5(d) ...............................................................................................................8

**RULES**

17 C.F.R. § 240.10b5-1(c) .................................................................................................... 11

**INTRODUCTION**

Plaintiffs' Complaint attempts to create a case based on the theory that Mr. Cinnamon and others at the Company conspired together to control significant events for the sole purpose of enabling Mr. Cinnamon to sell stock at an inflated price to fund a divorce settlement. This sensationalist attempt is transparent on its face, and it is understandable given that the Complaint fails to plead specific facts demonstrating that Defendants made false or misleading statements. The Complaint is filled with vague and misleading assertions that fail to show the Defendants did not have a reasonable basis for their statements when made.

Indeed, Plaintiffs' case is a remarkable throwback to the fraud-by-hindsight conclusory allegation-type of complaint that existed before the enactment of the PSLRA. The Complaint recites bland and legally irrelevant statements, then proclaims their falsity without any recitation of the factual basis for their conclusions. Due to lacking facts to support their speculative conclusions as to falsity, Plaintiffs focus the bulk of their opposition on Mr. Cinnamon's stock sales, failing to address Mr. Effren's total absence of such sales, which in itself undercuts Plaintiffs' theory. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008). Plaintiffs are pounding the table concerning Mr. Cinnamon's sales despite a totally benign rationale for his sales (a divorce settlement), which were rendered pursuant to a 10b5-1 plan that gave sole discretion to a third party.

Although the opposition posits that Defendants ask this Court "to improperly end before it starts" this action, this is exactly the type of case Congress intended the PSLRA to cut off at the pleading stage. Opp. at 4; *see Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) (holding that the purpose of the PSLRA was "to eliminate abusive and opportunistic securities litigation and to put an end to the practice of pleading fraud by hindsight."). Indeed, Plaintiffs do not even want the Court to consider documents they cite *in their own Complaint* for fear they will reveal the contradictions in the Complaint's allegations. Opp. at 4; Motion to Strike. Akeena Solar, one of the true pioneers in the solar industry, should not bear the burden of this spurious litigation.

**ARGUMENT**

On a motion to dismiss, while the court assumes that the *facts* in a complaint are true, "it is not required to indulge unwarranted inferences in order to save a complaint from dismissal." *Metzler*, 540

1  F.3d at 1065; *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  The Court need not accept as

2  true "'naked assertions' devoid of 'further factual enhancement'"; the complaint must offer more than

3  "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'"  *See Iqbal*,

4  129 S. Ct. at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,  557 (2007)).  Here, where the

5  Complaint's allegations rest upon speculative conclusions unsupported by facts and where the

6  inferences urged by Plaintiffs are unwarranted, the Court should dismiss the Complaint with

7  prejudice.  Because the Complaint fails to plead falsity, loss causation, and scienter, the Court should

8  dismiss the Complaint on any one or all of these bases.

9  **A.  Defendants Cannot Be Liable for Pre-Class Period Statements**

10  Defendants cannot be held liable for statements made prior to the beginning of the Class

11  Period.  Mtn. at 8.  The only authority Plaintiffs cite to rebut this point is utterly irrelevant because it

12  concerns a "duty to correct" statements made *during the class period*.  *See* Opp. at 14, n.10 (citing *In*

13  *re LDK Solar Sec. Litig.*, No. C 07-05182, 2008 WL 4369987, at *10-11 (N.D. Cal. Sept. 24, 2008)

14  (holding that defendants were required to correct statements made at the start of the class period where

15  later events during the class period rendered the prior statements false and misleading)).  Moreover,

16  Plaintiffs have not alleged facts demonstrating that any pre-Class Period statement was in fact false

17  when made.  For example, the Complaint does not allege that Akeena failed to complete all the jobs in

18  backlog.  Thus, for the reasons above, the pre-Class Period statements related to the backlog, Suntech

19  supply agreement, and Andalay claims must be dismissed as a matter of law.  *See* AC ¶¶ 16-60.

20  **B.  The Complaint Fails to Plead the Falsity of Any Statement**

21  Defendants' motion demonstrated that the Complaint lacked the particularity the PSLRA

22  requires to plead facts from which a reasonable inference can be made that the Defendants knew their

23  statements were false when made, and highlights that the Complaint's assertions are actually

24  contradicted by the concurrent publicly-available material cited by Plaintiffs in judicially noticeable

25  documents.  *See* Mtn. at 8-19; RJN at 1-5; Reply ISO RJN at 9-15.  In an effort to circumvent the

26  requirement that the Complaint plead falsity with particularity, Plaintiffs now argue that falsity should

27  be considered in "totality" with respect to the PSLRA.  Opp. at 20.  Putting aside that the cases

28  Plaintiffs cite concern the requirements for pleading scienter and not falsity, Plaintiffs not only bear

1    the burden of "nudging their claims across the line from conceivable to plausible," under the PSLRA,

2    Plaintiffs bear the burden of articulating the "who, what, when, where, and how" of *each alleged false*

3    *statement.  See* Mtn. at 9; *see* Opp. at 6, 17, 20 (citing *South Ferry LP, No. 2 v. Killinger*, 542 F.3d

4    776, 783 (9th Cir. 2008); and *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am.*

5    *West Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003)).

6            Inasmuch as the statements regarding backlog, Andalay, or the Suntech supply agreement

7    were made prior to the Class Period, the Court could end its analysis here.  But if the Court were to

8    continue to evaluate the statements, it would find falsity lacking for the reasons noted below.

9            ***Backlog***.  Plaintiffs attempt to establish falsity with respect to statements regarding backlog by

10   relying on self-serving proclamations that backlog was: (1) overstated in the amount reported; and (2)

11   unreliable to forecast future revenue.  *See* AC ¶ 75.  As to the first point, neither the Complaint nor the

12   opposition provides any reasons, facts, or information as required by the PSLRA to support this

13   allegation, including by how much reported backlog was allegedly overstated, which contracts should

14   not have been included, etc.  *See Metzler*, 540 F.3d at 1070.  As to the second allegation, Defendants

15   specifically disavowed backlog as a predictor of future revenue.  Ex. 2 at 4.

16           The case on which Plaintiffs primarily rely to support their claim of falsity is distinguishable

17   and in fact supports dismissal of the Complaint.  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982,

18   990-92 (9th Cir. 2008).  In *Berson*, plaintiffs claimed that investors were misled by Applied Signal's

19   backlog figures which Applied Signal claimed represented the dollar value of work it had contracted

20   to do but had not yet performed.  *See id.*  Plaintiffs claimed that the backlog figures were false as

21   Applied Signal had included in backlog *four* specifically identified contracts on which it had received

22   stop-work orders totaling *tens of millions of dollars*.  When a customer issued a stop-work order,

23   Applied Signal was no longer contractually entitled to the work.  Thus, the Ninth Circuit found

24   Applied Signal's representation regarding the content of backlog false.  Plaintiffs had also identified

25   four confidential witnesses who would testify as to the existence and effect of the stop-work orders

26   and pointed to an admission by defendants that Applied Signal had included stop-work orders in

27   backlog.  *See id.* at 985.  In contrast, the Complaint includes no facts as to *why* Akeena's backlog

28   figures were allegedly false, *by how much* they were allegedly false and cites to no confidential

1    witnesses or internal documents supporting a finding of falsity.  *Metzler*, 540 F.3d at 1070.

2         The *only* basis Plaintiffs present for claiming the falsity of Akeena's backlog figures is their

3    *theory* that the backlog figures disclosed by Akeena "*presumably*" should have converted into revenue

4    for 4Q 2007.  Defendants dispelled this theory in their motion demonstrating: (1) Defendants *never*

5    *represented* to the market that the reported backlog would convert into revenue for 4Q 2007 and in fact

6    expressly disavowed backlog as an accurate predictor of future revenue (Mtn. at 11 citing conference

7    call); and (2) neither the Company, *nor analysts* (in reports cited in the Complaint), believed that

8    reported backlog would convert into revenue for 4Q 2007 (Mtn. at 11-12).

9         In response, Plaintiffs again attempt to re-characterize Mr. Cinnamon's August 9, 2007

10   statement, claiming he represented that all of backlog would convert into revenue in one to two

11   months.  Opp. at 13.  Not so.  On August 9, 2007, Mr. Cinnamon stated that Akeena "*targeted*"

12   residential sales to take one to two months to install but commercial sales *could* take longer.  Mtn. at

13   5; AC ¶ 41.  Mr. Cinnamon's statement cannot reasonably be interpreted to mean all sales in backlog

14   (residential and commercial) would convert into revenue by the end of 4Q 2007.

15        Lacking any statement linking backlog to revenue for 4Q 2007, Plaintiffs assert their own 4Q

16   2007 revenue forecast at "presumably" $13.6 million.  This projection by Plaintiffs is nothing more

17   than speculation based on false assumptions and disproved by contemporaneous information provided

18   to the market.  *See* Opp. at 14; AC ¶ 56.  Defendants clearly showed that the Company had reiterated

19   revenue forecasts of 135% over FY2007, or $9.5M in revenue for 4Q 2007.  Mtn. at 11-12;   AC ¶ 54.

20   Plaintiffs' complaint that Defendants never provided a 4Q 2007 revenue figure but instead reiterated

21   their FY 2007 guidance and forced investors to "[hunt] for truffles" (Opp. at 14, n.10) ignores the

22   reality that *analysts also* predicted only $9.5M in revenue for 4Q 2007.  Mtn. at 5; Ex. 3 at 9.

23   Plaintiffs fail to explain how it would be reasonable to assume that an investor would have presumed

24   4Q 2007 revenue of $13.6M when the Company *and* analysts projected only $9.5M.

25        Plaintiffs' other basis for claiming backlog was false is that the backlog figures provided in

26   August and November 2007 could not be relied on to forecast future revenue.  This is

27   incomprehensible given Mr. Effren's *specific disavowal of backlog as a reliable indicator of future*

28   *revenue*.  *See* Mtn. at 11 (citing Ex. 2 at 4 (quoting Mr. Effren as stating "we don't believe that

1   backlog is a meaningful metric . . . we've concluded that backlog would not provide meaningful

2   visibility into future quarterly results.")).  Instead of addressing Mr. Effren's statement of caution,

3   Plaintiffs seek to confuse the issues and cite *Berson* for the premise that Mr. Effren's disavowal was

4   "meaningless."  Opp. at 14 (citing *Berson*, 527 F.3d at 986-87).  The cited passage involves analysis

5   of whether Applied Signal had misled investors about the *present* backlog figures where the company

6   had warned that contracts in backlog might not convert into revenue *in the future*.  *See* 527 F.3d at

7   985-86.  The Ninth Circuit held that warnings regarding *future* risks did not disclose that the *present*

8   backlog figures included stop-work orders and thus presented a false impression of Applied Signal's

9   current business.  *See id.* at 986.  *Berson* does not stand for the proposition that defendants may be

10  held liable when backlog does not convert into future revenue where investors have been *explicitly*

11  warned of that very same fallibility.  *See e.g.*, *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357,

12  371 (3d Cir. 1993)) ("Under the 'bespeaks caution' doctrine, courts have held that meaningful

13  cautionary language can render omissions or misrepresentations immaterial.").[1]

14          *Andalay*.  In September of 2007, three months prior to the start of the Class Period, Akeena

15  unveiled Andalay as a new residential solar panel that was more attractive and required less

16  installation time.[2]  *See* Mtn. at 13.  On September 24, 2007, in discussing Andalay, Mr. Cinnamon

17  represented that Andalay's reduced parts and attachments would decrease installation time causing

18  gross margins on its 2008 residential sales related to the rollout of Andalay to increase in the range of

19  10-15%.  *See id.* at 13-14.

20          While Plaintiffs have made Mr. Cinnamon's statement regarding gross margins a centerpiece

21  of their opposition, Plaintiffs cannot rely on this statement to establish falsity of statements with

22  respect to Andalay or Suntech for several important reasons.  First, as noted above, this statement was

23

24          [1] Contrary to Plaintiffs' assertions that Defendants did not challenge materiality, Defendants noted
    that Plaintiffs failed to plead materiality with respect to backlog as these statements, to the extent

25  Plaintiffs claim that they forecast future revenue, are immaterial under the bespeaks caution doctrine.
    Opp. at 13; *In re Duane Reade Inc. Sec. Litig.*, No. 02-civ-6478, 2003 WL 22801416, at *5 (S.D.N.Y.

26  Nov. 25, 2003), *aff'd.* 107 Fed. Appx. 250 (2d Cir. 2004); Mtn. at 11.  *See infra* at 6 (for additional
    arguments on materiality).

27          [2] Plaintiffs make the unsupported statement that Andalay panels "comprised 65%-70% of the
    Company's sales during the Class Period."  Opp. at 17.  Given that Andalay was a product that was

28  just beginning to be rolled out in 4Q 2007, it would not be reasonable to infer that Andalay could have
    comprised 65%-70% of sales during the Class Period.  *See* Mtn. at 14.

1   made prior to the start of the Class Period and is thus not actionable.  *See supra* at 2-3.  Second,

2   Plaintiffs have failed to show that gross margins *did not improve* in the range of 10-15% for 2008

3   Andalay residential sales.  *See* Opp. at 16; Mtn. at 14-15.[3]  Third, as this statement regarding *future*

4   gross margins was forward-looking and accompanied by cautionary language, Defendants are

5   protected from liability under the PSLRA's safe harbor provision.[4]  *See* Mtn. at 15, n.9.

6        Beyond the fact that Mr. Cinnamon's statement regarding gross margins for Andalay is not

7   actionable, Plaintiffs' underlying "theory" as to why statements regarding Andalay were "false" is

8   meritless.  Plaintiffs point to unsupported, hypothetical, unspecified "design defects" suffered by

9   Andalay, which allegedly caused Mr. Cinnamon to want to obtain a public listing for Akeena.  Opp. at

10  1-2, 16.  The allegations as to the supposed defects lack the factual support required to carry these

11  claims across the PSLRA's pleading hurdles.  Mtn. at 14; Opp. at 16.[5]  The theory that these

12  supposed defects caused Mr. Cinnamon to take Akeena public is particularly curious given that

13  Akeena went public in August 2006, and Andalay was not introduced until *September 2007*.

14        Lastly, Plaintiffs completely ignore the fact that Defendants disclosed information and warned

15  _____

16      [3] Further, results regarding combined gross margins are irrelevant because the Company *refused*
    to give forecasts for gross margins for 2008 because the mix of commercial / residential was
17  unknown: "it's premature for [Akeena] to say that margins on a blended basis will go up or down."
    *See* AC ¶ 57; Ex. 2 at 7.  Thus, the fact that gross margins for 4Q 2007 decreased in comparison to
18  3Q 2007 does not render false any statement made by Defendants regarding margins.  *Ronconi v.
    Larkin*, 253 F.3d 423, 433 (9th Cir. 2001).

19      [4] Plaintiffs offer no support to the contrary other than their self-serving conclusion that Defendants
    are not protected from liability.  *See* Opp. at 17 n.13.  Moreover, because the PSLRA's safe harbor
20  provisions are disjunctive, even if Plaintiffs had pleaded actual knowledge (which they did not, *see
    infra at* 12-15) such allegations would not overcome the protection Defendants are afforded by
21  accompanying this forward-looking statement with sufficient cautionary language.  *See Edward J.
    Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 795 (11th Cir. 2010) (holding
22  defendants can avoid liability if the forward-looking statements are accompanied by cautionary
    language *or* plaintiffs fail to show they made the statements with actual knowledge); *In re Portal
23  Software, Inc. Sec. Litig.*, No. 03-5138, 2006 WL 2385250, at *12 (N.D. Cal. Aug. 17, 2006) (same).

24      Defendants addressed how statements regarding Andalay's aesthetics, reliability and ability to
    increase profits or margins were not actionable as puffery.  *See* Mtn. at 15.  Plaintiffs appear to have
25  abandoned these statements as a basis for liability with respect to Andalay.  In any case, the cases
    Plaintiffs cite for the proposition that these statements were not puffery are factually and legally
26  inapposite to this case.  *Compare* Opp. at 17 n.12 to Mtn. at 8-9.

27      [5] The "third party" analyst report to which Plaintiffs point is insufficient to clear the PSLRA
    hurdles.  First, third party analyst reports of non-attributed information cannot substitute for facts
28  under the PSLRA.  *See* Mtn. at 14, n.7.  Second, *the report itself speculates that margins would only
    be affected in Q2 2008* – long after the Class Period.  *See* AC ¶ 89.  This analyst report also stated the
    alleged isssue *had been resolved.  Id.*

1   investors that the Andalay product was a new "module technology [that was] untested and may not be

2   effective or patentable or may encounter other unexpected problems, which could adversely affect our

3   business and results of operations." *See* Supp. Alepin Decl. Ex. 27 at 3 and Ex. 28 at 3.

4        ***Suntech Supply/License Agreements***.  The Suntech supply agreement allegations fail to state

5   a claim because they were made prior to the Class Period and Defendants specifically disclosed in a

6   conference call cited in the Complaint that Akeena had locked in a price that might later turn out to

7   exceed the market price.  Mtn. at 16 n.10 citing Ex. 2 at 3.  The Suntech license claim is similarly

8   deficient in that Defendants contemporaneously disclosed the minimal revenue impact it would have

9   in 2008.  Mtn. at 18 citing AC ¶ 71; Ex. 8 at 2.  Instead of addressing these arguments, Plaintiffs recite

10  the conclusory allegations made in their Complaint.  *See, e.g.,* Opp. at 17-18 ("Akeena was buying

11  more product from Suntech under the supply contract than it could marketably sell"; "Suntech had no

12  intention to pay meaningful loyalty [sic.] licensing fees").  These allegations are illogical, unsupported

13  by any facts, and fly in the face of concurrent judicially noticeable information incorporated by

14  reference into the Complaint.  *See* Mtn. at 15-18.[6]

15       With respect to the supply agreement, the opposition without basis concludes that Akeena

16  represented this was an advantageous contract when in fact "Suntech was 'charging AKNS a premium

17  price' for the solar panels."  Opp. at 18.  Aside from the fact that Akeena's business judgment is not

18  grounds for securities fraud, in reality, in September of 2007, Akeena disclosed that it would pay

19  Suntech a *fixed price* for the solar panels – whether that fixed price would mean that Akeena would

20  pay a *discount* or a *premium* for the panels would only become clear *in the future* as silicon prices

21  fluctuated throughout the solar industry.[7]  Ex. 2 at 3.  Plaintiffs thus urge the unwarranted inference

22  that Defendants knew at the time they entered the supply agreement that they were paying a premium;

23  such an inference could only be reasonable if this Court could conclude that Defendants could see into

---

24

25       [6]  Plaintiffs claim that Defendants promised that the Suntech license agreement would "lead to 'sales over 10MW in 2008.'"  Opp. at 18.  It was Suntech, and not Akeena, that *targeted* sales of over 10MW for 2008.  AC ¶ 65 (citing 1/02/08 press release).

26

27       [7]  Plaintiffs once again ignore Defendants' warning that the Company was "subject to market prices for the components . . . which are subject to fluctuations," the market "recently experienced a shortage of supply due to insufficient availability of silicon" which caused prices for solar modules to increase, and that interruptions in the Company's ability to procure components would "adversely affect or limit our sales and growth."  *See* Supp. Alepin Decl. Ex. 27 at 2 and Ex. 28 at 2.

28

1  the future.  Moreover, Defendants *specifically warned* of the possibility that securing a fixed price

2  would cause Akeena either to pay a discount or a premium for the panels.  *See* Ex. 2 at 10.

3  　　　　Concerning the license agreement, Plaintiffs suggest that Mr. Cinnamon caused Akeena to

4  deliver "the big 'high margin' licensing contract" with Suntech in order to raise the stock price in

5  January 2008.  Opp. at 2-3.  Plaintiffs' quotation of "high margin" and characterization of the

6  agreement as "big" can only refer to its own Complaint, because the market was aware

7  *contemporaneously* with the Suntech license agreement announcement that it would have a limited

8  revenue impact in 2008.  Opp. at 2; Mtn. at 17-18; Reply ISO RJN at 14-15.  As for their

9  miscellaneous attacks on the license agreement, Plaintiffs have provided no additional support for the

10  conclusory claims that the license agreement was "legally unenforceable" or that Suntech had no

11  intention of paying royalties.  Opp. at 18; Mtn. at 17-18.

12  　　　　**Comerica.**  As demonstrated in the Motion to Dismiss, the Complaint fails to demonstrate that

13  Akeena's December 26, 2007 disclosure regarding its commitment for an increased line of credit with

14  Comerica was false or misleading.  Mtn. at 18-19.  First, the December 26, 2007 disclosure clearly

15  warned investors that the terms were "subject to execution of final definitive loan documentation."

16  Ex. 15.  Second, Plaintiffs do not challenge that the Company's December 26, 2007 press release

17  warned that the terms were not set in stone; instead, Plaintiffs now focus on Defendants' "duty to

18  update" the December 26, 2007 statement after the signing of the final documentation.[8]  *See* Opp. at

19  15.  Even if Defendants had a "duty to update," which they did not, *see infra*, Defendants *did* timely

20  disclose the terms *two business days* after signing the final loan documentation – well within the time

21  required by the SEC for disclosure of material information.  Ex. 9 at 4; *see In re GeoPharma, Inc. Sec.*

22  *Litig.*, 411 F. Supp. 2d 434, 450-51 (S.D.N.Y. 2006) (holding defendant company complied with

---

[8] This theory of liability was not alleged in the Complaint and thus cannot be considered.  *See supra* at 11.  A "duty to update" arises when "a statement, reasonable at the time it is made, becomes misleading becasue of a subsequent event." *In re Int'l Bus. Mach. Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998).  The PSLRA specifically provides that there is no duty to update forward-looking statements.  15 U.S.C. 78u-5(d).  A "duty to correct" arises when "a company makes a historical statement that at the time made, the company believed to the true, but as revealed by subsequently discovered information actually was not."  163 F.3d at 109 (citation omitted).  Plaintiffs have not demonstrated how Defendants had either a duty to correct or a duty to update.  Plaintiffs have not shown that the signing of the final loan documentation which included a cash collateralization requirement made any prior statement false.

1   relevant SEC regulation "which requires disclosure within four business days of a 'material corporate

2   event.'").  Lastly, it was well within Defendants' business judgment to execute a line of credit which

3   required a cash collateralization.

4       ***Miscellaneous Allegations***.  Plaintiffs' claim regarding "defective internal controls" is

5   similarly unfounded.  First, the "defective internal controls" to which Plaintiffs refer were discussed in

6   the annual report to shareholders in August 2007.  Opp. at 19 (citing AC ¶ 77).  The Company hired

7   Mr. Effren as its CFO prior to the Class Period in September 2007 partly to address this issue.  *See* Ex.

8   13 at 25.  On March 19, 2008, the Company disclosed that it had no internal control deficiencies for

9   the fiscal year 2007.  *Id.*  Plaintiffs cite no facts to challenge this disclosure.  Plaintiffs' conclusion that

10  Akeena was operating with allegedly defective internal controls is thus speculative and unfounded and

11  should be dismissed.  *See Iqbal*, 195 S. Ct. at 968.

12      Plaintiffs' further attempt to link the unrelated January 9, 2008 RiskMetrics report regarding

13  perceived "rising inventory" to the alleged "fraud" is unfounded.  First, the RiskMetric report is

14  nothing more than an opinion piece analyzing previously reported financial information and thus is

15  not actionable.  *See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 374 (5th Cir.

16  2004) (holding defendants are not liable for analyst opinions).  Second, Plaintiffs fail to link alleged

17  rising inventory levels months after the close of the Class Period to any purportedly "false statement"

18  made during the Class Period.  *See* Opp. at 19; AC ¶¶ 75, 77.  With respect to the March 13, 2008

19  financial results disclosure, as noted in the motion, the statement regarding the 4Q 2007 loss is

20  irrelevant because Plaintiffs have failed to link the losses to any purportedly false statement made by

21  Defendants.  *See* Mtn. at 12, n.5.[9]

22      Plaintiffs' last attempt to save their Complaint is to claim that Defendants did not challenge a

23  series of miscellaneous statements scattered throughout the Complaint.  Opp. at 20.  As noted by

24  Defendants, Mtn. at 9-10, the Complaint's allegations are like a 55-page riddle of conclusory

25  allegations without factual support.  Defendants were not required to address block quotes or

26  statements unrelated to the "fraud" as alleged and defined by Plaintiffs.  *See* AC ¶ 22 (defining the

27  ──────────────

28      [9] Plaintiffs have similarly failed to show how 4Q 2007 profit margins revealed that any previous
    statement made by Defendants was false.  *See* Mtn. at 14-15.

1  "fraud" as including statements regarding Suntech, backlog, Andalay, margins and 4Q losses); *Pollio*

2  *v. MF Global, Ltd.*, 608 F. Supp. 2d 564, 570 (S.D.N.Y. 2009) ("[A]lthough plaintiff's Complaint

3  quotes verbatim from a series of press releases and other statements allegedly made by defendants

4  during the Class Period, it fails to identify which portions of these statements (if any) were false or

5  misleading.").  For example, although the Complaint alleges that "Akeena was under accruing

6  warranty reserves, which would negatively impact future earnings, particularly the 25% margins

7  promised on November 13, 2007" (Opp. at 20), the Complaint fails to identify any statements

8  regarding warranty reserves *made by Defendants* and fails to include facts demonstrating that

9  warranty reserves in fact impacted margins.[10]  AC ¶ 75.  Defendants addressed the remainder of the

10  allegations.  *See* Mtn. at 12, n.5 (addressing 4Q 2007 losses); Mtn. at 13 (addressing customer

11  rebates).

12       **C.       The Complaint Has Not Pleaded an Insider Trading Claim**

13            Defendants' motion demonstrated that the Complaint failed to state a Section 20A insider

14  trading claim.  Mtn. at 25, n.15.  Plaintiffs' opposition references a §10(b) insider trading claim which

15  is, in effect, an impermissible attempt to amend their Complaint.  Plaintiffs' Complaint describes

16  various alleged false and misleading statements made by Defendants but simply does not allege a

17  §10(b) insider trading claim.  It is well-established that a complaint may not be amended by

18  opposition.  *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).  Plaintiffs' own case

19  law recognizes the rule.  *See In re Cardinal Health*, *Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 727, n.52

20  (S.D. Ohio 2006) (refusing to consider insider trading claim raised in opposition where complaint only

21  alleged stock sales in conjunction with misstatement and accounting fraud claims).  Because Plaintiffs

22  have not adequately alleged a §10(b) insider trading claim, no such claim is properly before the Court.

23  But even if the Court were to consider this claim, the opposition fails to satisfy the elements of such a

24  claim.  *See Pennsylvania Avenue Funds v. Borey*, No. C06-1737, 2009 WL 902070, at *14 (W.D.

25  Wash. Mar. 30, 2009) (dismissing §10(b) insider trading claim where no strong inference of scienter

26  _____

27       [10] The only statement regarding warranty reserves comes from an analyst who provided his opinion on Akeena's warranty reserves and concluded that margins *might* be affected *in the event of a*

28  "*material power generation issue.*"  AC ¶ 79.  This statement is not attributed to Defendants and fails to show that Akeena had an issue with its warranty reserves that *did in fact* affect margins.

1  alleged); *see also supra* at 12-15 (discussing inadequate scienter allegations).[11]

2        **D.**      **The Complaint Fails to Plead Loss Causation**

3        In their Motion to Dismiss, Defendants demonstrated that the Complaint fails to allege loss

4  causation as Plaintiffs fail to identify *any* "corrective" disclosures which revealed the alleged fraud

5  related to the Company's backlog, Andalay product, Suntech agreements or line of credit with

6  Comerica.  *See* Mtn. at 19-20; *see also infra* at 2-10.  Instead of addressing this deficiency, Plaintiffs

7  simply list various statements excerpted from their Complaint and state that Akeena's stock price

8  dropped following the statements (sometimes days or even weeks later).  *See* Opp. at 23-24.  Plaintiffs

9  miss the point.  To plead loss causation, Plaintiffs cannot simply point to a statement made before a

10  stock price drop.  Plaintiffs must show how that statement *revealed* Defendants' fraud.  *See Metzler*,

11  540 F.3d at 1062-63; *see e.g.*, Opp. at 24 (stating that Mr. Cinnamon's statement regarding licensing

12  revenue on 3/13/2008 caused Plaintiffs' losses; the minimal nature of the licensing revenue was

13  disclosed to the market on January 3, 2008).[12]  Because Plaintiffs have failed in this regard, their

14  Complaint must be dismissed.

15        In addition, the Complaint's reference to statements from two analyst reports (the 1/9/2008

16  Risk Metrics Report and 3/3/2008 Global Hunted Securities Report) do not support loss causation

17  because those statements fail to *reveal* Defendants' alleged *fraud*.  The reports also fail to plead loss

18  causation because they merely present speculation as to the future of certain aspects of Akeena's

19  business.[13]  *See* Opp. at 22-23.  For example, the January 9, 2008 Risk Metrics report provided an

20  analyst's opinions regarding how Akeena's warranty reserves and inventory levels would impact

---

22      [11] Moreover, because Mr. Cinnamon's sales were made pursuant to a 10b5-1 trading plan, the
23  sales cannot be "on the basis of" material inside information for purposes of an insider trading claim.
*See* 17 C.F.R. § 240.10b5-1(c).

24      [12] Defendants similarly showed that the announcement of larger than expected losses and lower
gross margins in comparison to 3Q 2007 did not reveal the "truth" regarding Defendants' never made
25  projections with respect to losses or gross margins for 4Q 2007.  Mtn. at 12, n 5, 14-15.

26      [13] More confounding, the 3/3/2008 Global Hunter Securities Report is not even alleged to have
caused a stock price drop.  AC ¶¶ 83-84.  The report merely initiated coverage on Akeena with a
27  neutral rating and "assign[ed] a value of just $7.20 . . . to Akeena stock."  Opp. at 24 (citing AC ¶¶ 83-
84).  *See* Ex. 11 at 1.  Plaintiffs fail to show how an analyst report initiating coverage with a neutral
28  rating could have had *any* effect on their stock that would have caused a loss.  *Metzler*, 540 F.3d at
1062.

1   Akeena's margins in the future.  *See* AC ¶¶ 78-79.  Not only have Plaintiffs failed to show how this

2   report revealed anything "new" regarding Akeena's warranty reserves and inventory levels as this

3   information had been revealed to the market months prior (*see* ¶¶ 78-79), the statements constitute the

4   analyst's speculative opinions with respect to Akeena's margin projections for quarters beyond the

5   Class Period and are too vague and speculative to demonstrate loss causation.  *See* AC ¶ 78 (inventory

6   levels "*may* result in future quarter margin pressure"); ¶ 79 (warranty accrues "*is likely* to have a

7   significant adverse impact on margins.") (emphasis added); *see National Junior Baseball League v.*

8   *Pharmanet Development Group, Inc.*, No. 08-5723, 2010 WL 1379735, at *36, n.34 (D.N.J. Mar. 30,

9   2010) ("Similarly, to the extent that these analysts raised certain issues regarding PharmaNet's

10   financial health and outlook, it is also insufficient to show loss causation as these reports were vague

11   and speculative.") (citing cases).

12            **E.       The Complaint Fails to Raise a Strong Inference of Scienter**

13            The Complaint fails to meet the *Tellabs* scienter standard, requiring a strong inference when

14   taking into account "plausible opposing inferences" and assessing the allegations holistically.  *Tellabs*,

15   *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007); Mtn. at 21.  Evidence of scienter

16   must be more than merely "reasonable" or "permissible," and instead must be "cogent" and "at least

17   as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs,* 551 U.S. at

18   323.  "An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable

19   explanations for the defendant's conduct."  *Id.* at 314.  Plaintiffs fail to address the non-culpable and

20   more plausible inferences noted by Defendants and are unable to tie their motive theory to any false

21   statement as required to plead scienter.  Having failed to plead *any* allegations that Mr. Cinnamon or

22   Mr. Effren made any false statement, much less that they knowingly or recklessly did so, Plaintiffs

23   hinge their entire scienter theory on insufficient motive theories and the core operations inference, a

24   narrow legal presumption.  Mtn. at 21-22.  Because motive must be paired with knowledge or reckless

25   indifference *with respect to the alleged false* statements (Mtn. at 23 (citing cases)), Plaintiffs fail to

26   plead a strong inference of fraudulent intent as to Mr. Cinnamon and Mr. Effren.  *See In re Silicon*

27   *Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 977 (9th Cir. 1999) ("*SGI*") ("the required state of mind"

28   involves intentional or conscious misconduct:  either "actual knowledge" that a statement is false or

1   misleading or "deliberate recklessness" as to the truth or falsity).

2        ***Mr. Cinnamon's Stock Sales Do Not Raise a Strong Inference of Scienter.***  Defendants

3   showed how Mr. Cinnamon's stock sales did not raise a strong inference of scienter as motive is

4   insufficient to clear the hurdles of the PSLRA and because Mr. Cinnamon's stock sales were benign.

5   Mr. Cinnamon entered a divorce settlement with his wife, Akeena disclosed in December 2007 that he

6   had entered a 10b5-1 plan to satisfy obligations under this settlement, and all of the Class Period sales

7   were made pursuant to the plan. Mtn. at 23-25.  Plaintiffs argue speculative conclusions regarding

8   Mr. Cinnamon's motives and unwarranted inferences regarding the stock sales.

9        Mr. Cinnamon's stock sales were not unusual or suspicious and thus cannot raise any inference

10  of fraudulent intent. *Tellabs*, 551 U.S. at 324 (requiring courts to consider "plausible nonculpable

11  explanations for defendant's conduct," *i.e.*, that Mr. Cinnamon sold stock to satisfy divorce

12  obligations).  Plaintiffs do not address Defendants' argument that the absence of sales by Mr. Effren

13  negates any inference of scienter.  Mtn. at 22-23; *Metzler*, 540 F.3d at 1067 ("We typically require

14  larger sales amounts [than 37% of holdings]—and corroborative sales by other defendants—to allow

15  insider trading to support scienter.").  In examining whether stock sales are "unusual" or "suspicious,"

16  courts consider "(a) the amount and percentage of shares sold by insiders; (b) the timing of the sales;

17  and (c) whether the sales were consistent with the insider's prior trading history."  *SGI*, 183 F.3d at 986.

18       First with respect to amount, Plaintiffs seek to emphasize the number of shares Mr.

19  Cinnamon's broker sold, and ignore that although Mr. Cinnamon sold 400,000 shares, this represented

20  only 5% of his *8 million* in holdings.[14]  Such low amounts and percentages are not the making of

21  securities fraud.  The cases on which Plaintiffs rely to infer that the 400,000 shares sold were

22  "unusual" are inapposite.  Opp. at 8; *Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1199-1200, n.10 (C.D.

23  Cal. July 30, 2004) (complaint pleaded scienter because defendants sold over *7.5 million shares*

24  within 4 months for proceeds of over $661 million), *aff'd in part*, 490 F.3d 778 (9th Cir. 2007); *In re*

25

26      [14] Plaintiffs make much of the fact that Mr. Cinnamon sold 400,000 shares, and not 700,000 (5%
    compared to 8% of Mr. Cinnamon's holdings), purportedly in order to avoid dilution.  Opp. at 2-3, 11.
27  The December 17, 2007 8-K announcing Mr. Cinnamon's 10b5-1 plan said only that he contemplated
    selling "up to" 700,000 shares.  Ex. 21.  Either amount is significantly lower than amounts and
28  percentages held to be suspicious by courts.  Mtn. at 25 (citing cases).

1    *UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) (scienter pleaded in case

2    involving $400 million restatement, SEC investigation and significant GAAP violations where

3    defendants sold roughly $40 million in stock and two defendants sold *98%* of their holdings).

4         The timing of Mr. Cinnamon's sales also is not suspicious.  The opposition argues that *Mr.*

5    *Cinnamon* sold at fortuitous times during the Class Period, completely ignoring that Mr. Cinnamon

6    had no discretion over the sales which were made pursuant to a 10b5-1 plan by his broker.  Opp. at 8-

7    9.  Plaintiffs also dismiss the more than plausible non-culpable explanation that the sales were wholly

8    unrelated to any Akeena-related disclosure and instead were made to satisfy his divorce settlement.

9    *Id.*  Plaintiffs argue that the Court should not consider Mr. Cinnamon's 10b5-1 plan on a motion to

10   dismiss, failing to address Defendants' Ninth Circuit authority that courts routinely consider plans in

11   finding sales rebut an inference of scienter.  Opp. at 9 n.6, 10.[15]  The timing of Mr. Cinnamon's sales

12   do not support scienter because Mr. Cinnamon had no discretion over them.[16]

13        Mr. Cinnamon's prior trading history also does not support scienter as Plaintiffs suggest.  Opp.

14   at 9.  Plaintiffs argue that Mr. Cinnamon's lack of prior stock sales supports an inference of scienter

15   because he began to sell Akeena stock "for the first time" in January 2008.  Opp. at 9.  Plaintiffs

16   ignore that following Akeena's merger in August 2006, Mr. Cinnamon was subject to a lock-up

17   agreement which prevented him from selling stock for twelve months.  Supp. Alepin. Decl. Exs. 24;

18

19        [15] Plaintiffs cite two out of circuit district court cases and a Western District of Washington derivative case in arguing the Court should not consider the plan.  Opp. at 9 n.6.  This non-binding

20   authority is not persuasive given that the law in this circuit clearly contemplates that 10b5-1 plans can be considered on a motion to dismiss in after-market cases to rebut an inference of scienter.  Mtn. at

21   24 (citing cases).  To the extent Plaintiffs suggest that 10b5-1 plans should not be considered on a motion to dismiss, this assertion is inconsistent with Ninth Circuit law.  *Metzler*, 540 F.3d at 1067

22   n.11.  *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964 (N.D. Cal. 2009) is similarly distinguishable.  *Id.* (scienter pleaded where case involved three restatements concerning $400 million

23   in improper revenue recognition, GAAP violations, an SEC investigation, resignation or termination of three defendants, and where defendants and insiders sold over 1.6 million shares for profits of $58

24   million and where two defendants sold 98% of their holdings while possessing undisclosed adverse information); Opp. at 9 n.6.  Complaints rarely plead the existence of such plans, but they are still

25   routinely considered in misstatement cases.

26        [16] Plaintiffs' citations to case law where a plan was entered or amended during the class period also are easily distinguishable because Mr. Cinnamon entered the plan *prior* to the start of the Class

27   Period.  Ex. 21; Opp. at 10-11 (citing cases).  The opposition also mistakenly asserts that under the divorce settlement Mr. Cinnamon was "required" to the sell the stock no later than January 31, 2008.

28   Opp. at 10.  Indeed the divorce agreement only required Mr. Cinnamon to pay his ex-wife a cash sum by January 31, or deliver stock to her by then to be sold by July 31, 2008.  Ex. 20 ¶¶ 2-4.

1    25 at 36; 26 at 36.  Mr. Cinnamon's lack of trading history in no way renders his subsequent sales

2    suspicious.  *See SGI,* 183 F.3d at 987 (rejecting strong inference of scienter where plaintiff alleged

3    defendant had never before sold company stock but "omit[ted] [to] mention" that defendant was

4    legally forbidden from trading post-acquisition until second quarter when sales in fact occurred).[17]

5          Were the Court were to find Mr. Cinnamon's trades suspicious, which it should not, mere

6    motive to increase Akeena's stock price is not sufficient to raise a strong inference of scienter.  *See*

7    *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1119 (N.D. Cal. 2009) (holding that while the stock

8    sales of defendants in comparison to pre-class period sales appeared suspicious, "this suspicion is not

9    enough to conclude that Defendants' stock transactions support a strong inference of scienter.").[18]

10                                          **CONCLUSION**

11          The Complaint fails to plead a single false or misleading statement, much less one made with

12   scienter, and fails to plead loss causation.  The Court should dismiss the Complaint with prejudice.

13   Dated: May 7, 2010                    Respectfully submitted,

14                                          WILSON SONSINI GOODRICH & ROSATI
                                           PROFESSIONAL CORPORATION
15                                         650 Page Mill Road
                                           Palo Alto, CA 94304
16                                         Telephone: (650) 493-9300
                                           Facsimile: (650) 493-6811
17
18                                         By:  /s/ Steven M. Schatz
                                                Steven M. Schatz
19
                                           *Attorneys for Defendants Akeena Solar, Inc.,*
20                                         *Barry Cinnamon and Gary Effren*

---

21       [17] Plaintiffs' case law on prior trading history is easily distinguishable.  In *America West*, most of
     the nine individual defendants sold 100% of their shares.  320 F.3d at 939.  None of the individual
22   defendants had sold stock in the twenty months preceding the ten month class period and they sold a
     massive amount of stock over a three month time period.  *Id.*  Plaintiffs' own case distinguished it
23   from other cases "where only one insider did the trading[.]" *Id.*;  *see also Metzler*, 540 F.3d at 1067
     (scienter not pleaded where one of three individual defendants did not sell stock).

24       [18] Recognizing the weakness of their case, Plaintiffs ask this Court to indulge in a legal
25   presumption arguing that Defendants were aware of unidentified issues because they concerned "core
     business operations."  Opp. at 21-22. The core operations inference is only available in unusual
26   circumstances not applicable here, where Plaintiffs do not establish that bad adverse facts were in
     existence, or more fundamentally, that anything known to Defendants would lead them to believe the
27   challenged statements were false or misleading.  *South Ferry*, 542 F.3d at 785-86 (citing *Berson,* 527
     F.3d at 988); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1001 (9th Cir. 2009) (approach
28   is "narrow exception").  Plaintiffs here do not establish the necessary foundation for the presumption
     that adverse facts were in existence at the time of the challenged disclosures.

1

**ECF CERTIFICATION**

2

      I, Kelley M. Kinney, am the ECF User whose identification and password are being used to

3

file this Reply Brief in Support of Defendants' Motion to Dismiss Amended Complaint for Violations

4

of the Federal Securities Laws.  In compliance with General Order 45.X.B., I hereby attest that

5

Steven M. Schatz  has concurred in this filing.

6

7

Dated: May 7, 2010                   WILSON SONSINI GOODRICH & ROSATI
                                        PROFESSIONAL CORPORATION

8

9

                             By:  /s/ Kelley M. Kinney
                                     Kelley M. Kinney

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28