1   SCOTT+SCOTT LLP
    ARTHUR L. SHINGLER III (181719)
2   MARY K. BLASY (211262)
    WALTER W. NOSS (*pro hac vice*)
3   HAL D. CUNNINGHAM (243048)
    DAVID H. GOLDBERGER (225869)
4   707 Broadway, Suite 1000
    San Diego, CA  92101
5   Telephone:  619-233-4565
    Facsimile: 619-233-0508
6   ashingler@scott-scott.com
    mblasy@scott-scott.com
7   wnoss@scott-scott.com
    hcunningham@scott-scott.com
8   dgoldberger@scott-scott.com

9   – and –

10  DAVID R. SCOTT (*pro hac vice*)
    P.O. Box 192
11  156 South Main Street
    Colchester, CT  06415
12  Telephone:  860-537-3818
    Facsimile: 860-537-4432
13  drscott@scott-scott.com

14  Lead Counsel for Plaintiffs

15                   UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17                        SAN JOSE DIVISION

18

19  SHARON HODGES, *et al.*,                  No. C-09-02147 JW-PVT

20                          Plaintiff,         PLAINTIFFS' NOTICE OF MOTION
                                               AND MOTION FOR CLASS
21  vs.                                        CERTIFICATION AND
                                               MEMORANDUM OF POINTS AND
22  AKEENA SOLAR, INC., *et al.*,              AUTHORITIES IN SUPPORT
                                               THEREOF
23                          Defendants
                                               JUDGE:       Hon. James Ware
24                                             COURTROOM:   Courtroom 8, 4th Floor
                                               DATE:        February 7, 2011
25                                             TIME:        9:00 a.m.

26

27

28

    MOTION FOR CLASS CERTIFICATION – No. C-09-02147 JW-PVT

1

**TABLE OF CONTENTS**

2

3   NOTICE OF MOTION AND MOTION ...................................................................1

4   STATEMENT OF ISSUES TO BE DECIDED .........................................................1

5   MEMORANDUM OF POINTS AND AUTHORITIES ............................................2

6       I.      INTRODUCTION ..............................................................................2

7       II.     STATEMENT OF FACTS AND RELEVANT PROCUDURAL
                BACKGROUND .................................................................................3

8
        III.    STANDARD OF REVIEW ................................................................7
9
        IV.     ARGUMENT .....................................................................................8

10
                A.      This Action Satisfies the Requirements of Rule 23(a)..........8

11
                        1.      The Class Is So Numerous that Joinder of All Members of

12                              the Class Is Impracticable ................................................9

13                      2.      Questions of Law and Fact Are Common to Members of
                                the Class ..........................................................................9

14
                        3.      The Claims of Plaintiffs Are Typical of Those of the Class..........11
15
                        4.      Plaintiffs Will Fairly and Adequately Protect the Interests

16                              of the Class.....................................................................12

17              B.      This Action Satisfies the Requirements of Rule 23(b)(3).........................14

18                      1.      Common Questions of Law and Fact Predominate Over
                                Individual Questions ......................................................14

19
                        2.      A Class Action Is Superior to Other Available Methods for
20                              Resolving This Controversy ...........................................22

21      V.      CONCLUSION.................................................................................24

22

23

24

25

26

27

28

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

**CASES**

4

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997)................................................................7, 8, 15

5

*Basic, Inc. v. Levinson,*
    485 U.S. 224 (1988)................................................................8, 15, 16

6

7

*Bell v. Ascendant Solutions, Inc.,*
    422 F.3d 307 (5th Cir. 2005) ......................................................17

8

9

*Berti v. VideoLan Techs.,*
    No. 97-296, 1998 U.S. Dist. LEXIS 18066 (W.D. Ky. June 10, 1998)..................17

10

*Binder v. Gillespie,*
    184 F.3d 1059 (9th Cir. 1999) ......................................................16, 18

11

12

*Blackie v. Barrack,*
    524 F.2d 891 (9th Cir.1975) ......................................................*passim*

13

14

*Bovee v. Coopers & Lybrand,*
    216 F.R.D. 596 (S.D. Ohio 2003) ..................................................17

15

*Cammer v. Bloom,*
    711 F. Supp. 1264 (D.N.J. 1989) ..................................................16, 17, 18, 19

16

17

*City of Westland Police and Fire Retirement Sys. v. Sonic Solutions,*
    No. C 07-05111 CW, 2009 WL 942182 (N.D. Cal. April 6, 2009)........................12

18

19

*Conn. Ret. Plans and Trust Funds v. Amgen, Inc.,*
    No. CV 07-2536, 2009 WL 26633743 (C.D. Cal. Aug. 12, 2009)..................16, 21

20

*Deposit Guar. Nat'l Bank v. Roper,*
    445 U.S. 326 (1980)................................................................24

21

22

*Deutschman v. Beneficial Corp.,*
    132 F.R.D. 359 (D. Del. 1990) ....................................................17

23

24

*Dukes v. Wal-Mart, Inc.,*
    509 F.3d 1168 (9th Cir. 2007) ......................................................3, 8

25

*Epstein v. MCA, Inc.*
    50 F.3d 644 (9th Cir. 1995) ......................................................23

26

27

*Freedman v. Louisiana-Pacific Corp.,*
    922 F. Supp. 377 (D. Or. 1996) ..................................................15

28

1  *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*,
2      212 F.R.D. 400 (E.D. Wis. 2002) ...................................................................................11

3  *Hanlon v. Chrysler Corp.*,
4      150 F.3d 1011 (9th Cir. 1998) ......................................................................................12

5  *Harris v. Palm Springs Alpine Estates, Inc.*,
      329 F.2d 909 (9th Cir. 1964) ..........................................................................................9

6  *Huberman v. Tag-It Pac., Inc.*,
7      314 Fed. Appx. 59 (9th Cir. 2009) ...............................................................................16

8  *In re Accredo Health, Inc. Sec. Litig.*,
      No. 03-2216, 2006 WL 1716910 (W.D. Tenn. April 19, 2006) ..........................17, 18, 19

9  *In re Adobe Sys., Inc. Sec. Litig.*,
10     139 F.R.D. 150 (N.D.Cal.1991).....................................................................................2, 7

11 *In re Amerifirst Sec. Litig.*,
      139 F.R.D. 423 (S.D. Fla. 1991) ...................................................................................11

12 *In re Cirrus Logic Sec.*,
13     155 F.R.D. 654 (N.D. Cal. 1994) ..................................................................................11

14 *In re Connetics Corp. Sec. Litig.*,
15     257 F.R.D. 572 (N.D. Cal. 2009).............................................................................11, 14

16 *In re Connetics Corp. Sec. Litig.*,
      No. C 07-02940, 2009 WL 1126508 (N.D. Cal. April 27, 2009) ...................................16
17
   *In re Dynegy, Inc. Sec. Litig.*,
18     226 F.R.D. 263 (S.D. Tex. 2005).....................................................................................9

19 *In re Emulex Corp. Sec. Litig.*,
20     210 F.R.D. 717 (C.D. Cal. 2002) ..................................................................................15

21 *In re Enron Corp. Sec.*,
      529 F.Supp.2d 644 (S.D. Tex. 2006) .............................................................................17
22
   *In re Infineon Techs. AG Sec. Litig.*,
23     266 F.R.D. 386 (N.D. Cal. 2009)............................................................................ *passim*

24 *In re Initial Pub. Offering Sec. Litig.*,
25     227 F.R.D. 65 (S.D.N.Y. 2004) ....................................................................................17

26 *In Re Juniper Networks, Inc. Sec. Litig.*,
      264 F.R.D. 584 (N.D. Cal. 2009)............................................................................ *passim*
27
   *In re LDK Solar Sec. Litig.*,
28     255 F.R.D. 519 (N.D. Cal. 2009)...............................................................................8, 18

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    No. 04 Civ. 8144, 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)...........................................10

*In re Micron Techs., Inc. Sec. Litig.*,
    247 F.R.D. 627 (D. Idaho 2007) ...........................................................................................16

*In re Nature's Sunshine Product's Inc. Sec. Litig.*,
    251 F.R.D. 656 (D. Utah 2008) ............................................................................................19

*In re Portal Software, Inc. Sec. Litig.*,
    No. 03 Civ. 5138, 2007 WL 1991529 (N.D. Cal. June 30, 2007) ...........................................8

*In re Ravisent Techs., Inc. Sec. Litig.*,
    No. 00-1014, 2005 WL 906361 (E.D. Pa. April 18, 2005) ...................................................17

*In re Retek Inc. Sec. Litig.*,
    236 F.R.D. 431 (D. Minn. 2006)......................................................................................17, 18

*In re Seagate Tech. II Sec. Litig.*,
    843 F. Supp. 1341 (N.D. Cal. 1994) ..................................................................................2, 7

*In re Tricord Sys. Sec. Litig.*,
    No. 94-746, 1996 U.S. Dist. LEXIS 20943 (D. Minn. April 5, 1996)...................................17

*In re Unioil Sec. Litig.*,
    107 F.R.D. 615 (C.D. Cal. 1985) ........................................................................................15

*In re United Energy Corp. Solar Power Modules Tax Shelter Invs. Sec. Litig.*,
    122 F.R.D. 251 (C.D. Cal. 1988) ........................................................................................15

*In re UTStarcom, Inc. Sec. Litig.*,
    No. C 04-04908 JW, 2010 WL 1945737 (N.D. Cal. May 12, 2010)............................2, 9, 18

*In re Verisign, Inc.*
    No. C 02-02270, 2005 U.S. Dist. LEXIS 10438 (N.D. Cal. Jan. 13, 2005) ...........................8

*In re Worldcom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) .........................................................................................21

*Levine v. SkyMall, Inc.*,
    No. 99-166, 2002 WL 31056919 (D. Ariz. May 24, 2002) ...................................................17

*McNamara v. Bre-X Minerals, Ltd.*,
    No. 97-159, 2003 U.S. Dist. LEXIS 25641 (E.D. Tex. Mar. 31, 2003) .................................17

*Neubronner v. Milken*,
    6 F.3d 666 (9th Cir. 1993) ...................................................................................................12

*O'Neil v. Appel*,
    165 F.R.D. 479 (W.D. Mich. 1995) .....................................................................................19

*Perez-Funez v. District Director, I.N.S.,*
   611 F. Supp. 990 (C.D. Cal. 1994) .................................................................9

*Schaefer v. Overland Express Family of Funds,*
   169 F.R.D. 124 (S.D. Cal. 1996) ..................................................................15

*Seidman v. Am. Mobile Sys., Inc.,*
   157 F.R.D. 354 (E.D. Pa. 1994) ...................................................................11

*Stevelman v. Alias Research Inc.,*
   No. 91-682, 2000 WL 888385 (D. Conn. June 22, 2000) ............................17

*Unger v. Amedisys Inc.,*
   401 F.3d 316 (5th Cir. 2005) ...................................................................17, 20

*Yamner v. Boich,*
   No. 92 Civ. 20597, 1994 WL 514035 (N.D. Cal. Sept.15, 1994).................2

*Zinser v. Accufix Research Institute, Inc.,*
   253 F.3d 1180 (9th Cir. 2001) .....................................................................23

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
   Rule 8 ...............................................................................................................6
   Rule 9(b) ...........................................................................................................6
   Rule 23 ..........................................................................................................3, 8
   Rule 23(a) ................................................................................................*passim*
   Rule 23(a)(2) ................................................................................................9, 11
   Rule 23(a)(3) ..................................................................................................11
   Rule 23(a)(4) ..............................................................................................12, 14
   Rule 23(b) .........................................................................................................8
   Rule 23(b)(3) ...........................................................................................*passim*
   Rule 23(b)(3)(A) ...........................................................................................23

15 U.S.C.
   §78 ............................................................................................................10, 14
   §78j(b) .....................................................................................................4, 6, 7
   §78t(a) ..............................................................................................................3
   §78t-1 ....................................................................................................3, 4, 12

1

## NOTICE OF MOTION AND MOTION

2       PLEASE TAKE NOTICE that, on February 7, 2011 at 9:00 a.m., before the Honorable James

3 Ware, movants herein will ask this Court for an order certifying this matter as a class action pursuant

4 to Fed. R. Civ. P. 23(a) and (b)(3), appointing Lead Plaintiffs Sharon Hodges, Joel Gentleman, and

5 David Gordon as Class representatives and Scott+Scott LLP as Class counsel.  This motion is

6 supported by the following memorandum of points and authorities, all pleadings and papers filed

7 herein, arguments of counsel, and any other matters properly before the Court.

8

## STATEMENT OF ISSUES TO BE DECIDED

9       1.       Whether this Court should certify this action as a class action pursuant to Rule 23(a)

10 and (b)(3) of the Federal Rules of Civil Procedure.

11       2.       Whether this Court should appoint Sharon Hodges, Joel Gentleman and David

12 Gordon as Class representatives.

13       3.       Whether this Court should appoint Scott+Scott LLP as Class counsel.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR CLASS CERTIFICATION – No. C-09-02147 JW-PVT                        - 1 -

1

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

**I.      INTRODUCTION**

3

Lead Plaintiffs Sharon Hodges, Joel Gentleman, and David Gordon (collectively,

4

"Plaintiffs") hereby move this Court for an order certifying this action as a class action pursuant to

5

Fed. R. Civ. P. 23(a) and (b)(3).  The proposed class is defined as: All persons who purchased or

6

otherwise acquired Akeena Solar, Inc. ("Akeena" or the "Company") securities between December

7

26, 2007 and March 13, 2008, inclusive (the "Class Period"), who were damaged thereby (the

8

"Class").  Excluded from the Class are defendants, the officers and directors of the Company,

9

members of their immediate families and their legal representatives, heirs, successors or assigns and

10

any entity in which defendants have or had a controlling interest.  Plaintiffs also move for

11

appointment of their counsel, Scott+Scott LLP ("Scott+Scott") as Class counsel.

12

As explained herein, this action should be certified as a class action and Plaintiffs should be

13

appointed class representatives because all of the requirements of Rule 23(a) and 23(b)(3) have been

14

met.  The Ninth Circuit and this Court have consistently endorsed the use of class action procedures

15

in adjudicating federal securities violations.  *See Blackie v. Barrack*, 524 F.2d 891, 903 (9th

16

Cir.1975) ("'the ultimate effectiveness of (the security anti-fraud laws) may depend on the

17

applicability of the class action device'")[1]; *In re Seagate Tech. II Sec. Litig.*, 843 F. Supp. 1341,

18

1350 (N.D. Cal. 1994) ("the securities field has been characterized as 'particularly well suited for

19

representative litigation under [FRCP] 23'"); *Yamner v. Boich,* No. 92 Civ. 20597, 1994 WL

20

514035, at *3 (N.D. Cal. Sept.15, 1994) ("[t]he Ninth Circuit favors a liberal use of class actions to

21

enforce federal securities laws"; *accord In re Adobe Sys., Inc. Sec. Litig.,* 139 F.R.D. 150, 152-53

22

(N.D.Cal.1991).  Indeed, this "Court has previously found class treatment superior to individual

23

actions in the context of securities litigation." *See In re UTStarcom, Inc. Sec. Litig.,* No. C 04-04908

24

JW, 2010 WL 1945737, at *10 (N.D. Cal. May 12, 2010) (citing *In Re Juniper Networks, Inc. Sec.*

25

*Litig.*, 264 F.R.D. 584, 593 (N.D. Cal. 2009)).

26

———————————————

27

[1]      Unless otherwise noted, all emphasis is added and citations are omitted.

28

MOTION FOR CLASS CERTIFICATION – No. C-09-02147 JW-PVT                        - 2 -

1    As the Ninth Circuit recently emphasized, "Rule 23 provides district courts with broad

2    discretion to determine whether a class should be certified, and to revisit that certification throughout

3    the legal proceedings before the court," such that "[i]f later evidence disproves Plaintiffs'

4    contentions that common issues predominate, the district court can at that stage modify or decertify

5    the class . . . or use a variety of management devices to address the individualized issues that have

6    arisen." *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1176 (9th Cir. 2007).

7    However, with this relatively short class period of less than three months and relatively

8    straightforward securities fraud action, the Rule 23(a) factors are all easily met: (1) Class members

9    are so numerous that joinder of all members is impracticable; (2) there are questions of law and fact

10   common to the Class; (3) the claims of Plaintiffs are typical of the claims of the Class; (4) and

11   Plaintiffs will fairly and adequately protect the interests of the Class.   The requirements of

12   Rule 23(b)(3) are also met because the common questions of law and fact predominate over

13   individual issues and because a class action is superior to other available methods of adjudication.

14   Because the requirements of Rule 23(a) and (b)(3) are satisfied, Plaintiffs respectfully request the

15   Court to enter an order certifying the proposed Class, appointing them as Class representatives and

16   appointing Scott+Scott as counsel for the Class.

17   **II.    STATEMENT OF FACTS AND RELEVANT PROCUDURAL BACKGROUND**

18   This securities fraud class action brought on behalf of all persons who purchased the

19   common stock of Akeena between December 26, 2007 and March 13, 2008, inclusive (the "Class

20   Period") charges Akeena, its founder, CEO and Chairman Barry Cinnamon, and its CFO, Gary

21   Effren (collectively, "Defendants") with violating §§10(b) and 20(a) of the Securities Exchange Act

22   of 1934 (the "Exchange Act") and charges Barry Cinnamon individually with violating §20A of the

23   Exchange Act.   ¶1.[2]   In the operative Complaint filed herein on December 11, 2009, Plaintiffs

24   alleged that Defendants collectively defrauded the purchasers of Akeena's publicly traded stock by

25

26   [2]    All paragraph ("¶") references are to the Amended Complaint ("Complaint") (ECF No. 20),
     unless otherwise noted.  The two officer defendants, Barry Cinnamon and Gary Effren, are Akeena's
27   Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), respectively.

28

1   issuing false and misleading statements and making omissions of material fact that inflated Akeena's

2   stock price during the Class Period in violation of Exchange Act §§10(b) (and SEC Rule 10b-5) and

3   20(a).  ¶¶18-19, 61-75, 109-121.  Plaintiffs also separately allege that Barry Cinnamon violated

4   Exchange Act, §20A when he sold over $5.5 million of Akeena stock while in possession of the

5   material non-public information detailed in the Complaint.  ¶¶7-22, 29, 32-76, 122-126.

6          The alleged scheme is relatively straightforward.  Having been sued for divorce in 2005 by

7   his long-term spouse who was demanding her community property interest in the company that

8   Barry Cinnamon built from scratch, "Cinnamon knew the only way he could fund his wife's

9   financial demands with stock sales proceeds – without dramatically further reducing his control of

10  Akeena – was to fatten the Company's stock price so he could buy her out with stock sales proceeds

11  enriched by the public capital markets."  ¶10.  Meanwhile, Barry Cinnamon knew that "the primary

12  stock analysts that covered Akeena were demanding that Cinnamon demonstrate a clear 'path to

13  profitability' before they would increase its stock ratings, including demonstrating a strong demand

14  for Akeena's sleek new 'Andalay' system released in the fall of 2007, increasing profit margins and

15  signing a significant licensing partner who could pay Akeena higher margin loyalty licensing fees,

16  which go straight to the bottom line and increase earnings."  *Id.*  "Committed to raising the

17  Company's public stock price to satisfy his own financial predicament, Cinnamon determined to

18  heed their demands" by "touting Akeena's new state-of-the-art 'Andalay' solar system, billing it as a

19  significant cost leader and profit enhancer" and "promising that 'sales of Andalay [would] contribute

20  towards gross margin improvement in the range of 10% to 15%" and concealing that "the electric

21  utilities the California Solar Initiative made administrators for the rebate program had not yet

22  certified the Andalay system, such that customer rebates were not being paid, forcing Akeena to fund

23  the installations itself, or forgo sales where it was unable to do so."  ¶¶10-11.

24         At the October 31, 2007 mandatory settlement conference in the dissolution proceedings,

25  Barry Cinnamon consented to an order requiring that he sell millions of dollars of Akeena stock to

26  settle his former spouse's community property interest in Akeena.  ¶16.  "Knowing he had to fund

27  the divorce settlement by January 31, 2008, or give up an ever increasing number of shares to his

28  wife to sell, Cinnamon would undertake more aggressive measures designed to respond directly to

1   the demands being placed on him to raise Akeena's stock ratings." ¶17.  Specifically, Defendants

2   announced at the start of the Class Period on December 26, 2007 "that Akeena's credit line with

3   Comerica Bank, the Company's longtime lender that was also providing limited financing to

4   customers for Andalay purchases, had been increased by 70% [purportedly] in 'recognition of the

5   growing strength of the company's balance sheet and financial condition,'" which was "important as

6   Akeena then had less than eight months cash available and Comerica had already waived a violation

7   of a financial covenant, averting a default." ¶18.  Yet "defendants concealed from the market that in

8   reality this was not a credit line 'increase' at all but a mere cash collateralization agreement whereby

9   Akeena would be required to deposit every additional dollar 'borrowed' back into the bank." *Id.*

10  Still, due to their deception, "news of the 'increase' sparked a significant surge in Akeena's stock

11  price on unusually high trading volume." *Id.*

12      Then, to really ramp up the stock price, "on January 2, 2008, Cinnamon announced the

13  Company had entered into a substantial licensing agreement with Suntech that promised additional

14  sales of over 10 MW of Andalay system panels in 2008, causing an incredible 43+% spike in

15  Akeena's stock price in a single trading session." ¶19.  As one observer noted, Suntech "estimates

16  10 MW of sales in 2008 [and Akeena] sold 1MW last quarter for $8.5 Million so this would translate

17  into an additional $85Million in sales for 08 . . . .  Given that estimates are for $55Million, this is a

18  huge amount of growth . . . ." ¶68.  "By virtue of this timing deception, rather than being required to

19  sell 700,000 shares of Akeena stock at the approximately $7 per share the stock closed at on

20  December 24, 2007, this ruse permitted [Barry] Cinnamon to sell just 400,000 shares for proceeds of

21  over $5.6 million" during the first week of January 2008 to fund his divorce settlement by

22  January 31, 2008 – *creating tens of millions of dollars in illusory market capitalization in the*

23  *process that would soon vanish as the market learned that Barry Cinnamon and others were busy*

24  *cashing in but Akeena was wholly unable to authenticate the value the market had ascribed to the*

25  *line of credit increase or to the Suntech licensing agreement:*

26

27

28

1
2
3
4
5
6
7
8
9
10
11



12

¶¶20-21.  By the end of the Class Period on March 13, 2008 when Akeena announced its FY 2007

financial results, Defendants were still unable to authenticate the value the market had attributed to

either the purported line of credit increase or to the Suntech licensing agreement and the market

punished Akeena's stock price, further driving down its stock price on unusually high volume.  ¶86.

On May 20, 2010, the Court denied Defendants' motion to dismiss the Complaint.  *See* ECF

No. 44 (the "May 20th Order").  As to Plaintiff's §10(b) claims, after finding certain allegedly false

and misleading statements issued prior to the start of the Class Period were non-actionable because

they were not issued during the Class Period[3], the Court denied Defendants' motion to dismiss

Plaintiff's §10(b) claim in all other respects, finding the Complaint's allegations satisfied F.R.C.P.

9(b) and the Private Securities Litigation Reform Act's heightened pleading requirements as to

falsity and scienter, and Rule 8's requirements as to loss causation.  *Id.* at 4-8.  And, rejecting

_____

[3]      Specifically, the Court found that certain allegedly false and misleading statements issued
prior to the start of the Class Period could not "serve as a basis for liability as a matter of law
because they were made prior to the December 26, 2007 start of the Class Period" and so the Court
struck paragraphs 40-41, 49-51, 75, 82 and 87-90 of the Complaint.  *See* May 20th Order at 3-4.  In
so holding, the Court did not find Plaintiffs' falsity, scienter and/or loss causation were lacking, it
simply held that as pre-Class Period statements, these allegations were non-actionable.  *Id.*

1   Defendants' only real challenge to Plaintiffs' 20(a) and 20A claims, that "the Complaint [did] not

2   adequately allege a primary violation under Section 10(b)," the Court also upheld those claims and

3   ordered that the parties commence discovery.[4]

4        Discovery has since commenced and on October 15, 2010, Defendants commenced their

5   rolling production, producing a significant number of documents.  Likewise, on October 1, 2010 and

6   October 19, 2010, Plaintiffs produced the limited number of responsive documents in their

7   possession to Defendants' discovery requests and the parties are currently in the process of

8   scheduling each of the Plaintiff's depositions.  The Court's June 10, 2010 Scheduling Order has

9   established an August 1, 2011 discovery cut-off and a June 27, 2011 Preliminary Pretrial

10  Conference.  *See* ECF No. 49 at 1.

11  **III.    STANDARD OF REVIEW**

12       Securities fraud actions are well-suited for class action treatment.  *See Amchem Prods., Inc.*

13  *v. Windsor*, 521 U.S. 591, 625 (1997); *Blackie*, 524 F.2d at 902; *Seagate II*, 843 F. Supp. at 1350.

14  Courts widely recognize that any doubt as to the propriety of certification should be resolved in

15  favor of certifying the class because denying class certification will almost certainly terminate the

16  action and be detrimental to the members of the class.  *Amchem*, 521 U.S. at 617 ("'The policy at the

17  very core of the class action mechanism is to overcome the problem that small recoveries do not

18  provide the incentive for any individual to bring a solo action prosecuting his or her rights.'").  This

19  principle guides the liberal view of certifying securities cases as class actions.  *Adobe Sys., Inc.*, 139

20  F.R.D. at 152-53.

21       This action, like other securities fraud class actions, alleges that Defendants perpetrated a

22  "fraud on the market" – *i.e.*, that defendants misled the entire market for the Company's securities

23  and that all persons who purchased the securities during the Class Period when the

24  misrepresentations inflated the market price were damaged in the same way.  Such a fraud on the

25  market gives rise to a presumption that the purchasers of Akeena securities uniformly relied on the

26

27  [4]     *See* Motion to Dismiss the Amended Complaint for Violations of the Federal Securities Laws
        filed herein on February 12, 2010, ECF No. 23 at 25 n.15 and May 20th Order at 8-9.

28

1  market price being accurate and based on all relevant information that they were entitled to receive

2  and not affected by false or concealed information which would affect that price.  *See generally*

3  *Basic Inc. v. Levinson*, 485 U.S. 224 (1988); *Blackie*, 524 F.2d at 891.  However, each individual

4  purchaser may not have suffered large enough damages to make the costs and expenses of a complex

5  lawsuit worthwhile.  *Amchem*, 521 U.S. at 617; *Blackie*, 524 F.2d at 902; *In re Verisign, Inc.*

6  No. C 02-02270, 2005 U.S. Dist. LEXIS 10438, at *32 (N.D. Cal. Jan. 13, 2005).

7         The party seeking class certification bears the burden of establishing that each of the four

8  requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met.  *In re Infineon*

9  *Techs. AG Sec. Litig.*, 266 F.R.D. 386, 389 (N.D. Cal. 2009) (citing *Dukes v. Wal-Mart, Inc.*, 509

10  F.3d 1168, 1176 (9th Cir.2007)).  The decision to certify a class is committed to the discretion of the

11  district court within the guidelines of Fed. R. Civ. P. 23.  *Dukes*, 509 F.3d at 1176.  In determining

12  whether class certification is appropriate, "'the question is not whether the plaintiff or plaintiffs have

13  stated a cause of action or will prevail on the merits, but rather, whether the requirements of [Rule

14  23] are met.'"  *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 524-25 (N.D. Cal. 2009).  The court is

15  generally "bound to take the substantive allegations of the complaint as true." *In re Portal Software,*

16  *Inc. Sec. Litig.*, No. 03 Civ. 5138, 2007 WL 1991529, at *2 (N.D. Cal. June 30, 2007) (citing

17  *Blackie*, 524 F.2d at 901 n.17).  The court may, however, "look beyond the pleadings to determine

18  whether the requirements of Rule 23 have been met." *Infineon,* 266 F.R.D. at 390.  In fact, "'courts

19  are not only at liberty to but must consider evidence which goes to the requirements of Rule 23 . . .

20  even [if] the evidence may also relate to the underlying merits of the case." *Id.*

21         As detailed herein, the requirements of Rule 23(a) and (b)(3) have been satisfied.

22  **IV.   ARGUMENT**

23       **A.   This Action Satisfies the Requirements of Rule 23(a)**

24       Rule 23(a) sets out four prerequisites for certifying a class:

25       (1) [T]he class is so numerous that joinder of all members is impracticable; (2) there
26       are questions of law or fact common to the class; (3) the claims or defenses of the
     representative parties are typical of the claims or defenses of the class; and (4) the
27       representative parties will fairly and adequately protect the interests of the class.

28

1    Fed. R. Civ. P. 23(a). The four prerequisites of Rule 23(a) are commonly referred to as numerosity,

2    commonality, typicality and adequacy of representation.  *Infineon*, 266 F.R.D. at 393.  This case

3    easily satisfies each of these prerequisites.

4    **1.**     **The Class Is so Numerous that Joinder of All Members of the Class Is Impracticable**

5    Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is

6    "impracticable."  Fed. R. Civ. P. 23(a)(1).  "Impracticable does not mean impossible, only that it

7    would be difficult or inconvenient to join all members of the class."  *UTStarcom,* 2010 WL 1945737,

8    at *9 (citing *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964)).

9    There is no fixed number of class members which either compels or precludes the certification of a

10   class.  *Perez-Funez v. District Director, I.N.S.*, 611 F. Supp. 990, 995 (C.D. Cal. 1994).  This Court

11   recently noted that a class of 1,000 members "clearly satisfies the numerosity requirement."

12   *Infineon*, 266 F.R.D. at 393.  In addition, this Court has also noted that numerosity is assumed by

13   some courts in matters involving securities traded on a national stock exchange.  *Id.*

14   Here, Akeena's common stock was traded on the NASDAQ Capital Market Sector of the

15   NASDAQ Stock Market ("NASDAQ") and the average weekly volume during the Class Period was

16   approximately 14.6 million shares or 52.2% of total outstanding shares.  *See* Declaration of Beth

17   Charlesworth filed concurrently herewith (hereinafter, "Charlesworth Decl."), ¶¶13-17.  Thus, more

18   likely than not, there were thousands of purchasers of Akeena shares during the Class Period.

19   *Infineon*, 266 F.R.D. at 393 (noting that the numerosity requirement was met because the stock

20   traded on the New York Stock Exchange and Frankfurt Stock Exchange and because plaintiffs

21   provided evidence that weekly trading volume was frequently in the millions); *In re Dynegy, Inc.*

22   *Sec. Litig.*, 226 F.R.D. 263, 269 (S.D. Tex. 2005) ("'[F]ederal trial courts are quite willing to accept

23   common sense assumptions in order to support findings of numerosity.'").

24   **2.**     **Questions of Law and Fact Are Common to Members of the Class**

25   Rule 23(a)(2) requires plaintiffs to demonstrate that there are questions of law or fact

26   common to the class.  Fed. R. Civ. P. 23(a)(2).  This requirement "'has been construed permissively.

27   All questions of fact and law need not be common to satisfy the rule.  The existence of shared legal

28

MOTION FOR CLASS CERTIFICATION – No. C-09-02147 JW-PVT                    - 9 -

1   issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled

2   with disparate legal remedies within the class.'" *Infineon*, 266 F.R.D. at 393.  As alleged in

3   Plaintiffs' Complaint, the common questions of law and fact include: (a) whether the Defendants

4   violated the Exchange Act; (b) whether the Defendants omitted and/or misrepresented material facts;

5   (c) whether Defendants knew or deliberately disregarded that their statements were false and

6   misleading; (d) whether the prices of Akeena's publicly traded securities were artificially inflated;

7   (e) whether Barry Cinnamon sold Akeena stock while in possession of material non-public

8   information; (f) whether Barry Cinnamon and Effren exercised control over Akeena; and (g) the

9   extent and the appropriate measure of damages. ¶¶101-103, 109-126.

10          The Class's claims are grounded in a common nucleus of operative facts related to

11   Defendants' false and misleading statements about the Company's financial results and future

12   business prospects.  As detailed in the Complaint, Plaintiffs allege that Defendants collectively

13   defrauded Class members by misrepresenting Akeena's business and financial prospects during the

14   Class Period, thereby artificially inflating Akeena's stock price (¶¶18-19, 61-75, 109-121) and that

15   Barry Cinnamon independently sold over $5.5 million worth of Akeena stock while in possession of

16   the material non-public information detailed in the Complaint.  ¶¶7-22, 29, 32-76, 122-126.

17          Throughout the Class Period, Class members purchased Akeena stock at artificially inflated

18   prices caused by Defendants' false and misleading statements and omissions which permitted Barry

19   Cinnamon to significantly reduce the number of Akeena shares he would be required to sell to fund

20   his divorce settlement.  ¶¶20-21, 29.  Class members were damaged when Akeena's stock price

21   cratered as the market learned the truth.  ¶¶23, 76-86.  Here, the central fact issues and their legal

22   consequences are common to all Class members.

23          Where, as here, Defendants engaged in a common or single course of conduct impacting all

24   Class members, the litigation necessarily will focus on a common nucleus of operative facts and the

25   commonality requirement is satisfied.  *See, e.g., In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No.

26   04 Civ. 8144, 2009 WL 5178546, at *9 (S.D.N.Y. Dec. 23, 2009) ("Commonality does not demand

27   that every question of law or fact be common to every class member, but instead merely requires that

28   the claims arise from a common nucleus of operative facts.").  Indeed, this Court has recognized that

1    securities fraud actions alleging such a common course of conduct and based on a "fraud on the

2    market" satisfy the commonality requirements of Rule 23(a)(2).  *See Juniper Networks*, 264 F.R.D.

3    at 588-89; *Infineon*, 266 F.R.D. at 393; *In re Cirrus Logic Sec.*, 155 F.R.D. 654, 657 (N.D. Cal.

4    1994).

5         Members of the Class will have varying damages because they purchased and sold the

6    securities at different times.  However, courts have consistently held that this does not defeat

7    commonality.    *See*, *e.g.*, *Great Neck Capital Appreciation Inv. P'ship, L.P. v.*

8    *PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 407-08 (E.D. Wis. 2002) ("The commonality

9    requirement is easily met in cases where class members all bought or sold the same stock in reliance

10   on the same disclosures made by the same parties even when damages vary.");  *Seidman v. Am.*

11   *Mobile Sys., Inc.*, 157 F.R.D. 354, 360 (E.D. Pa. 1994) (potential need for individual damage

12   calculations in security fraud action does not defeat certification); *In re Amerifirst Sec. Litig.*, 139

13   F.R.D. 423, 428 (S.D. Fla. 1991) (differences in damages will not defeat commonality). Thus, this

14   action satisfies the commonality requirement of Fed. R. Civ. P. 23(a)(2).

15            **3.       The Claims of Plaintiffs Are Typical of Those of the Class**

16        Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of

17   the claims or defenses of the class." *Infineon*, 266 F.R.D. at 393-94.  The purpose of typicality is to

18   "assure that the interest of the named representative aligns with the interests of the class."  *In re*

19   *Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 576 (N.D. Cal. 2009).   "Like the commonality

20   requirement, the typicality requirement is permissive: 'representative claims are "typical" if they are

21   reasonably co-extensive with those of absent class members; they need not be substantially

22   identical.'" *Infineon*, 266 F.R.D. at 393-94.  The test is whether "'other members have the same or

23   similar injury, whether the action is based on conduct which is not unique to the named plaintiffs,

24   and whether other class members have been injured by the same course of conduct.'"  *Id*. at 394.

25        Here, the typicality requirement is satisfied because the claims of all Class members derive

26   from the same legal theories and allege the same set of operative facts.  Plaintiffs, like the other

27   Class members, purchased Akeena's securities at artificially inflated prices caused by Defendants'

28   misconduct and false and misleading statements during the Class Period and suffered losses when

1   the Company's stock price declined after Akeena's true condition was partially revealed to the

2   market in a series of disclosures from January 8, 2008 through March 13, 2008.  Specifically, Sharon

3   Hodges, a retired legal secretary investing funds she received from her mother's estate, purchased

4   35,000 shares of Akeena stock throughout the Class Period, suffering an estimated $26,000+ in

5   losses.  *See* Declaration of Hal D. Cunningham in Support of Motion of the Akeena Investor Group

6   for Appointment of Lead Plaintiff ("Cunningham Decl."), ECF No. 7-1, Ex. B.  David Gordon, who

7   is currently pursuing his Ph.D. in Philosophy, purchased 1,000 shares of Akeena stock during the

8   Class Period – ***at the height of the inflation in Akeena's stock price***.  *Id.*  Mr. Gordon continued

9   holding all 1,000 shares through the end of the Class Period, suffering almost $8,000 in losses.  *Id.*

10  Joel Gentleman purchased 1,000 shares of Akeena stock during the Class Period, suffering almost

11  $10,000 in losses.  *Id.*  Like other Class members, each of the three Plaintiffs made purchases of

12  Akeena stock "contemporaneous" with Barry Cinnamon's sales of Akeena stock for purposes of

13  demonstrating a §20A violation.  *See* ¶123; *see also Neubronner v. Milken,* 6 F.3d 666, 670 (9th Cir.

14  1993) (adopting a flexible definition of "contemporaneous" trading to be determined on a case-by-

15  case basis so long as investors' purchases were made within "days", rather than months, of

16  defendants' sales); *City of Westland Police and Fire Retirement Sys. v. Sonic Solutions,* No. C 07-

17  05111 CW, 2009 WL 942182, at *12 (N.D. Cal. April 6, 2009) (finding purchases made "on the

18  same day . . . one day after . . . and nine days after Defendant[s] sold shares" were all

19  "contemporaneous" sales).  As such, Plaintiffs, like all members of the Class, were victims of a

20  common course of fraudulent conduct by Defendants throughout the Class Period in violation of the

21  federal securities laws.  Plaintiffs' claims are typical of those of the Class.

22          **4.       Plaintiffs Will Fairly and Adequately Protect the Interests of the Class**

23          Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the

24  interests of the class."  Fed. R. Civ. P. 23(a)(4).  The purpose of adequacy is to protect the legal

25  rights of absent class members.  *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir. 1998).

26  Two questions are considered when determining the adequacy of representation: "'(1) do the named

27  plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the

28

1  named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Infineon*,

2  266 F.R.D. at 394.

3          Here, both prongs of the "adequacy" test are met.  First, Plaintiffs have retained attorneys

4  with extensive experience in the area of securities litigation who have successfully prosecuted

5  numerous securities fraud class actions and other complex actions on behalf of injured investors.

6  For instance, commenting on the speed, legal acumen and tenacity Scott+Scott LLP attorneys

7  employed in obtaining a temporary restraining order enjoining the "off shore transfer of . . .

8  approximate[ly] $1 billion in assets" held by Bernard Madoff "feeder funds," a New York State

9  Court held last year that:

10          It is this Court's position that Scott+Scott did a superlative job in its
           representation . . . .   For the record, it should be noted that Scott+Scott has
11          demonstrated a remarkable grasp and handling of the extraordinarily complex
           matters in this case.  The extremely professional and thorough means by which
12          [Scott+Scott] has litigated this matter has not been overlooked by this Court.  They
           have possessed a knowledge of the issues presented and this knowledge has always
13          been used to the benefit of all investors.

14  *New York University v. Ariel Fund Limited*, No. 603803/08, Opinion at 9-10 (New York State

15  Supreme Court, New York County, Feb. 22, 2010).  *See* Declaration of Mary K. Blasy in Support of

16  Plaintiffs' Motion for Class Certification ("Blasy Decl."), Ex. 1.  More recently, after acknowledging

17  that the securities fraud class action settlement another court was approving derived out of "a hard-

18  fought case," the Honorable Keith P. Ellison of the United States District Court for the Southern

19  District of Texas emphasized that "the Court [was] grateful that [it] had attorneys who could fight

20  hard but also fight fair," that he "was very fortunate in having the benefit of both sides' excellent

21  representation," and graciously proffered that should he ever be able to "do any of you any good in

22  the way of providing a recommendation for a board certification or anything like that, I do hope you

23  will think of me.  I'm happy to swing the bat for you."[5]  There can be no legitimate dispute that

24

25

26  [5]      *See* Transcript of Miscellaneous Hearing Before the Honorable Keith P. Ellison United States
27  District Judge, *City of Livonia vs. Employees' Retirement System v. Tetra Technologies Inc.,* S.D.
    Tex No. 08-Cv-00965 (Sept. 29, 2010), Blasy Decl., Ex. 2.

28

MOTION FOR CLASS CERTIFICATION – No. C-09-02147 JW-PVT              - 13 -

1    Plaintiffs' counsel are capable of prosecuting this litigation, and have vigorously and successfully

2    prosecuted this action to date.  *See gen.* Cunningham Decl., Ex. F (Scott+Scott LLP firm résumé).

3        In addition, as they promised they would in the detailed Joint Declaration Plaintiffs filed with

4    their lead plaintiff motion one year ago, Plaintiffs have vigorously prosecuted this action, being

5    actively involved in this litigation at each step of the proceedings.  *See* Cunningham Decl., Ex. C.

6    Since the Court appointed them as lead plaintiffs, the Plaintiffs have been fulfilling their fiduciary

7    duties and actively involved in the litigation, including, but not limited to, the review and filing of

8    the operative complaint, communicating regularly with counsel regarding case status and litigation

9    strategy, responding to the discovery requests propounded by Defendants and agreeing to be deposed

10   in connection with this motion.  *Id.*

11       Finally, there are no conflicts between Plaintiffs and the absent Class members because

12   Plaintiffs have the same claims as each Class member and seek to prove the same violations of the

13   Exchange Act and damages.  *Connectics Corp. Sec. Litig.*, 257 F.R.D. at 578 (holding that plaintiff

14   will share class members' interest in proving that the stock price was artificially inflated as a result

15   of defendants' misrepresentations throughout the class period regardless that all class members did

16   not buy and sell stock at exactly the same time).  Accordingly, the interests of the Class will be

17   adequately protected.  *See* Fed. R. Civ. P. 23(a)(4).

18   **B.    This Action Satisfies the Requirements of Rule 23(b)(3)**

19       Rule 23(b)(3) requires that common questions of law or fact predominate over individual

20   questions and that a class action is superior to other available methods of adjudication.  Fed. R. Civ.

21   P. 23(b)(3).  Here, common questions of law and fact predominate and a class action is the superior,

22   if not the only, method available to fairly and efficiently litigate this action.

23   **1.    Common Questions of Law and Fact Predominate over Individual
         Questions**

24   "'The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

25   cohesive to warrant adjudication by representation.'"  *Infineon*, 266 F.R.D. at 395.  Predominance

26   focuses on the relationship between the common and individual issues, and "[w]hen common

27   questions present a significant aspect of the case and they can be resolved for all members of the

28

1    class in a single adjudication, there is clear justification for handling the dispute on a representative

2    rather than on an individual basis." *Id.*  The U.S. Supreme Court has noted that "[p]redominance is a

3    test readily met in certain cases alleging . . . securities fraud." *Amchem*, 521 U.S. 591 at 138.

4    Where, as here, a complaint alleges a "common course of conduct" of misrepresentations, omissions,

5    and other wrongdoings that affect all members of the class in the same manner, common questions

6    predominate. *Blackie*, 524 F.2d at 905-08; *Infineon*, 266 F.R.D. at 395-96.  Indeed, the Ninth Circuit

7    has stated that in assessing whether common questions predominate, the court's inquiry should be

8    directed primarily toward the issue of liability.  *See Blackie*, 524 F.2d at 902.

9         Here, common questions of law and fact predominate over individual questions because

10   Defendants' alleged misconduct affected all Class members in the same manner, *i.e.*, Defendants'

11   false and misleading statements and omissions artificially inflated the price of Akeena common

12   stock and Plaintiffs and certain Class members purchased Akeena stock contemporaneous with

13   Barry Cinnamon's sales during the first week of January 2008.  *See, e.g., Infineon*, 266 F.R.D. at

14   395; *Freedman v. Louisiana-Pacific Corp.*, 922 F. Supp. 377, 399-400 (D. Or. 1996); *Schaefer v.*

15   *Overland Express Family of Funds*, 169 F.R.D. 124, 130-31 (S.D. Cal. 1996); *In re United Energy*

16   *Corp. Solar Power Modules Tax Shelter Invs. Sec. Litig.*, 122 F.R.D. 251, 256 (C.D. Cal. 1988); *In*

17   *re Emulex Corp. Sec. Litig.*, 210 F.R.D. 717, 721 (C.D. Cal. 2002); *In re Unioil Sec. Litig.*, 107

18   F.R.D. 615, 622 (C.D. Cal. 1985).  Once these common questions are resolved, little will remain

19   other than the mechanical act of computing the amount of damages suffered by each Class member.[6]

20        In addition, in this case, there are no individual issues related to the element of reliance

21   because reliance by all members of the Class may be presumed under the fraud-on-the-market

22   doctrine. *Juniper Networks*, 264 F.R.D. at 590-91 (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 243

23   (1988)).  This Court has noted that the applicability of the fraud-on-the- market presumption must be

24   considered in order to evaluate the predominance requirement of Rule 23(b)(3).  *Infineon*, 266

25

26   [6]      It is well settled that the calculation of damages is an individualized issue that does not defeat
27   predominance.  *Blackie*, 524 F.2d at 905 ("The amount of damages is invariably an individual
     question and does not defeat class action treatment.").

28

1   F.R.D. at 395-96.  The fraud-on-the-market presumption is "'based on the hypothesis that, in an

2   open and developed securities market, the price of a company's stock is determined by the available

3   material information regarding the company and its business. . . .  Misleading statements will

4   therefore defraud purchasers of stock even if the purchasers do not directly rely on the

5   misstatements.'" *Id*. at 395 (citing *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999)).  It can

6   be presumed that both Plaintiffs and the Class relied on the integrity of the market when making

7   their Class Period purchases.  *Blackie,* 524 F.2d at 906 n. 22 & 908 (common sense dictates "'that a

8   stock purchaser does not ordinarily seek to purchase a loss in the form of artificially inflated

9   stock'"); *accord Basic,* 485 U.S. at 246-47 ("'it is hard to imagine that there ever is a buyer or seller

10  who does not rely on market integrity.  Who would knowingly roll the dice in a crooked crap

11  game?").

12      "[A]t this stage of the proceeding, [Plaintiffs] satisfy[y] Rule 23(b)(3)'s superiority

13  requirement by presenting evidence that [Akeena] traded on an 'efficient market,' thereby

14  establishing the application of the 'fraud-on-the-market' presumption" and thereby "eliminating the

15  need for individual reliance by each class member." *Huberman v. Tag-It Pac., Inc.*, 314 Fed. Appx.

16  59, 63 (9th Cir. 2009); *In re Connetics Corp. Sec. Litig.*, No. C 07-02940, 2009 WL 1126508, at *19

17  (N.D. Cal. April 27, 2009) ("at this stage [i.e., the class certification stage], lead plaintiff need show

18  ***only*** that it traded on an efficient market."); *In re Micron Techs., Inc. Sec. Litig.*, 247 F.R.D. 627,

19  633 (D. Idaho 2007) (same); and *Conn. Ret. Plans and Trust Funds v. Amgen, Inc.*, No. CV 07-2536,

20  2009 WL 26633743, at *10 (C.D. Cal. Aug. 12, 2009) (same).  In considering whether a stock is

21  traded in an efficient market, courts have generally considered five factors: (1) whether the stock

22  trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3)

23  whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file

24  SEC registration Form S-3, as opposed to Form S-1 or S-2; and (5) whether there are "'empirical

25  facts showing a cause and effect relationship between unexpected corporate events or financial

26  releases and an immediate response in the stock price.'" *Binder*, 184 F.3d 1065 (adopting the five-

27  factor test articulated in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)); *see also*

28  *Infineon*, 266 F.R.D. at 395-96 and *Juniper Networks,* 264 F.R.D. at 591.  Other factors that are

1    sometimes evaluated, include the company's market capitalization (*Unger v. Amedisys Inc.*, 401 F.3d

2    316, 323 (5th Cir. 2005); *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 313 n.10 (5th Cir. 2005),

3    public float (*id.*), the principal exchange on which the security was listed and traded (*Cammer*, 711

4    F. Supp. at 1276-77[7]) and news coverage and dissemination of information to news sources

5    pertaining to the Company and its securities during the Class Period (*In re Enron Corp. Sec.*, 529

6    F.Supp.2d 644, 760 (S.D. Tex. 2006)).

7         Here, as alleged in the Complaint (¶¶104-06) and as set forth by Ms. Charlesworth, Akeena

8    stock traded in an efficient market throughout the Class Period.   Charlesworth Decl., ¶5.   Ms.

9    Charlesworth and Stanford Consulting Group, Inc. ("Stanford") are noted experts in the field of

10

11   [7]      Indeed, "the overwhelming case authority holds that securities listed on the NASDAQ trade
     in an efficient market." *In re Accredo Health, Inc. Sec. Litig.*, No. 03-2216, 2006 WL 1716910, at
12   *8 (W.D. Tenn. April 19, 2006) (citing *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-1014, 2005 WL
     906341 (E.D. Pa. April 18, 2005) ("Plaintiffs are entitled to a presumption of reliance under a 'fraud
13   on the market' theory because during the class period, Ravisent common stock was listed on
     NASDAQ, a highly efficient market, had a trading volume in the range of hundreds of thousand of
14   shares per day, and was required to file periodic public reports with the SEC.") *Id.*, at *5; *In re Initial
     Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 107 n.324 (S.D.N.Y. 2004) ("Federal courts have
15   repeatedly held that a listing on NASDAQ or a similar national market is a good indicator of
     efficiency."); *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 606-07 (S.D. Ohio 2003) ("Courts and
16   commentators have noted that certain markets, such as the NYSE, are particularly efficient ... .
     Because [the stock] was traded on the NYSE during the class period, the Court is satisfied that
17   plaintiffs have established, for purposes of the motion to certify, that the fraud on the market theory
     will be available to them."); *McNamara v. Bre-X Minerals, Ltd.*, No. 97-159, 2003 U.S. Dist. LEXIS
18   25641, at *70 (E.D. Tex. Mar. 31, 2003) ("The Court concludes that Plaintiffs have established that
     [the stock's] shares traded on an efficient NASDAQ market, and are entitled to the presumptions
19   deriving from the fraud-on-the-market doctrine."); *Levine v. SkyMall, Inc.*, No. 99-166, 2002 WL
     31056919, at *5 (D. Ariz. May 24, 2002) ("Although not dispositive, the fact that SkyMall stock is
20   traded on the NASDAQ stock market's National Market System also contributes to finding that the
     market is efficient."); *Stevelman v. Alias Research Inc.*, No. 91-682, 2000 WL 888385, at *4 (D.
21   Conn. June 22, 2000) ("The rebuttable presumption created by this so-called fraud-on-the-market
     theory presupposes that in an efficient capital market like NASDAQ, all information about a
22   publicly-traded company such as Alias is accurately reflected in the stock's trading price."); *Berti v.
     VideoLan Techs.*, No. 97-296, 1998 U.S. Dist. LEXIS 18066, at *7-8 n.4 (W.D. Ky. June 10, 1998)
23   ("The Court takes judicial notice of the fact that the NASDAQ is an efficient stock market,
     permitting the assumption that all public information is reflected in the price of stocks traded on that
24   exchange."); *In re Tricord Sys. Sec. Litig.*, No. 94-746, 1996 U.S. Dist. LEXIS 20943, at *22 (D.
     Minn. April 5, 1996) ("Here, Tricord stock was traded on the NASDAQ exchange-a nationwide,
25   developed, and open market, from which 'efficiency' can easily be inferred."); *Deutschman v.
     Beneficial Corp.*, 132 F.R.D. 359, 368 (D. Del. 1990) ("[A] well-developed and impersonal market,
26   such as the New York or Pacific stock exchanges, will instantaneously incorporate all publicly
     available information about a given security into the market price of that security.").  ***"Some courts
27   assume market efficiency based solely on the fact that the security trades on NASDAQ."*** *In re
     Retek Inc. Sec. Litig.*, 236 F.R.D. 431, 437 n.3 (D. Minn. 2006).

28

1    market efficiency.   *See*, *e.g.*, *LDK Solar*, 255 F.R.D. at 526-27 (granting motion for class

2    certification and finding market was efficient based on the declaration of a Stanford expert);

3    *UTStarcom.*, 2010 WL 1945737, at *7-*8 (same); *Accredo*, 2006 WL 1716910, at *8; *Retek*, 236

4    F.R.D. at 437.  In a detailed declaration submitted herewith, Ms. Charlesworth concludes that the

5    market for Akeena securities was highly efficient at all relevant times.  Charlesworth Decl., ¶5.

6         To come to this determination, Ms. Charlesworth examined the five *Cammer* factors adopted

7    by the Ninth Circuit in *Binder*: (1) whether the stock trades at high weekly volume; (2) whether

8    securities analysts follow and report on the stock; (3) whether the stock has market makers and

9    arbitrageurs; (4) whether the company is eligible to file a Form S-3 registration statement with the

10   SEC; and (5) whether there are "empirical facts showing a cause and effect relationship between

11   unexpected corporate events or financial releases and an immediate response in the stock price" (*see*

12   *Binder*, 184 F.3d at 1065 (quoting *Cammer*, 711 F. Supp. at 1286-87)); plus four additional factors

13   courts have deemed relevant: (6) Akeena's float, *i.e.* shares outstanding excluding stock owned by

14   officers and/or directors; (7) the principal exchange on which Akeena securities was listed and

15   traded; (8) institutional ownership of Akeena's securities; and (9) news coverage and dissemination

16   of information by news sources pertaining to the Company and its securities during the Class Period.

17   Charlesworth Decl., ¶¶10-11.

18        Significantly, the Company's stock traded on the NASDAQ, which is *per se* considered an

19   efficient market.  Charlesworth Decl., ¶¶34-37; *see, e.g., Juniper Networks*, 264 F.R.D. at 591 and

20   n.7 (citing additional cases).  Millions of Akeena shares traded on the NASDAQ every week during

21   the Class Period, the average weekly trading volume was 14.6 million shares or 52.2% of total

22   outstanding shares.  Charlesworth Decl., ¶15; *Cammer*, 711 F. Supp. at 1286 ("Turnover measured

23   by average weekly trading of two percent or more of the outstanding shares would justify a strong

24   presumption that the market for the security is an efficient one; one percent would justify a

25   substantial presumption.").  Significant analyst coverage supports a finding of market efficiency

26   because it shows that the company is closely reviewed by investment professionals, who in turn

27   make buy/sell recommendations to investors.  *Cammer*, 711 F. Supp. at 1286.  Here, Akeena was

28   covered by at least four analysts during the Class Period, and as Ms. Charlesworth notes, "[d]uring

1   this Class Period of less than three months, at least six reports or notes concerning the Company

2   were issued by securities analysts from at least four different firms."  Charlesworth Decl., ¶19; *In re*

3   *Nature's Sunshine Product's Inc. Sec. Litig.*, 251 F.R.D. 656, 663 (D. Utah 2008) (finding the fact

4   that there were at least "four analysts who published reports during the class period" "at least

5   somewhat, weigh[ed] in favor of a finding of market efficiency").  Further, Ms. Charlesworth found

6   Akeena was followed during the Class Period by "major news sources, including: Associated Press

7   Newswires, Barron's, Bloomberg News, Business Wire, Dow Jones News Service, M2 Presswire,

8   Market News Publishing, MidnightTrader, PR Newswire (U.S.), Reuters News, San Jose Mercury

9   News, The Boston Globe, The Globe and Mail, The Oakland Tribune, The San Francisco Chronicle,

10  and The Wall Street Journal" and that "[d]uring the Class Period of less than three months, more

11  than 100 electronic and/or printed articles were published with 'Akeena Solar' appearing in the

12  headline or lead paragraph of the article." Charlesworth Decl., ¶44.

13         There were as many as 39 active market makers for Akeena's stock compared to the average

14  of 16.86-19.44 for stocks listed on the NASDAQ during December 2007 and January 2008.

15  Charlesworth Decl., ¶22; *Cammer*, 711 F. Supp. at 1286-87 (noting that market efficiency would be

16  supported by the existence of market makers because they "ensure completion of the market

17  mechanism" by "react[ing] swiftly to company news and reported financial results by buying or

18  selling stock and driving it to a changed price level").  Akeena filed Forms S-3, including the Form

19  S-3 filed shortly before the start of the Class Period on November 29, 2007, and during the Class

20  Period on January 9, 2008.  Charlesworth Decl., ¶28; *Accredo,* 2006 WL 1716910, at *7 n.4 ("A

21  company's ability to file an S-3 Registration Statement is 'an important factor' because 'eligibility to

22  file the S-3 form is predicated upon the SEC's belief that the market for the company's stock already

23  operates efficiently and that further disclosure is unnecessary, as the market price has already

24  accounted for relevant information.'")  (citing *O'Neil v. Appel*, 165 F.R.D. 479, 502 (W.D. Mich.

25  1995)); *Cammer*, 711 F. Supp. at 1284 (same).

26         The "cause and effect factor" is the "essence of an efficient market and the foundation for the

27  fraud on the market theory."  *Cammer*, 711 F. Supp. at 1287.  Here, there are empirical facts

28  showing a cause-and-effect relationship between unexpected corporate events or financial releases

1   and an immediate response in the stock price.  Ms. Charlesworth performed an "event study" that

2   examines the movement of Akeena's securities in reactions to unexpected news about the Company.

3   Charlesworth Decl., ¶¶31-32; Exs. 3, 5, 15. The event study demonstrates that, in general, large

4   significant changes in the price of Akeena's stock price generally were associated with material, new

5   and unexpected information about the Company.   Charlesworth Decl., ¶¶31-32.   The major

6   significant movements in Akeena's stock price and accompanying news are set out in the

7   Charlesworth Decl., ¶¶31-32.  The statistically significant reaction of the stock prices in reaction to

8   news about the Company indicates that the market was efficient, particularly that "[s]ignificant

9   positive residual returns occurred both when Akeena issued positive new information about its credit

10  line on December 26, 2007 and positive new information about its licensing agreement on January 2,

11  2008, as well as on January 3, 2008, the date of Jesup & Lamont's report opining that both events

12  increased confidence in management's ability to reduce Akeena's investment risk" and when on

13  March 13, 2008, "Akeena reported an earnings disappointment for the fourth quarter and year 2007,

14  and CFO Effren took a conservative position on the 2008 contribution of the Suntech licensing

15  agreement," which "news was accompanied by a significant residual share price decline."

16  Charlesworth Decl., ¶32.

17         Courts have held that a large float percentage (percentage of shares held by the public) can be

18  an indicator of market efficiency.  Charlesworth Decl., ¶33; *Unger v. Amedisys Inc.*, 401 F.3d 316,

19  323 (5th Cir. 2005).  Here, float was estimated at between 71.2% – 73.2% of total outstanding

20  shares, which supports a finding of efficiency.  *Id.*  There was substantial institutional ownership of

21  Akeena stock throughout the Class Period.  Charlesworth Decl., ¶¶38-42.  By March 2008, 40

22  institutional investors reported holding Akeena stock, many of them "household names, international

23  in scope, and clearly sophisticated investors, expending significant resources on security research to

24  benefit their clients and their own accounts ... includ[ing] Citi Investment Research (US); Credit

25  Suisse Securities (USA) LLC; J.P. Morgan Securities, Inc.; Morgan Stanley & Co., Inc.; Putnam

26  Investment Management, L.L.C.; and Vanguard Group, Inc. among others."  Charlesworth Decl.,

27  ¶41. "Those institutional investors which increased their holdings of Akeena shares, purchased 2.3

28  million Akeena shares during the fourth quarter of 2007, and purchased 2.9 million Akeena shares

1   during the first quarter of 2008, which includes most of the Class Period.  Thus, a substantial number

2   of shares changed hands among the institutional investors in the Class Period." *Id.,* ¶40.  Substantial

3   institutional ownership of Akeena's stock during the Class Period supports a finding of market

4   efficiency because it indicates that sophisticated and knowledgeable investors were actively

5   assimilating information about Akeena and trading on that information.  Charlesworth Decl., ¶42.

6        The statistically significant declines in Akeena's stock price following the partial disclosures

7   on "January 8 and 9, 2008, the first accompany[ing] news of a large stock sale by Akeena's CEO,

8   and the second…the date of a negative opinion on Akeena's inventory trends published by

9   RiskMetrics," followed by the "significant residual share price decline" when on at the end of the

10  Class Period on "March 13, 2008, Akeena reported an earnings disappointment for the fourth quarter

11  and year 2007, and CFO Effren took a conservative position on the 2008 contribution of the Suntech

12  licensing agreement," coupled with the "[s]ignificant positive residual returns [that] occurred both

13  when Akeena issued positive new information about its credit line on December 26, 2007 and

14  positive new information about its licensing agreement on January 2, 2008, as well as on January 3,

15  2008, the date of Jesup & Lamont's report opining that both events increased confidence in

16  management's ability to reduce Akeena's investment risk" (Charlesworth Decl., ¶32) establish that

17  the fraud-on-the-market presumption cannot be rebutted for any portion of the Class Period.  *See*

18  *also Infineon*, 266 F.R.D. at 396-97.  While it is true that if the Court later finds, on a complete

19  record following discovery, that sufficient corrective information credibly entered the market and

20  completely dissipated the effects of certain false and misleading statements during the Class Period,

21  persons who traded in the Company's stock after those corrective statements would have no direct or

22  indirect connection with the fraud as to those false statements or omissions, "now is an inappropriate

23  time to consider" any so-called truth-on-the-market evidence intended to "rebut the presumption of

24  reliance in a fraud on the market case." *Amgen*, 2009 WL 2633743, at *14; *see also Infineon*, 266

25  F.R.D. at 396-97 (finding sufficient corrective information had not entered the market to make the

26  fraud-on-the-market presumption of reliance unreasonable); *In re Worldcom, Inc. Sec. Litig.*, 219

27  F.R.D. 267, 307 (S.D.N.Y. 2003) ("[A] class period should not be cut off if questions of fact remain

28  as to whether the disclosures completely cured the market.").

MOTION FOR CLASS CERTIFICATION – No. C-09-02147 JW-PVT          - 21 -

1    Based on the present record before the Court, it is clear the market suddenly became alarmed

2    on January 8, 2008 when it learned that Barry Cinnamon sold more than $5.6+ million in Akeena

3    stock between January 2-7, 2008 *at all-time high prices in Akeena's stock* (¶¶20-21, 73), in the days

4    immediately following the substantial run-up in Akeena's stock price that the Suntech Licensing

5    Agreement announcement caused.  Charlesworth Decl., ¶¶31-32.  Meanwhile, "[m]issing from the

6    financial community's analysis – because defendants concealed them – were the actual terms of the

7    Suntech licensing agreement."  ¶72.  That, coupled with the fact that on January 9, 2008, Akeena

8    registered more than 8 million shares issued in connection with its recent private placements for

9    resale and RiskMetrics Group warned that same day that because Akeena's inventory expressed in

10   days sales ("DSI") had doubled "may result in future margin pressure" and that due to "[d]eclines in

11   warranty liability balances [Akeena] may have benefited earnings in recent quarters," put further

12   downward pressure on Akeena's stock price causing statistically significant stock price declines as

13   Ms. Charlesworth's Event Study demonstrates. *See* Charlesworth Decl., ¶31.  The statistically

14   significant declines in Akeena's stock price following the partial disclosures of these red flags

15   establish that the fraud was not fully revealed before March 13, 2008, and therefore, the Class Period

16   should be December, 26, 2007 to March 13, 2008, inclusive.

17              **2.      A Class Action Is Superior to Other Available Methods for Resolving
                         This Controversy**

18         Rule 23(b)(3) also requires the Court to determine that "a class action is superior to other

19   available methods for fairly and efficiently adjudicating the controversy."  As discussed herein,

20   courts, including this Court, have recognized that the class action device is superior to other

21   available methods for the fair and efficient adjudication of controversies involving a large number of

22   purchasers of securities injured by violations of the securities laws.  Class actions are a particularly

23   appropriate and desirable way of resolving securities fraud claims. *Blackie*, 524 F.2d at 903.

24         To determine the issue of "superiority," Rule 23(b)(3) enumerates the following factors for

25   the court to consider:

26         (A) [T]he class members' interests in individually controlling the prosecution . . . of
           separate actions; (B) the extent and nature of any litigation concerning the
27         controversy already begun by . . . class members; (C) the desirability . . . of

28

MOTION FOR CLASS CERTIFICATION – No. C-09-02147 JW-PVT                           - 22 -

1  concentrating the litigation of the claims in the particular forum; and (D) the likely
2  difficulties in managing a class action.

3  Fed. R. Civ. P. 23(b)(3).

4  A consideration of these factors requires the court to focus on the efficiency and economy

5  elements of the class action so that cases allowed under Rule 23(b)(3) are those that can be

6  adjudicated most profitably on a representative basis.  *Infineon*, 266 F.R.D. at 397.  These factors

7  also weigh in favor of certification.  The number of Class members is far too numerous and the

8  typical claim is too small for each individual class member to maintain a separate action.  *Zinser v.*

9  *Accufix Research Institute, Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) ("Where damages suffered by

10  each putative class member are not large, this factor [Rule 23(b)(3)(A)] weighs in favor of certifying

11  a class action.").

12  The second factor, the extent and nature of any litigation concerning the controversy already

13  commenced by or against members of the class, is intended to serve the purpose of assuring judicial

14  economy and reducing the possibility of multiple lawsuits.  *Id.* at 1191.  Here, there are no other

15  lawsuits pending against Defendants so there is no risk of inconsistent adjudications.

16  The third factor, the desirability or undesirability of concentrating the litigation of the claims

17  in a particular forum, also establishes that a class action in the Northern District of California is

18  superior.  The Company is located in Los Gatos, and this case has been pending in this District for

19  17 months.  Finally, the complexities of class action treatment do not outweigh the benefits of

20  considering common issues in one trial.

21  In short, a class action is the only viable vehicle by which the vast majority of persons

22  injured by Defendants' wrongful conduct can obtain a remedy.  *Infineon*, 266 F.R.D. at 397.

23  ("Where thousands of identical complaints would have to be filed, it is superior to concentrate

24  claims through a class action in a single forum.").  As the Ninth Circuit stated in *Epstein v. MCA,*

25  *Inc.*, "it is difficult to imagine a case where class certification would be more appropriate.  Without

26  it, thousands of identical complaints by former . . . shareholders would have to be filed – the very

27  result the class action mechanism was designed to avoid."  50 F.3d 644, 668 (9th Cir. 1995).

28  The Supreme Court has also endorsed class actions for resolving securities claims:

MOTION FOR CLASS CERTIFICATION – No. C-09-02147 JW-PVT                   - 23 -

1
2
3
4

> The aggregation of individual claims in the context of a classwide suit is an evolutionary response to the existence of injuries unremedied by the regulatory action of government.  Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.

5  *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980).  Here, judicial economy and the best

6  interests of the Class members favor class certification.

7  **V.      CONCLUSION**

8  Based on the foregoing, Plaintiffs respectfully request the Court to certify this action as a

9  class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) and appoint Lead Plaintiffs Sharon Hodges,

10  Joel Gentleman, and David Gordon as Class representatives and Scott+Scott as Class counsel.

11  DATED:  October 22, 2010                         Respectfully submitted,

12                                                            SCOTT+SCOTT LLP

13

14                                                                  /s/ Mary K. Blasy
15                                                            MARY K. BLASY
                                                            ARTHUR L. SHINGLER III (181719)
16                                                            MARY K. BLASY (211262)
                                                            WALTER NOSS (*pro hac vice*)
17                                                            HAL CUNNINGHAM (243048)
                                                            DAVID GOLDBERGER (225869)
18                                                            SCOTT+SCOTT LLP
                                                            707 Broadway, Suite 1000
19                                                            San Diego, CA  92101
                                                            Telephone:  619/233-4565
20                                                            619/233-0508 (fax)
21
                                                            and
22
                                                            DAVID R. SCOTT
23                                                            156 South Main Street
                                                            P.O. Box 192
24                                                            Colchester, CT  06415
                                                            Telephone:  860/537-3818
25                                                            860/537-4432 (fax)

26                                                            Lead Counsel for Lead Plaintiffs

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on October 22, 2010, I caused the foregoing to be electronically filed

3

with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

4

the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused

5

the foregoing document or paper to be mailed via the United States Postal Service to the non-

6

CM/ECF participants indicated on the Manual Notice List.

7

I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on October 22, 2010.

9

10

  /s/ Mary K. Blasy

11

Mary K. Blasy
SCOTT+SCOTT LLP

12

707 Broadway, Suite 1000
San Diego, CA 92101

13

Telephone: 619-233-4565
Fax: 619-233-0508

14

E-mail: mblasy@scott-scott.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28